**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Sa'ud Habib, Beverly Williams, J. Marlene Smith, Kenneth Sliwinski, and Russ Dixon, individually and as representatives of a class of similarly situated persons, and on behalf of the M&T Bank Corporation Retirement Savings Plan, <br><br> Plaintiffs, <br><br> v. <br><br> M&T Bank Corporation, Manufacturers and Traders Trust Company, M&T Bank Employee Benefit Plans Committee, Wilmington Trust Investment Advisors, Wilmington Funds Management Corporation, Wilmington Trust Corporation, Janet Coletti, Michele Trolli, Mark Czarnecki, Stephen Braunscheidel, Brian Hickey, Darren King, Kevin Pearson, Michael Spychala, Brent O. Baird, C. Angela Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Gary N. Geisel, John D. Hawks, Jr., Patrick W.E. Hodgson, Richard G. King, Melinda R. Rich, Robert E. Sadler, Jr., Herbert L. Washington, Robert G. Wilmers, Robert J. Bennett, Michael D. Buckley, Jorge Pereira, Colin E. Doherty, Denis J. Salamon, Newton P.S. Merrill, and John Does 1–20, <br><br> Defendants. | Case No. 1:16-cv-375-FPG <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiffs Sa'ud Habib, Beverly Williams, J. Marlene Smith, Kenneth Sliwinski,

and Russ Dixon ("Plaintiffs"), individually and as representatives of the Class described herein,

and on behalf of the M&T Bank Corporation Retirement Savings Plan (the "Plan"), bring this

action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §

1

1001, *et seq.* ("ERISA"), against the Plan's fiduciaries[1] and against multiple Plan employers[2] who provided services to the Plan and/or profited from the Plan's use of proprietary M&T mutual funds. As described herein, Defendants have breached their fiduciary duties and engaged in unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.     As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), *available at* https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), *available at* http://www.plansponsor.com/2015-

---

[1] The Plan fiduciaries who are the subject of this action are: M&T Bank, the M&T Bank Employee Benefit Plans Committee, its current members (Janet Coletti, Michele Trolli, Mark Czarnecki, Stephen Braunscheidel, Brian Hickey, Darren King, Kevin Pearson, and Michael Spychala), and its former members who served on the committee in 2010 or later years (John Does 1-10) (collectively, the "Committee"); the members of M&T Bank's Board of Directors since 2010 (Brent O. Baird, C. Angela Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Gary N. Geisel, John D. Hawks, Jr., Patrick W.E. Hodgson, Richard G. King, Melinda R. Rich, Robert E. Sadler, Jr., Herbert L. Washington, Robert G. Wilmers, Robert J. Bennett, Michael D. Buckley, Jorge Pereira, Colin E. Doherty, Denis J. Salamone, and Newton P.S. Merrill) (collectively, the "Board"); Wilmington Funds Management Corporation ("WFMC"); Wilmington Trust Investment Advisors ("WTIA"); and all individuals who have been delegated fiduciary tasks or responsibilities by any of the above-named fiduciaries (John Does 11-20) (collectively, the "Fiduciary Defendants").

[2] The Plan employers who are the subject of this action are: Manufacturers and Traders Trust Company ("M&T Bank"); M&T Bank Corporation ("M&T") (parent corporation of M&T Bank), WFMC, WTIA, and Wilmington Trust Corporation ("Wilmington Trust") (collectively, the "Employer Defendants").

Recordkeeping-Survey/. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plans Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

3.     The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *David v. Alphin*, 2008 WL 5244504, at *2 (W.D.N.C. Dec. 15, 2008) (citing *Hughes Aircraft Co. v. Jacobson*, 525, U.S. 432, 439 (1999)). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee. In fact, employers often benefit from retaining high-cost investments in the Plan, because such investments often offer a kickback, known as "revenue sharing," to subsidize the Plan's administrative costs. For financial service companies, the potential for imprudent and disloyal conduct is even greater, because the Plan's fiduciaries are in a position benefit the company through the Plan's investment decisions

by, for example, filling the plan with expensive proprietary investment products that a disinterested fiduciary would not choose.

4.     The real life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. *See* Melanie Hicken, *Your Employer May Cost You $100K in Retirement Savings*, CNN MONEY (Mar. 27, 2013), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees/. Put another way, excess fees can force a worker to work an extra five to six years to make up for the excess fees that were paid. *Id.*

5.     To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

6.     Defendants do not act in the best interest of the Plan and its participants. Instead, Defendants use the Plan as an opportunity to promote the business interests of M&T and its affiliates and subsidiaries at the expense of the Plan and its participants.

7.     In late 2010, eight of the Plan's 23 designated investment alternatives were M&T Bank proprietary mutual funds. These funds were in the Plan despite their relatively high fees compared to comparable funds found in other retirement plans—on average the fees in the M&T-affiliated proprietary funds were approximately 90% higher than similar funds found in similarly-sized defined contribution plans, and these high fees were not justified by the performance of any of these proprietary funds or the services provided by any of the funds.

8.      The Fiduciary Defendants not only failed to remove these imprudent funds as their fiduciary duties required, they went in the opposite direction by greatly expanding the lineup of proprietary mutual funds in the Plan. In approximately May 2011, M&T finalized its purchase of the distressed Wilmington Trust, which had its own family of over-priced mutual funds. *Almost immediately* after taking over Wilmington Bank, the Fiduciary Defendants added six out of Wilmington's nine mutual fund offerings to the Plan without conducting a thorough and impartial investigation of non-M&T alternatives that could have offered lower fees or superior performance.

9.      Over the next five years, despite the relatively high fees and ongoing poor performance of the Wilmington Funds,[3] the Fiduciary Defendants retained these imprudent proprietary investments in the Plan, reluctantly removing a few only because the funds themselves ceased their operations. Fiduciaries have a duty to monitor the investments within a plan and remove those investments that are imprudent. Based upon the investment decisions made by the Plan's fiduciaries, it can be inferred that the Plan did not have a prudent or impartial process for selecting the Plan's investments, or for monitoring the proprietary investments in the Plan. These breaches of the Fiduciary Defendants' fiduciary duties have cost Plan participants tens of millions of dollars in damages in excess fees and investment underperformance.

10.     The imprudence of the Wilmington mutual funds is further demonstrated by comparing the Fiduciary Defendants' conduct to that of non-conflicted fiduciaries. As of the end

---

[3] In 2012, M&T combined the M&T Bank family of mutual funds and the Wilmington family of funds and rebranded them all as the "Wilmington Funds". Therefore, all references to "Wilmington" mutual funds are meant to include both the funds that were originally associated with Wilmington Trust as well as the funds formerly known as M&T Bank Funds, unless otherwise indicated.

of 2013, among the approximately 1,450 defined contribution plans with over $500 million in assets (the Plan had approximately $1.9 billion at this time), not a single plan (other than the Plan) held ANY of the twelve Wilmington mutual funds included in the Plan as designated investment alternatives.

11.     In the instances where the Fiduciary Defendants did not use proprietary funds, the Plan's fiduciaries still failed to exercise basic duties of prudence and loyalty as required by law. For example, much of the Plan's assets are held in T. Rowe Price mutual funds ($700 million as of the end of 2015).[4] T. Rowe Price offers *identical* versions of these same funds as "collective trusts" or "separate accounts" that are much less expensive. Collective trusts and separate accounts are similar to mutual funds but are only offered to large institutional investors like 401(k) plans. By allowing fiduciaries to leverage the negotiating power of the Plan, and by taking advantage of the economies of scale a large plan can help achieve, separate accounts and collective trusts can significantly reduce costs for large, institutional investors such as the Plan. The Fiduciary Defendants have no excuse for failing to investigate the use of such collective trusts or separate accounts. But the Fiduciary Defendants do have an impermissible purpose: the higher-cost T. Rowe Price mutual funds in the Plan offered greater "revenue sharing" payments than the less expensive vehicles. In other words, the Fiduciary Defendants, by retaining costlier T. Rowe Price mutual funds, where identical and less expensive collective trust or separate account options were available (which the Fiduciary Defendants would have been aware of had they conducted an adequate investigation of alternatives to the Plan's investments), reduced

---

[4] T. Rowe Price also performed all of the Plan's recordkeeping and custodial services.

M&T Bank's *own costs* in administering the Plan while increasing Plan *participants*' costs in an amount that was significantly greater than M&T Bank's cost savings.

12.     As a second example, on multiple occasions the Fiduciary Defendants invested Plan assets in higher-priced share classes of mutual funds offered by third-party fund families, even though less expensive share classes were available for the exact same investments. For example, the Plan offered the Admin share class of the PIMCO Total Return fund, rather than Institutional shares of the same fund up until June 2013, despite the fact that Admin shares were over 50% more expensive than the Institutional shares. Similarly, the Plan offered Investor shares of the Harbor International Fund for several years, rather than Institutional shares that were also available, despite the fact that the Investor shares were roughly 45% more expensive. The Plan also offered the Retirement class of shares of the TIAA CREF Mid Cap Value Fund for the entirety of this fund's time in the Plan, despite the fact that the Retirement shares were 55% more expensive than Institutional shares of the exact same mutual fund that the Plan could have chosen if the Fiduciary Defendants had investigated other available share classes. Multiple courts have held that the failure to investigate the availability of a less expensive class of shares available is a breach of fiduciary duty, because a prudent investor would never knowingly select a more expensive investment where a cheaper version of the exact same investment is available. *See Tibble v. Edison Int'l*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Braden v. Wal-Mart Stores*, 588 F.3d 585, 595-96 & n.5 (8th Cir. 2009); *Kruger v. Novant Health*, 131 F. Supp. 3d 470, 476-78 (M.D.N.C. Sept. 17, 2015); *Krueger v. Ameriprise Financial, Inc.*, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012); *Gipson v. Wells Fargo & Co.*, 2009 WL 702004, at *5-6 (D. Minn. Mar. 13, 2009). The Fiduciary

Defendants' improper inclusion and retention of more expensive share classes cost Plan participants millions of dollars in excess costs for no good reason.

13.     These imprudent processes and subsequent investment decisions were not the result of mere negligence or oversight. To the contrary, the Fiduciary Defendants consistently included proprietary M&T-affiliated mutual funds in the Plan, and failed to monitor their performance and expenses (or investigate alternatives to the M&T-affiliated mutual funds), because M&T earned millions of dollars in investment management fees by retaining proprietary investments in the Plan. Similarly, M&T utilized high-cost investments, even where less expensive versions of the same investments were available, because the higher-cost options made revenue sharing payments to the Plan, thereby reducing M&T's costs for running the Plan. By managing the Plan in this fashion, the Fiduciary Defendants have breached their duty of loyalty, as well as their duty of prudence, in violation of 29 U.S.C. § 1104. Additionally, the Employer Defendants knowingly participated in these fiduciary breaches by providing services to the Plan through the proprietary M&T-affiliated mutual funds and receiving compensation traceable to Plan assets, and therefore are liable to disgorge all profits they received from the Plan's investments in proprietary mutual funds.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), failure to monitor fiduciaries (Count Two), and equitable restitution of ill-gotten proceeds (Count Three).

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of

the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

16.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

17.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

18.     Plaintiff Sa'ud Habib resides in Alexandria, Virginia, and was a participant in the Plan until 2011, when his account balance was distributed from the Plan. Habib is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Habib was invested in three different funds offered within the Plan within six years of the filing of this action. Habib has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

19.     Plaintiff Beverly Williams resides in Clarence, New York, and is a current participant in the Plan. Williams is or has invested in ten of the Plan's designated investment alternatives between April 2010 and the present, including five that are or were managed by M&T Bank (Wilmington Stable Value Fund, Wilmington Large Cap Value Fund, Wilmington Mid Cap Value Fund, Wilmington Broad Market Bond Fund, and Wilmington Intermediate Term Bond Fund). Williams also was invested in Administrative shares of the PIMCO Total

Return Fund before the Plan switched to Institutional shares of the fund in June 2013. Williams has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Furthermore, the Employer Defendants have been unjustly enriched from the various fees and expenses generated as a result of Williams' Plan investments. These entities would not have been enriched had the Plan been managed in compliance with ERISA.

20.     Plaintiff J. Marlene Smith resides in Harrisburg, Pennsylvania, and was a participant in the Plan until October 2013, when her account balance was distributed from the Plan. Smith is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not violated ERISA as described herein. Smith was invested in eight of the Plan's designated investment alternatives between April 2010 and March 2012, including one that was managed by M&T Bank (the Wilmington Mid Cap Growth Fund). Smith has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Furthermore, the Employer Defendants have been unjustly enriched from the various fees and expenses generated as a result of Smith's Plan investments. These entities would not have been enriched had the Plan been managed in compliance with ERISA.

21.     Plaintiff Kenneth Sliwinski resides in North Tonawanda, New York, and was a participant in the Plan until September 2012, when his account balance was distributed from the Plan. Sliwinski is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Sliwinski was invested in five of the Plan's designated investment alternatives between

April 2010 and September 2012, four of which were T. Rowe Price mutual funds. Sliwinski has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

22.     Plaintiff Russ Dixon resides in Cheektowaga, New York, and was a participant in the Plan until December 2010, when his account balance was withdrawn from the Plan. Dixon is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Dixon was invested in seven of the Plan's designated investment alternatives between April 2010 and December 2010, including four proprietary M&T mutual funds (M&T Prime Money Market Fund, M&T US Government Bond Fund, Wilmington Large Cap Value, and Wilmington Mid Cap Growth), and Investor shares of the Harbor International Fund. Dixon has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Furthermore, the Employer Defendants have been unjustly enriched from the various fees and expenses generated as a result of Dixon's Plan investments. These entities would not have been enriched had the Plan been managed in compliance with ERISA.

### THE PLAN

23.     The Plan was established in 1986, restated in 2011, and restated again in 2016.

24.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

25.     The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

26.     The Plan covers all eligible employees of M&T and its subsidiaries within the

United States.

27.     The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis. The employer often matches those contributions up to a certain percentage of the compensation contributed by the employee each pay period. Within the Plan, employees may defer anywhere from 1% to 50% of their compensation each pay period on a pre-tax basis (subject to annual contribution limits), and the Plan employer offers additional contributions equal to 75% of the employee's contribution, capped at 4.5% of the employee's compensation that pay period.

28.     The Plan is governed by several documents. First, the Plan Document governs the overall operation of the Plan. Second, the Investment Policy Statement ("IPS"), adopted on March 10, 2008 by the Committee, governs the selection, monitoring, retention, and removal of designated investment alternatives from the Plan. Specifically, the IPS "[d]efines the Plan's investment objectives[,] [d]efines the roles of those responsible for the Plan's investments[,] [d]escribes the criteria and procedures for selecting investment options and investment managers[,] [e]stablishes investment procedures, measurement standards and monitoring procedures[,] and [d]escribes ways to address investment options and investment managers that fail to satisfy established objectives." IPS § 2. Third, the Trust Agreement is an agreement between the Plan's trustee, sponsor, and administrator. As a practical matter, the Trust Agreement designates the parties who have actual authority to dictate or alter the Plan's designated investment alternatives on behalf of the Plan, and outlines the procedures by which the Plan's assets are to be managed. The Trust Agreement is incorporated into the Plan by reference. Plan Document § 2.57. Fourth, at some point prior to the 2016 restatement of the Plan, the Committee enacted a Charter outlining the processes and procedures by which the

Committee will administer the Plan.

29.     Participants in a defined-contribution plan are limited in their investment choices to a lineup of options offered by the Plan. Investment Company Institute, A Close Look at 401(k) Plans, at 9 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study"). As a result, the lineup of investments that is determined by the Plan's fiduciaries is critical to participants' investment results and ultimately the retirement benefits they receive.

**DEFENDANTS**

*M&T Bank*

30.     M&T Bank is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and is a participating employer in the Plan. M&T Bank provides the funding for the Plan. M&T Bank is headquartered in Buffalo, New York. Pursuant to Section IV.1 of the IPS, M&T Bank selects the Plan's trustee, hires the Plan's recordkeeper, hires any investment advisory consultants to the Plan, and appoints members of the Committee. To the extent that these representations in the IPS are accurate, M&T Bank exercises discretionary authority or discretionary control respecting management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

31.     M&T Bank directly owns WTIA, and therefore receives revenues from the Plan in the form of the fees that WTIA is paid from Plan assets for acting as investment sub-advisor to the Wilmington mutual funds within the Plan. As the sponsor of the Plan, and a participating employer in the Plan, M&T Bank is a "party in interest" under 29 U.S.C. § 1002(14). Every member of the Committee is an officer of M&T Bank. Further, many M&T Bank employees

13

have dual roles whereby they also work with WTC, WFMC, and WTIA. For example, Defendant Czarnecki is President and COO of M&T and M&T Bank, but has served simultaneously as the President of Wilmington Trust, WTIA, and WFMC. Given the interconnected nature of M&T Bank and its affiliates, M&T Bank had actual and constructive knowledge of the conduct of the other Fiduciary Defendants and of their breaches of fiduciary duties. As a result, regardless of whether M&T Bank is a fiduciary, M&T Bank is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments made in breach of other Defendants' fiduciary duties.

***The Committee***

32.     The Committee is identified in the Plan document and the Plan's financial statements as the Administrator of the Plan and a fiduciary of the Plan. As a result, the Benefits Committee is a fiduciary by virtue of its administrative position, *see* 29 C.F.R. § 2509.75-8 at D-3, and is also a named fiduciary pursuant to 29 U.S.C. § 1102(a).

33.     Pursuant to the Plan Document, the Committee appoints investment managers, hires the Plan's trustee, selects the Plan's recordkeeper, and is responsible for selecting and removing designated investment alternatives within the Plan. Plan Document §§ 9.1, 910. To the extent these representations in the Plan Document are accurate, by virtue of the functions it performs and the authority possesses, the Committee possesses discretionary authority and responsibility with respect to the administration of the Plan, possesses discretionary authority and control respecting management of the Plan, and exercises authority or control respecting management or disposition of Plan assets. The Committee is therefore a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A).

34.     The Committee at all relevant times has had a strong financial incentive to

advance M&T's financial interests. Six of the eight individual Committee member Defendants are among the thirteen "principal officers" of M&T identified in its 2015 Dodd-Frank Resolution Plan, and thus their job duties relate directly to promoting the financial interests of M&T. M&T Bank Corporation 2015 Resolution Plan at 9 (Dec. 31, 2015), *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/mt-bk-3g-20151231.pdf.  Seven of the eight Committee Defendants are M&T insiders who own more than $1 million worth of M&T stock, and therefore advancing M&T's financial interests was in the personal financial interests of the Committee Defendants. Defendant Czarnecki's conflicts have been particularly acute, in that he was serving as president of Wilmington Trust, WTIA, and WFMC at the same time that the Committee decided to add and subsequently retain numerous Wilmington mutual funds (which were all managed by WFMC and WTIA).

*WTIA*

35.     Defendant WTIA, previously known as MTB Investment Advisors Inc., is a subsidiary of M&T Bank (which itself is a subsidiary of M&T) and a Plan employer. According to annual Department of Labor filings by the Plan, WTIA "provid[es] recommendations related to the investment alternatives offered by the Plan."  Because WTIA has recommended that the Plan invest in Wilmington mutual funds, and WTIA receives advisory fees as the investment advisor for all Wilmington Funds, WTIA "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of [the Plan]," and is therefore a functional fiduciary under 29 U.S.C. § 1002(21)(A).

36.     According to the same Department of Labor filings, WTIA also "provides advisory services for Plan investments in the Wilmington Funds."  For example, as the investment sub-advisor for the Wilmington Funds, WTIA has discretion to select the specific

15

investment holdings of each mutual fund in which the Plan is invested.  While the Wilmington Mid Cap Growth fund might have been required to invest in mid-cap growth stocks, WTIA had the discretion to select which of the 500 or so companies to invest in within that universe.  WTIA also had the authority to weight the portfolio towards particular industries, such as technology or health care.[5]  Or, in Wilmington Funds that hired sub-advisory firms to select individual securities, such as the Wilmington Multi-Manager International Fund, WTIA serves as the investment sub-advisor responsible for selecting those managers, monitoring their performance, and removing them, if necessary. Both functions directly affect the returns realized by the Plan. WTIA further makes recommendations to the Wilmington Funds' trustees regarding overall investment strategies and management of the mutual funds in which Plan assets were invested, including setting benchmarks and closing and merging funds. At all relevant times, WTIA has received compensation from Plan assets invested in Wilmington Funds as payment for its services. By virtue of these various powers and duties, WTIA "exercises any authority or control respecting management or disposition of [Plan] assets" and "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of [the Plan]." WTIA is therefore a functional fiduciary under 29 U.S.C. § 1002(21)(A).

37.     WTIA possesses any actual or constructive knowledge possessed by M&T Bank, WFMC, and Wilmington Trust, in addition to the knowledge obtained through its own actions and responsibilities in providing investment recommendations regarding the investment

---

[5]*See* WILMINGTON FUNDS, *President's Message and Annual Report* (Apr. 30, 2016), *available at* https://www.sec.gov/Archives/edgar/data/830744/000119312516642593/d213452dncsr.htm (explaining that WTIA is responsible for allocating assets among the different investments held by each Wilmington mutual fund based on its opinion on how best to achieve the fund's objectives).

alternatives held by the Plan. As disclosed in WTIA's Form ADV registration filed with the Securities and Exchange Commission (SEC), "Employees of WTIA may be designated as dual officers of other affiliates of M&T Bank, and, as dual officers, and/or employees, such individuals will perform duties for multiple organizations." Wilmington Trust Investment Advisors 2016 Form ADV, Part II, at 20 (March 31, 2016), *available at* http://www.wilmingtontrust.com/repositories/landingpages/WTIA_site/communications/WTIA_ ADV_Part2_03_31_16.pdf. Further, "WTIA engages M&T Bank affiliates to provide services in areas such as operations, technology, information systems, data security, human resources, risk management, regulatory compliance and legal advice." *Id.* at 21. Given the interconnected nature of WTIA and other M&T subsidiaries, WTIA had actual and constructive knowledge of the conduct of the other Fiduciary Defendants and of their breaches of fiduciary duties. As a result, regardless of whether WTIA is a fiduciary, M&T Bank is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Fiduciary Defendants' breaches of their fiduciary duties.

***The Board***

38.     The Board Defendants include all individuals who have served on the M&T Bank Board of Directors between 2010 and the present. Under the terms of the Plan, the Board had the authority, prior to January 1, 2016, to appoint and remove persons from the Committee. Plan Document § 9.1(c). It is well-accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). 29 C.F.R. § 2509.75-8 (D-4); *Liss v. Smith*, 991 F. Supp. 278, 310-11 (S.D.N.Y. 1998); *Coyne & Delany Co.*

17

*v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status.").

39.     The responsibility for appointing and removing members of the Committee carried with it an accompanying duty to monitor the appointed fiduciaries, to ensure that they were complying with the terms of the Plan and ERISA's statutory standards. *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005); 29 C.F.R. § 2509.75-8 (FR-17). Furthermore, that monitoring duty carried with it a responsibility "to take action upon discovery that the appointed fiduciaries [were] not performing properly." *Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998). Defendant Czarnecki was both a member of M&T Bank's Board of Directors and a member of the Committee; the Board therefore had sufficient actual or constructive knowledge to determine that the other Fiduciary Defendants were acting in breach of their fiduciary duties.

### WFMC

40.     WFMC is directly owned by Wilmington Trust, and both companies are subsidiaries of parent company M&T. WFMC is a participating employer in the Plan. At all relevant times, WFMC has served as the investment advisor for all Wilmington Funds held within the Plan. As investment advisor, WFMC has discretion to allocate Plan assets invested in Wilmington Funds among different individual securities based on its opinion on how best to achieve each fund's investment objectives. WFMC is also responsible for selecting investment sub-advisors for each of the Wilmington Funds who then select the individual securities that will be held by the fund and then manage the fund's portfolio of securities. WFMC further makes recommendations to the Wilmington Funds' trustees regarding overall investment strategies and management of the funds, including setting benchmarks and closing and merging funds. WFMC

18

collects fees on a daily basis from the Wilmington Funds for its services, and thus WFMC receives fees directly from the Plan assets invested in Wilmington mutual funds. Under 29 U.S.C. § 1002(21)(A), WFMC is a fiduciary to the Plan because it "exercises any authority or control respecting management or disposition of [Plan] assets" and "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of [the Plan]."

41.     Several of WFMC's employees are designated as dual officers of WTIA and WFMC. Further, portfolio managers within WFMC "may be designated as dual officers or employees of [Wilmington Trust] … and/or M&T Bank." Wilmington Funds Management Corporation 2016 Form ADV, Part IIA, at 16 (Mar. 31, 2016), *available at* http://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=378958. For example, Defendant Czarnecki served as President of WFMC within the statutory period at the same time that he was serving on the Board and on the Committee. WFMC therefore had knowledge that the selection and retention of Wilmington mutual funds within the Plan constituted a breach of the other Fiduciary Defendants' fiduciary duties, and is therefore subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Fiduciary Defendants' breaches of their fiduciary duties.

42.     M&T Bank, the Committee, WTIA, the Board, and WFMC possessed the authority to delegate their fiduciary responsibilities to any other person or persons. Plan Document §§ 9.1(e), 9.2. Any individual or entity to whom these Defendants delegated any of their fiduciary functions or responsibilities are also fiduciaries of the Plan pursuant to 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because the individuals and/or entities that have been delegated

fiduciary responsibilities are not currently known to Plaintiffs, they are collectively named as John Does 11–20.

43.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

***M&T***

44.     M&T, the holding company that owns M&T Bank, is a Plan employer and a party in interest by virtue of its receiving fees earned by its subsidiaries in connection with the management or administration of the Plan. All eight members of the Committee are officers of M&T. Defendant Czarnecki is a member of M&T's Board in addition to serving on the Committee. Because of the role its officers played in managing the Plan and the Plan's investment options, M&T had actual and constructive knowledge that the profits it earned from the activities of WTIA, WFMC, M&T Bank, and Wilmington Trust in connection with the Plan stemmed from fiduciary breaches by the Fiduciary Defendants. Therefore, M&T is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from the Fiduciary Defendants' breaches of their fiduciary duties.

***Wilmington Trust***

45.     Wilmington Trust is a financial services holding company that directly owns Wilmington Trust Company, Wilmington Trust, N.A., and WFMC. Defendant Czarnecki is the President and CEO of Wilmington Trust. Wilmington Trust has profited from the Plan's

retention of mutual funds within the Wilmington Funds family, and more specifically, the payments made from Plan assets to Wilmington Trust's subsidiary, WFMC. Given the interconnected nature of M&T's operations and the role of Wilmington Trust's CEO, Defendant Czarnecki, in managing the Plan, Wilmington Trust had actual and constructive knowledge that the revenues it was receiving from Plan assets were the product of fiduciary breaches by the Fiduciary Defendants. Wilmington Trust is therefore subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from the Fiduciary Defendants' breaches of their fiduciary duties.

## ERISA FIDUCIARY DUTIES

46.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
> (i)     Providing benefits to participants and their beneficiaries; and
>
> (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

47.     "The fiduciary obligations of the [plan's fiduciaries] to the participants and beneficiaries of an ERISA plan are those of trustees of an express trust—the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan*, 680 F.2d at 272 n.8 (2d Cir. 1982)).

**DUTY OF LOYALTY**

48.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *accord Hudson v. Gen. Dynamics Corp.*, 118 F. Supp. 2d 226, 249 (D. Conn. 2000) ("[P]ursuant to a fiduciary's duty of loyalty, **all decisions** regarding an ERISA plan 'must be made with an eye single to the interests of participants and beneficiaries.'") (quoting *Bierwirth*, 680 F.2d at 271) (emphasis added). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added); *accord In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

49.     While ERISA does not prohibit an employer's corporate officers from serving as plan fiduciaries—basically wearing two hats—it does require that the officer "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. In administering an ERISA plan, corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the

complete loyalty to participants demanded of them as trustees of the pension plan." *Donovan*, 680 F.2d at 271. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

50.     "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in intensive and scrupulous independent investigation of their options to insure that they act in the best interests of plan beneficiaries.'" *Howard v. Shay*, 100 F.3d 1484, 1488–89 (9th Cir. 1996) (quoting *Leigh v. Engle*, 727 F.2d 133, 125–26 (7th Cir. 1984)).

## DUTY OF PRUDENCE

51.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, 2011 WL 1226459, at *4

(S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

52.     Failing to closely monitor and subsequently minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting and retaining higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Braden*, 588 F.3d at 596.  The law requires "investigation" and "deliberation" by the fiduciaries regarding the soundness of each investment, and where a fiduciary may be ill-equipped to judge the soundness of an investment, the law requires a fiduciary "to seek outside assistance." *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).

### SOURCE AND CONSTRUCTION OF DUTIES

53.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.; accord La Scala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (explaining that the duty of prudence "is measured according to the objective prudent person standard developed in the common law of trusts"). In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

54.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, **this emphasis reflects the availability and continuing emergence of modern investment products**, not only with significantly varied characteristics but also **with similar products being offered with significantly differing costs**. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasis added). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

## CO-FIDUCIARY LIABILITY

55.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

56.     In a defined-contribution plan, fiduciaries are obligated to assemble a diversified menu of designated investment alternatives. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants and beneficiaries may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

57.     Each investment alternative within a defined-contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—in which multiple investors' money is pooled together to purchase a diversified portfolio of securities. ICI Study at 7. Each pooled investment product generally offers investors exposure to a particular asset class or sub-asset class. Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

58.     The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate. Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 day and 30 years), and the

26

default risk associated with the particular borrower. Equity, or stock, investments, obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company. Pooled investment products investing in equities are generally defined by three characteristics: (1) where the investment managers invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks, value stocks, and companies in between). Balanced funds are a type of mutual fund that invests in a mix of stocks and bonds. Target-date funds assemble a broad portfolio of investments from different asset classes (generally by investing in a portfolio of pooled investment products using what is known as a "fund-of-funds" model) at a risk level that declines over time as the targeted retirement date approaches.

59. Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in a set of frequent transactions. For example, within Wilmington mutual funds, WFMC is paid an annual asset management fee as the funds' investment advisor that accrues and is paid daily. WFMC then pays WTIA for the sub-advisory services WTIA provides to the funds.

60. Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483,

493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

MINIMIZATION OF PLAN EXPENSES

61.     At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[6] to 50 bps [within

---

[6] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of

a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

62.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. Investment Company Institute & Deloitte Consulting LLP, Inside the Structure of Defined Contribution/401(k) Plan Fees, at 17 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study"). The administrative and investment functions are separated within a defined contribution plan. Administrative services are performed by the plan's service providers (such as the recordkeeper, trustee, auditors, attorneys, or consultants), and recordkeeping is generally the largest administrative expense. Because of this separation of services, the investments within a defined-contribution plan are not responsible for performing any administrative services such as recordkeeping, investor education, or customer service. The only service performed by the plan's investment products is managing the plan's investments. Administrative expenses can be either paid by the plan sponsor or by the plan. Investment management expenses are the fees charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

---

the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Nov. 11, 2015).

63.     Administrative expenses (e.g., recordkeeping, trustee and custodial services, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula. Though revenue sharing arrangements do not necessarily constitute breaches of fiduciary duties, plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed plans." U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

64.     Fiduciaries exercising control over administration of the plan and the selection and monitoring of designated investment alternatives can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally result in lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be

able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.33% for plans with over $1 billion in assets. ICI Study at 41.

65.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

## MANAGEMENT OF THE PLAN'S INVESTMENT OPTIONS

66.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan.

67.     The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among available investments. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001). Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years). For all of these reasons, prudent fiduciaries will limit their investment menus

to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

68.     The second critical insight provided by academic and financial industry literature is that in evaluating prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

69.     While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and

concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). Any sustainable ability to beat the market that managers might demonstrate is typically dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PLAN

**I. DEFENDANTS ADDED SEVEN PROPRIETARY M&T-AFFILIATED INVESTMENTS TO THE PLAN IN 2011 IN VIOLATION OF THEIR FIDUCIARY DUTIES**

70.    As of the end of 2014, defined contribution plans in the United States held $6.8 trillion in assets. Investment Company Institute, *2015 Investment Company Fact Book* (2015), *available at* http://www.icifactbook.org/fb_ch7.html. This has created a large marketplace for retirement plan services that is well-established and highly competitive. Billion dollar plans such

as the Plan[7] wield tremendous bargaining power and can obtain high-quality investment management and administrative services at very low costs.

71.    In 2010, the Plan had approximately $1.1 billion in assets, and offered participants twenty-three designated investment alternatives, eight of which were mutual funds form M&T Bank's proprietary MTB Group of Funds.

72.    In May 2011, M&T Bank finalized its purchase of Wilmington Trust, a Delaware bank that had its own family of mutual funds, the Wilmington Funds. Four months later, the Wilmington Trust defined-contribution plan was merged into the Plan.

73.    Before the merger, Wilmington's plan had over $200 million in assets, and consisted of 24 designated investment alternatives that included Wilmington stock, the Wilmington Stable Value Fund, a non-proprietary stable value fund, six Wilmington mutual funds, three non-proprietary separate accounts, and twelve non-proprietary mutual funds from fund families such as Vanguard, Fidelity, and American Funds.

74.    When one defined-contribution plan is merged into a larger plan, standard practice is to "map" the investments from the old plan into the closest analogue within the new plan. Jeanne Sahadi, *Mind Your 401(k) in M&A*, CNN MONEY (Oct. 26, 2000), *available at* http://money.cnn.com/2000/10/26/strategies/q_retire_401kmerger/. For example, a participant invested in a large-company growth mutual fund in the old plan will have that money transferred into a large company growth fund within the new plan, or the closest thing to it. It is quite rare for the investments within a plan being merged to simply transfer over to the new plan.

---

[7] The Plan had approximately $1.83 billion in assets as of the end of 2015.

75.     The Fiduciary Defendants did not follow standard practice when mapping the Wilmington Trust plan into the Plan. Instead, they designed the merger to maximize the financial benefit received by M&T. The Fiduciary Defendants got rid of all non-proprietary investment options that had been held by the Wilmington plan, yet added the Wilmington Stable Value Fund and the six Wilmington mutual funds to the Plan (and all of the assets held by those funds), to maximize the amount of Plan assets held within proprietary M&T investments. The Committee and WTIA had substantial conflicts of interest that loomed large over the Plan merger process, as the Committee members were M&T Bank officers and M&T shareholders with financial incentives to retain assets in M&T's newly-acquired funds, and WTIA was presented with additional fee generating opportunities through its new advisor relationship with the newly-acquired funds.

76.     Before adding the seven proprietary Wilmington investments to the Plan in 2011, the Fiduciary Defendants were obligated to conduct a thorough investigation of each fund, and only add it to the Plan if the addition of each fund was prudent and in the best interest of the Plan's participants. According to the Plan's Investment Policy Statement, the funds should not have been added unless their "[f]ees [we]re competitive compared to similar investments." IPS § VI.5. Furthermore, the Fiduciary Defendants should have reviewed each fund's one-, three-, five-, and ten-year average rates of return, *see* IPS § VI.1-2, to ensure that the costs imposed by each of these actively-managed mutual funds could be "justified by realistically evaluated return expectations." Restatement(Third) of Trusts § 90 cmt. h(2).

77.     The Fiduciary Defendants must not have conducted such an investigation, or if they did, the investigation must have given preferential treatment to the Wilmington mutual funds with the goal of furthering the financial interests of M&T, because a prudent and impartial

36

investigation of all proprietary Wilmington investments would have revealed that their expenses were above average compared to many alternatives within the marketplace that also had a superior performance history. A reasonable fiduciary would have conducted such an investigation as part of the Plan merger process, which likely would have led to the exclusion of Wilmington's mutual funds from the merged Plan. Instead, the Fiduciary Defendants selectively retained the Wilmington investments without conducting a prudent investigation of unaffiliated investment options based on their own interests without any consideration of the best interests of Plan participants.

## II.      DEFENDANTS RETAINED HIGH-COST AND POORLY PERFORMING PROPRIETARY MUTUAL FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS

78.      The Plan has retained several actively-managed proprietary funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent and were likely to perform poorly in the future.

79.      The fact that these funds were imprudent investment options is not merely evident with the benefit of hindsight. Rather, it should have been evident from the information available to Defendants as fiduciaries and investment professionals that these funds were imprudent and inappropriate for a large institutional investor like the Plan, given readily apparent alternatives. The fact that Defendants retained these funds in spite of this contemporaneously-available evidence of superior alternatives further demonstrates that the process by which the Plan was managed was deeply flawed.

80.     In 2009, in plans with over $1 billion in assets, the average expense ratio for domestic equity funds was 0.56%; for international equity funds it was 0.77%; and for domestic bond funds it was 0.38%. ICI Study at 46.

81.     The expense ratios for the actively-managed proprietary funds within the Plan were significantly higher. The proprietary M&T Bank funds held in the Plan in 2010 had significantly higher expenses than they should have, given the size of the Plan. The MTB Large-Cap Growth, MTB Large-Cap Value, MTB Mid-Cap Growth, and MTB Small-Cap Growth funds (the four proprietary domestic equity funds in the Plan at that time) had expense ratios of 1.10%, 0.99%, 0.96%, and 1.17%, respectively, all significantly higher than the average of 0.56%. Similarly, the MTB Intermediate Bond and MTB US Government Bond funds (the two proprietary domestic bond funds in the Plan) had expense ratios of 0.63% and 0.81%, respectively, significantly in excess of the average expense ratio of 0.38% for domestic bond funds among similarly-sized plans. Finally, the MTB International Equity fund, the sole proprietary international equity fund in the Plan, had an expense ratio of 1.32%, over 70% more expensive than the category average of 0.77%.  While Plan participants would not have been aware of these facts or the comparatively high fees of the M&T Bank mutual funds, the Fiduciary Defendants, tasked with conducting an adequate investigation of available investments on the marketplace, should have been aware of the excessiveness of the fees associated with M&T Bank by virtue of such an investigation.

82.     This gap between the expenses charged by the average fund and the expenses charged by the Wilmington proprietary funds[8] grew larger as the proprietary funds became more expensive while mutual fund expenses industry-wide dropped significantly. For example, in 2012, for plans with over $1 billion in assets, the average domestic equity fund had an expense ratio of 0.48%. The average domestic bond fund charged 0.35%. The average international equity fund charged 0.64%. The average balanced fund charged 0.35%. And miscellaneous funds that fell outside traditional categories charged 0.72% on average. ICI Study at 45.

83.     Yet, as of the end of 2012, all but one of the twelve Wilmington mutual funds in the Plan were more expensive than the average comparable fund found in other similarly-sized plans.[9] The four proprietary domestic equity funds (the Wilmington Large Cap Growth, Wilmington Large Cap Value, Wilmington Mid Cap Growth, and Wilmington Small Cap Growth funds) had expense ratios of 1.04%, 1.04%, 1.08% and 1.25%, respectively, all more than double the category average of 0.48%. The Wilmington Multi-Manager International fund had a 1.41% expense ratio, also more than double the 0.64% average for international equity funds. The Wilmington Broad Market Bond, Wilmington Intermediate-Term Bond, and Wilmington Short-Term Corporate Bond funds had expense ratios of 0.65%, 0.60%, and 0.61%, respectively, significantly higher than the 0.35% category average for domestic bond funds. The Wilmington Strategic Allocation Aggressive and the Wilmington Strategic Allocation Conservative funds had expense ratios of 1.41% and 1.24% respectively, *three to four times*

---

[8] M&T's and Wilmington's mutual fund families were combined in 2012 and rebranded as Wilmington Funds. *See supra* ¶ 9 n.3.

[9] The Wilmington Small-Cap Strategy Fund uses a modified indexing approach, whereby the fund tracks a custom index weighted to favor either growth or value stocks. Because there is no stock selection and associated research costs, the fund's costs are limited. In 2012, the fund's net expense ratio was 0.31%.

*higher* than the 0.35% average for balanced funds in similarly-sized plans. Finally, the Wilmington Multi-Manager Real Asset fund had a 1.12% expense ratio, compared with the 0.72% average for non-traditional or miscellaneous mutual funds.

84.     The above comparisons actually understate the excessiveness of the investment management fees paid by the Plan's participants. The fees in the Plan were many times higher than the fees in comparable mutual funds which many similar plans offer. The chart below compares each proprietary fund in the Plan to a comparable passively-managed and actively-managed alternative in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives, as each alternative fund is more widely-used by plans similar in size to the Plan than the Wilmington fund held by the Plan. As shown by the chart below, the fees for funds within the Plan at the end of 2012 were ***693% to 2250% higher*** than passive index fund alternatives in the same investment style, and ***54% to 1500% higher*** than lower-cost actively managed funds in the same investment style (and that offered comparable or superior investment management services):

| Fund in Plan | 2012 Expense Ratio | Passive/Active Lower Cost Alternative[10] | 2012 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Mid Cap Growth (ARMEX) | 108 bps | Vanguard Mid-Cap Growth Index Adm (VMGMX)<br><br>T. Rowe Price Institutional Mid-Cap Growth (PMEGX) | 10 bps<br><br>63 bps | Mid Cap Growth | 980%<br><br>71% |

---

[10]   Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). The listed expense figures are taken from the most recent summary prospectus as of January 2013.

| Fund in Plan | 2012 Expense Ratio | Passive/Active Lower Cost Alternative[10] | 2012 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Large Cap Growth (MLGIX) | 104 bps | TIAA-CREF Large-Cap Growth Index (TILIX)<br><br>American Funds Growth Fund of America R6 (RGAGX) | 8 bps<br><br>34 bps | Large Cap Growth | 1200%<br><br>206% |
| Wilmington Large Cap Value (MLCVX) | 104 bps | TIAA-CREF Large-Cap Value Index (TILVX)<br><br>American Funds American Mutual Fund R6 (RMFGX) | 8 bps<br><br>32 bps | Large Cap Value | 1200%<br><br>225% |
| Wilmington Short-Term Corporate Bond (MVSTX) | 64 bps | Vanguard Short-Term Bond Index Fund (VSBSX)<br><br>Vanguard Short-Term Investment Grade I (VFSIX)[11] | 7 bps<br><br>7 bps | Short-Term Bond | 814%<br><br>814% |
| Wilmington Strategic Allocation Conservative (WCAIX) | 119 bps | Vanguard LifeStrategy Conservative Growth Fund (VSCGX)<br><br>Vanguard Wellesley Income Adm (VWIAX) | 15 bps<br><br>18 bps | Conservative Allocation | 693%<br><br>561% |

---

[11] Though Vanguard is perhaps best-known for its index funds, Vanguard offers actively-managed funds as well. Three actively-managed funds from Vanguard have been included within this chart, along with actively-managed funds from institutional money managers American Funds, T. Rowe Price, Metropolitan West, and Dodge & Cox.

| Fund in Plan | 2012 Expense Ratio | Passive/Active Lower Cost Alternative[10] | 2012 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Strategic Allocation Aggressive (WAAIX) | 141 bps | Vanguard LifeStrategy Growth (VASGX)<br><br>American Funds Capital Income Builder R6 (RIRGX) | 17 bps<br><br>32 bps | Aggressive Allocation | 729%<br><br>341% |
| Wilmington Intermediate-Term Bond (ARIFX) | 60 bps | Vanguard Intermediate-Term Bond Index I (VBIMX)<br><br>Metropolitan West Total Return Bond (MWTSX) | 7 bps<br><br>39 bps | Intermediate-Term Bond | 757%<br><br>54% |
| Wilmington Broad Market Bond (ARKIX) | 65 bps | Vanguard Intermediate-Term Bond Index I (VBIMX)<br><br>Metropolitan West Total Return Bond (MWTSX) | 7 bps<br><br>39 bps | Intermediate-Term Bond | 829%<br><br>67% |
| Wilmington Multi-Manager International (MVIEX) | 141 bps | Vanguard Developed Markets Index Instl (VTMNX)<br><br>Dodge & Cox International Stock (DODFX) | 7 bps<br><br>64 bps | Foreign Large Blend | 1914%<br><br>120% |

| Fund in Plan | 2012 Expense Ratio | Passive/Active Lower Cost Alternative[10] | 2012 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Multi-Manager Real Asset (WMRIX)[12] | 112 bps | Vanguard REIT Index Adm (VGSLX) Vanguard Inflation-Protected Securities I (VIPIX) | 10 bps 7 bps | Real Estate / Inflation-Protected Bond | 1020% 1500% |

85.     Despite the high cost of the proprietary investments within the Plan, and despite the massive discrepancy between the proprietary funds in the Plan and the non-proprietary alternatives identified above, the Fiduciary Defendants failed to remove the high-cost proprietary mutual funds from the Plan in favor of lower-cost non-proprietary investments because M&T and its affiliates would have lost the profits they were earning from the inclusion of Wilmington mutual funds in the Plan. This constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA, and cost Plan participants millions of dollars in excess fees.

86.     The Fiduciary Defendants also failed to conduct an impartial review of the performance of each of the proprietary mutual funds, and of the Wilmington funds as a whole, to determine whether it remained prudent for the Plan to retain these proprietary funds.

---

[12] The Wilmington Multi-Manager Real Asset Fund invests in a portfolio of "inflation-protected debt securities, real-estate-related securities and commodity/natural resource-related securities" for purposes mixture of three different asset classes in order to provide "current income" and to "protect against the long-term effects of inflation on an investment portfolio." Wilmington Multi-Manager Real Asset Fund Fact Sheet at 1 (Mar. 31, 2016), *available at* http://wilmingtonlit.com/downloads/performance/quarterlyfactsheets/Multi_Manager_Real_Asset_Fund_Q1.pdf. Because the Real Asset fund invests in three totally different asset classes, it does not have a natural benchmark index. However, because nearly all of the fund's assets are concentrated in real estate securities and inflation-protected bonds, Plaintiffs here are using a passively-managed real estate securities fund and an actively-managed inflation-protected bond fund as logical alternatives to the Real Asset Fund.

87.     Had Defendants conducted such a review, it would have revealed that Wilmington Funds was consistently one of the worst performing mutual fund families in the United States. In 2013, Wilmington Funds was the 52nd-ranked mutual fund company out of 55 over the past five years, and the 33rd ranked fund family out of 48 over the past ten years. In 2014, Wilmington Funds was the 54th-ranked mutual fund family out of 56 fund families, and ranked 42nd out of 48 fund families over the past ten years.[13] Thus, the high fees charged to the Plan for the Wilmington Funds were not justified by superior investment performance or any reasonable expectation of superior investment performance. To the contrary, a mutual fund company with consistently low rankings is likely to have an inferior research and management infrastructure in place, making future underperformance highly likely. *Cf.* Carhart, *On Persistence in Mutual Fund Performance*, at 57 (reporting data showing that despite the general arbitrariness and unpredictability of mutual fund returns, the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance).

88.     These low institutional rankings should have been especially troubling to the Fiduciary Defendants given the high percentage of Wilmington's mutual funds that are held by the Plan. In 2012, Wilmington offered 21 mutual funds to the public, more than half of which (12) were held by the Plan. By the end of 2014, only eighteen Wilmington funds were being

---

[13]     *See*   http://www.barrons.com/articles/SB50001424053111904710004579364970231787840 (Barron's 2013 mutual fund family rankings); http://online.wsj.com/public/resources/documents/FundFam2Tables.B.pdf (Barron's 2014 mutual fund family rankings). The only other appearance by either M&T or Wilmington since 2010 was in 2010, when Wilmington Funds ranked 35th out of 53 fund families over the past five years (Wilmington did not appear in the 2010 ten-year rankings). For all other years, Wilmington Funds did not appear in the rankings, presumably because of the limited number of offerings—as of the end of 2013, Wilmington Funds only offered twenty mutual funds. By the end of 2015, that number had dropped to fourteen.

offered to the public, more than half of which (10) were held within the Plan. Thus, not only was Wilmington Funds as a whole performing poorly between 2008 and 2014 (given Wilmington's five-year trailing performance rankings in 2013 and 2014), but the majority of the mutual funds contributing to that poor performance were held by the Plan.

89.     Throughout the statutory period, only one proprietary mutual fund was removed from the Plan due to its poor performance. Every other removal of a Wilmington mutual fund occurred because the fund merged with another proprietary fund, or because the fund ceased its operations altogether.

90.     Given Wilmington mutual funds' consistently high fees and poor performance between 2008 and 2014, an impartial review of Wilmington Funds' institutional performance and an adequate investigation of available alternatives would have led a prudent fiduciary to remove all Wilmington mutual funds from the Plan at some point between 2010 and 2014 given Wilmington's poor institutional track record both in terms of fees and performance. *See Pension Benefit Guar. Corp. ex rel. St. Vincent Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 719 (2d Cir. 2013) (hereinafter "*PBGC*") (providing that a fiduciary breaches the duty of prudence if a superior investment alternative was available and an adequate investigation would have revealed the existence of that alternative). The failure to monitor the proprietary funds in the Plan in an impartial and prudent fashion has cost Plan participants tens of millions of dollars due to excess fees and underperformance by the Wilmington Funds.

91.     The disloyal and imprudent nature of the Fiduciary Defendants' conduct is further demonstrated by the conduct of non-conflicted fiduciaries. As of the end of 2013, among the approximately 1,450 defined-contribution plans with over $500 million in assets (the Plan had approximately $1.9 billion in assets at this time), not a single plan (other than the Plan) included

ANY of the twelve Wilmington funds held by the Plan as a designated investment alternative. Every non-conflicted fiduciary of similarly-sized plans had either removed Wilmington mutual funds from their plan or avoided them altogether.

92.     The fees charged by the proprietary investments within the Plan remained high after 2012. Using 2012 data, for plans with over $1 billion in assets, the average domestic equity fund had an expense ratio of 0.48%. The average domestic bond fund charged 0.35%. The average international equity fund charged 0.64%. The average balanced fund charged 0.35%. And miscellaneous funds that fell outside traditional categories charged 0.72% on average. ICI Study at 45.

93.     Yet, as of the end of 2014, all but one of the twelve Wilmington mutual funds in the Plan were still much more expensive than the average comparable fund found in a similarly-sized plan in 2012. The Wilmington Mid Cap Growth Fund had an expense ratio of 1.08%, more than double the category average of 0.48%. The Wilmington Multi-Manager International fund had a 1.21% expense ratio, nearly double the 0.64% average for international equity funds. The Wilmington Broad Market Bond, Wilmington Intermediate-Term Bond, Wilmington Short Duration Government Bond, and Wilmington Short-Term Corporate Bond funds had expense ratios of 0.55%, 0.53%, 0.64%, and 0.48%, respectively, all significantly higher than the 0.35% category average for domestic bond funds. The Wilmington Strategic Allocation Aggressive and the Wilmington Strategic Allocation Conservative funds had expense ratios of 1.45% and 1.21%

respectively, ***three to four times higher*** than the 0.35% average for balanced funds in similarly-sized plans.[14]

94.     These comparisons understate the excessiveness of fees within the Wilmington Funds in the Plan in 2014, because the most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), *available at* http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601     (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

95.     Further, average-based comparisons also understate the excessiveness of the investment management fees of the Wilmington Funds because many prudent alternative funds were available that offered lower expenses than the average.  As shown by the chart below, the fees for funds within the Plan at the end of 2014 were ***437% to 1628% higher*** than passive index fund alternatives in the same investment style, and ***36% to 1486% higher*** than lower-cost actively managed funds in the same investment style (and that offered comparable or superior investment management services):

---

[14] The Wilmington Small-Cap Strategy Fund uses a modified indexing approach, whereby the fund tracks a custom index weighted to favor either growth or value stocks. Because there is no stock selection and associated research costs, the fund's costs are limited. In 2012, the fund's net expense ratio was 0.31%.

| Fund in Plan | 2014 Exp. Ratio | Passive/Active Lower Cost Alternative[15] | 2014 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Mid Cap Growth (ARMEX) | 108 bps | Vanguard Mid-Cap Growth Index Adm (VMGMX)<br><br>T. Rowe Price Institutional Mid-Cap Growth (PMEGX) | 9 bps<br><br>61 bps | Mid Cap Growth | 1100%<br><br>77% |
| Wilmington Short-Term Corporate Bond (MVSTX) | 48 bps | Vanguard Short-Term Bond Index Instl (VBITX)<br><br>Vanguard Short-Term Investment Grade I (VFSIX) | 7 bps<br><br>7 bps | Short-Term Bond | 586%<br><br>586% |
| Wilmington Strategic Allocation Conservative (WCAIX) | 121 bps | Vanguard LifeStrategy Conservative Growth Fund (VSCGX)<br><br>Vanguard Wellesley Income Adm (VWIAX) | 15 bps<br><br>18 bps | Conservative Allocation | 707%<br><br>572% |
| Wilmington Strategic Allocation Aggressive (WAAIX) | 145 bps | Vanguard LifeStrategy Growth (VASGX)<br><br>American Funds Capital Income Builder R6 (RIRGX) | 27 bps<br><br>30 bps | Aggressive Allocation | 437%<br><br>383% |

[15] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). The listed expense figures are taken from the most recent summary prospectus as of January 2015.

| Fund in Plan | 2014 Exp. Ratio | Passive/Active Lower Cost Alternative[15] | 2014 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Intermediate-Term Bond (ARIFX) | 53 bps | Vanguard Intermediate-Term Bond Index I (VBIMX)<br><br>Metropolitan West Total Return Bond (MWTSX) | 7 bps<br><br>39 bps | Intermediate-Term Bond | 657%<br><br>36% |
| Wilmington Broad Market Bond (ARKIX) | 55 bps | Vanguard Intermediate-Term Bond Index I (VBIMX)<br><br>Metropolitan West Total Return Bond (MWTSX) | 7 bps<br><br>39 bps | Intermediate-Term Bond | 686%<br><br>41% |
| Wilmington Multi-Manager International (MVIEX) | 121 bps | Vanguard Developed Markets Index Instl (VTMNX)<br><br>Dodge & Cox International Stock (DODFX) | 7 bps<br><br>64 bps | Foreign Large Blend | 1628%<br><br>89% |
| Wilmington Multi-Manager Real Asset (WMRIX) | 111 bps | Vanguard REIT Index Adm (VGSLX)<br><br>Vanguard Inflation-Protected Securities I (VIPIX) | 10 bps<br><br>7 bps | Real Estate / Inflation-Protected Bond | 1010%<br><br>1486% |

96.     As of the end 2014, the Plan was still the only defined contribution plan with over

$500 million in assets that included any of the proprietary funds held within the Plan as a

designated investment alternative.[16]

97.     Based on the above facts, one can reasonably infer that the Fiduciary Defendants'

process for reviewing Plan investments was deeply flawed. The Fiduciary Defendants failed to

evaluate (or, at the very least, failed to impartially evaluate) the track record, cost, and

performance of each investment within the Plan as compared to other alternatives. The Fiduciary

Defendants showed favoritism towards Wilmington mutual funds, avoiding removal of

Wilmington funds wherever possible. Even in the one instance when the Fiduciary Defendants

did remove a proprietary fund from the Plan, the action was taken years after a prudent and

impartial fiduciary would have taken the same action. And the Fiduciary Defendants failed to

periodically re-assess the long-term performance record of Wilmington Funds as a whole, which

would have called into question whether the Wilmington Funds as a mutual fund family were

appropriate for the Plan. Accordingly, it can be reasonably inferred that the process by which the

Plan was managed was flawed. *PBGC*, 712 F.3d at 718 (holding that a claim for a breach of the

duty of prudence is rendered plausible where the circumstantial facts reveal that the plan's

investment management process was flawed); *Braden*, 588 F.3d at 396 (plausible factual

allegations of flawed investment decisions by fiduciaries give rise to an inference that "the

---

[16] As the Wilmington mutual funds in the Plan have remained unattractive to similarly-sized defined contribution plans, the total number of Wilmington funds in the Plan has decreased based on fund closures.  Following recommendations from WFMC and WTIA, Wilmington Trust liquidated its Large Cap Growth and Large Cap Value funds in 2014 and its Mid Cap Growth, Small Cap Strategy, and Small Cap Growth funds in 2015.  With the exception of Small Cap Growth, the Plan offered these proprietary funds up until the time of liquidation.

process by which [defendants] selected and managed the funds in the Plan [was] tainted by failure of effort, competence, or loyalty").

98.     Had the Fiduciary Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest, they would have removed the Wilmington mutual funds from the Plan in favor of investments such as the funds listed above that offered similar or superior performance at significantly less expense. Instead, the Fiduciary Defendants retained the Wilmington funds at each periodic review of the Plan's investment lineup because they were producing significant revenue for M&T and its affiliates, and the Plan assets within each fund artificially made the Wilmington funds appear more competitive in the marketplace than they really were. By prioritizing the financial interests of M&T and its affiliates over Plan participants, the Fiduciary Defendants breached the duties of loyalty and prudence.

## III.     DEFENDANTS FAILED TO USE THE LOWEST COST SHARE CLASS OF SEVERAL MUTUAL FUNDS IN THE PLAN

99.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

100.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available. Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative. Simply

put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

101.     This claim is not about the use of "retail mutual funds" versus the use of "institutional mutual funds".  Retail mutual funds are perfectly acceptable and prudent choices under certain circumstances. In some instances, a mutual fund company may only offer retail mutual funds. For example, Dodge & Cox—who ranks sixth in defined contribution assets under management among mutual fund companies—only offers retail shares of its mutual funds.  Yet a large number of prudent fiduciaries have selected and retained Dodge & Cox funds within their plans. Or, in other instances, the mutual fund company might restrict institutional share classes in such a manner that would make it impossible to utilize the mutual funds. For example, Fidelity offers lower-cost K-share mutual funds, but within the prospectus of each fund makes clear that K shares are only available to plans that use Fidelity as a recordkeeper.  This claim is instead about utilizing the lowest-cost class of shares that is available to the Plan.

102.     In several instances, the Fiduciary Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available.

103.     M&T utilized these higher-cost share classes, even where less expensive versions of the exact same investments were available, because the higher-cost options made higher revenue sharing payments to the Plan, thereby reducing M&T's costs for running the Plan. These extra revenue sharing payments, however, did not make up for the extra costs to Plan participants.

104.    For example, until 2012, the Plan offered participants the Investor share class of the Harbor International Fund, needlessly costing investors 37 extra basis points annually compared to the lower cost Institutional shares for which the Plan was eligible.

105.    As a second example, the Plan used Admin shares of the PIMCO Total Return Fund until 2013, even though Institutional shares of the exact same Fund were available throughout the statutory period. By failing to prudently investigate the availability and advisability of switching to the lower-cost share class, Defendants needlessly cost Plan participants an extra 25 basis points annually.

106.    As a third example, the Plan offered Retirement shares of the TIAA CREF Mid Cap Value Fund for the entire time the fund was in the Plan.   Had Defendants prudently investigated the availability and advisability of lower-cost shares, they would have discovered that the Plan qualified for Institutional shares, which would have cost Plan participants 25 basis points less per year.

107.    Finally, in the fall of 2015, T. Rowe Price began offering Institutional shares for every T. Rowe Price mutual fund in the Plan.   These funds would have saved Plan participants between 13 and 25 basis points annually.   Had Defendants conducted a prudent review of the expenses of the Plan's investments, and the availability of lower-cost share classes, they would have discovered the availability of Institutional shares of these T. Rowe Price funds.

108.    The Fiduciary Defendants knew or should have known of the existence of these cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan into the lower-cost shares.

109.    A prudent fiduciary conducting an impartial review of the Plan's investments would have conducted such a review of the Plan's investments on at least a quarterly basis, and

would have identified the cheaper share classes available and transferred the Plan's investments in the three above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, the Fiduciary Defendants did not transfer Plan holdings in any of these three funds from retail shares into institutional shares, in breach of their fiduciary duties.

110.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

111.    One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Jan. 21, 2016), *available at* http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-surge-ups-the-ante-for-401-k-advice.

112.    Such failures are inexcusable given the substantial bargaining power of billion dollar plans like the Plan here. As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish:*

*Classifying   Mutual   Funds*,   PLAN   SPONSOR   (Jan.   2011),   *available   at* http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

IV.   **DEFENDANTS FAILED TO INVESTIGATE THE USE OF SEPARATE ACCOUNTS AND COLLECTIVE TRUSTS**

113.    Defendants also failed to adequately investigate the use of non-mutual fund alternatives such as collective trusts and separately managed accounts.

114.    According to the United States Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, are available to "large plans … with total assets of over $500 million[.]" U.S. Department of Labor, *Study of 401(k) Plan Fees and Expenses*, April 13, 1998. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Id*.

115.    Separate accounts offer a number of advantages over mutual funds, including the ability to negotiate fees and greater control by the plan sponsor or fiduciary over the investment guidelines.

116.    Even compared to the lowest-cost share class of a mutual fund, costs within separate accounts managed by the same investment manager are typically much lower.

117.    For example, the Plan offers the Diamond Hill Large Cap Fund at a cost of 76 bps. But Diamond Hill would have offered the same investment vehicle as a separate account for approximately 62 bps. *See* Diamond Hill Form ADV, Part II at 7 (Sept. 2, 2015), http://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRS N_ID=339626. Because of the Plan's size, it could have reaped considerable cost savings by using a separate account for the Diamond Hill Large Cap investment, but the Fiduciary Defendants failed to investigate this option.

118.    As another example, the Plan offers the Sterling Capital Midvalue Fund as a designated investment alternative at a cost of 93 bps. But Sterling Capital would have offered the same investment as a separate account for approximately 70 bps, based on 2014 year-end values. *See* Sterling Capital Form ADV, Part II, at 11 (Jan. 12, 2016), *available at* http://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRS N_ID=350970. Because of the Plan's size, it could have reaped considerable cost savings by using a separate account, but the Fiduciary Defendants (again) failed to investigate this option.

119.    As a third example, M&T Bank offers a variety of T. Rowe Price funds, including the Equity Income Fund at 66 bps, the Growth Fund at 68 bps, and the Small Cap Value Fund at 96 bps. But T. Rowe Price offers the exact same investment vehicles as separate accounts for much less: approximately 49 bps for the Equity Income Fund, approximately  47 bps for the Growth Fund, and for approximately 63 bps for the Small Cap Value Fund, all based on 2014 year-end values. *See* T. Rowe Price Associates, Inc. Form ADV, Part II at 7, 8 (Mar. 30, 2016), *available  at*  http://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx? BRCHR_VRSN_ID=349646. Because of the Plan's size, it could have reaped considerable cost savings by using a separate account format for the Plan assets invested in T. Rowe Price mutual funds, but the Fiduciary Defendants (once again) failed to investigate this option.

120.    Moreover, unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here. Accordingly, the fee savings that the Fiduciary Defendants could have obtained for the Plan were even greater than the amounts reflected in the investment managers' advertised fee schedules.

121.    Collective trusts, also called collective investment trusts or CITs, also would have provided much lower investment management fees than the mutual funds within the Plan. Collective trusts are not registered investment companies, so their regulatory and administrative expenses are much lower. As a result, they are generally much less expensive than mutual funds, plus collective trusts give plan fiduciaries the opportunity to use a plan's size and bargaining power to negotiate a lower rate. Robert Steyer, *Use of CITs in DC Plans Booming, Rises 68% since 2008*, PENSIONS & INVESTMENTS (Feb. 22, 2016), *available at* http://www.pionline.com/article/20160222/PRINT/302229985/use-of-cits-in-dc-plans-booming-rises-68-since-2008 (hereinafter "*Use of CITs in DC Plans Booming*").

122.    Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more. Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015), *available at* http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400. Due to their potential to reduce overall plan costs, collective trusts are becoming the norm within larger defined contribution plans. *See* ICI Study at 21, 23 (reporting that in plans with over $1 billion in assets, by the end of 2012 more assets were held in collective trusts than in mutual funds); *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[17]

---

[17] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), *available at* http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter *CITs Gaining Ground*). Many if not most mutual fund strategies are available in collective trust format, and the

Thus, a prudent fiduciary in plans with over $1 billion in assets will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

123.    According to the investment consulting firm Callan Associates Inc., for plans with over $1 billion in assets, collective trusts charge an average of 54 basis points. Based upon this average, for each of the Plan's actively-managed mutual funds, use of a collective trust structure would have reduced the fees charged to Plan participants by between 10 and 87 basis points.

124.    The Fiduciary Defendants' failure to investigate the use of collective trusts has been particularly harmful in the context of the T. Rowe Price mutual funds held within the Plan. Since 2010, the Plan has held between $400 and $700 million in nine different T. Rowe Price mutual funds. T. Rowe Price offers all but one of these funds as a collective trust vehicle. The fees within the collective trust investments would have provided significant cost savings to Plan participants. For example, the Plan has at all times had hundreds of millions of dollars invested in five of T. Rowe Price's target-date funds. The Plan paid between 56 to 75 bps within these target-date funds. T. Rowe Price advertises the exact same investments in collective-trust form for between 43 and 47 bps. Switching to collective trust target-date investments therefore would

---

investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming*; *CITs Gaining Ground*. And because collective trusts contract directly with the Plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, *ABA Primer on Bank Collective Funds*, June 2015, at        1,       *available      at*       https://www.aba.com/Tools/Function/Trust/Documents/ ABA%20Primer%20on%20Bank%20Collective%20Investment%20Funds.pdf.

have saved Plan participants millions of dollars in investment management fees, yet participants were left in more costly mutual funds that provided identical investment management services.

125.    Numerous companies with defined contributions plans with over $1 billion in assets (like the Plan) and who use T. Rowe Price as a recordkeeper (like the Plan)—including JetBlue, Rite Aid, Costco, Thermo Fisher Scientific, Entergy, Eastman Kodak, Sanofi-Aventis, Sempra Energy, Hyatt Corporation, CACI International, and Syngenta Corporation—have all switched from using T. Rowe Price mutual funds to using collective trusts for their target-date investments, no doubt because of the massive cost savings for participants realized by this switch. The actions of the fiduciaries of these other, similarly situated plans demonstrate that "a prudent fiduciary in like circumstances would have acted differently" than the Fiduciary Defendants. *PBGC*, 712 F.3d at 720.

126.    Though Plaintiffs do not have actual knowledge of the Fiduciary Defendants' decision-making processes for running the Plan, it is likely that the Fiduciary Defendants were acting in the financial interests of M&T in declining to investigate separate accounts or collective trusts. The higher-cost T. Rowe Price mutual funds offered the Plan greater "revenue sharing" payments than separate accounts or collective trusts would have paid. Similarly, the higher-cost Diamond Hill and Sterling Capital mutual funds made revenue sharing payments to the Plan that likely would not have been available had the Plan instead used a separate account structure for those investments. And while using a revenue sharing scheme is not necessarily a fiduciary breach, the Department of Labor has made clear that fiduciaries may not make imprudent investment decisions in furtherance of a revenue sharing scheme. DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6. In other words, the Fiduciary Defendants, by retaining costlier T. Rowe Price, Diamond Hill, and Sterling Capital mutual funds and failing to investigate the

availability of identical, less expensive collective trust or separate account options, reduced *M&T Bank's costs* in administering the Plan while increasing *Plan participants' costs* in an amount that was significantly greater than M&T Bank's cost savings.

127.   The Fiduciary Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan. By failing to investigate the use of separate account and collective trust alternatives to the mutual funds held by the Plan, the Fiduciary Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

128.   Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA (including, among other things, identification of available investment alternatives comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) until shortly before this action was filed. Further, Plaintiffs still do not have actual knowledge of Defendants' decision-making processes with respect to the Plan, including the Fiduciary Defendants' processes for selecting, monitoring, and removing Plan investments, and M&T Bank's and the Board's processes for monitoring the Plan's fiduciaries, because this information is solely within the possession of Defendants prior to discovery. For purposes of this First Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth throughout the First Amended Complaint.

## CLASS ACTION ALLEGATIONS

129.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

130.     Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[18]

> All participants and beneficiaries of the M&T Bank Corporation Retirement Savings Plan at any time on or after May 11, 2010, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative functions.

131.     Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plan has had between 15,000 and 18,000 participants with account balances during the applicable period.

132.     Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

133.     Adequacy:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any

---

[18] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

134.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.   Which Defendants are fiduciaries of the Plan;

    b.   Whether the Fiduciary Defendants breached their fiduciary duties by engaging in the conduct described herein;

    c.   Whether the Fiduciary Defendants are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

    d.   Whether M&T Bank and the Board breached their duty to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    e.   Whether the Employer Defendants are liable under 29 U.S.C. § 1132(a)(3) to disgorge the revenues they earned as a result of the fiduciary breaches that occurred;

    f.   The proper form of equitable and injunctive relief; and

    g.   The proper measure of monetary relief.

135.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

136.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would

substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

137.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this First Amended Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

### COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

138.    M&T Bank, the Committee, WTIA, WFMC, the Board, and John Does 1–20 are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

139.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Fiduciary Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

140.    The scope of the fiduciary duties and responsibilities of the Fiduciary Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. Further, the Fiduciary Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

141.    As described throughout the First Amended Complaint, the Fiduciary Defendants failed to monitor the Plan's investments to ensure that each of the Plan's investments remained prudent, and failed to remove those investments that were no longer prudent. The Fiduciary Defendants also failed to engage in a prudent process for selecting Plan investments when combining the Plan with the Wilmington Bank retirement plan in 2011.   The Fiduciary Defendants failed to implement a prudent process for monitoring the Plan's investments (including their expenses and relative performance), or a process for evaluating whether investment expenses could be reduced by using lower-cost share classes or alternatives to mutual funds.

142.    The Fiduciary Defendants also failed to monitor Plan investments to ensure that the Plan was invested in the lowest-cost share class of each mutual fund within the Plan, and

failed to transfer Plan investments into lower-cost share classes when those cheaper share classes became available. Further, Defendants failed to investigate the availability of separate accounts and collective trusts for the actively managed mutual funds within the Plan, and subsequently failed to transfer from mutual funds into a separate account or collective trust structure even though doing so would have saved Plan participants millions of dollars in excess fees.

143.    Each of the above-mentioned imprudent actions and failures to act in a prudent manner demonstrate the Fiduciary Defendants' failure to monitor the Plan and make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Fiduciary Defendants' selected and retained M&T-affiliated mutual funds as designated investment alternatives without conducting an investigation of alternatives in the marketplace in order to drive revenues and profits to M&T. Similarly, the Fiduciary Defendants' retained higher-cost shares of mutual funds and failed to investigate the availability of lower-cost share classes of certain funds, because the higher-cost mutual funds generated higher revenue-sharing payments to the Plan, lowering M&T Bank's costs in operating the Plan at the expense of Plan participants.  The Fiduciary Defendants also retained higher-cost mutual funds and failed to investigate the availability and prudence of using separate accounts and/or collective trusts, in order to generate higher revenue-sharing payments and reduce M&T's expenses in operating the Plan, all at the expense of Plan participants. Through these actions and omissions, the Fiduciary Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

144.    Through the actions and omissions described *supra* in paragraphs 141–43 and elsewhere in this First Amended Complaint, the Fiduciary Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

145.    Each Fiduciary Defendant is personally liable, and the Fiduciary Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

146.    Each Fiduciary Defendant knowingly participated in each breach of the other Fiduciary Defendants, knowing that such acts were a breach, enabled the other Fiduciary Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Fiduciary Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Fiduciary Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

147.    As alleged throughout the First Amended Complaint, M&T Bank and the Board are fiduciaries of the Plan.

148.   Under the IPS, M&T Bank had overall oversight responsibility for the Plan, and the explicit responsibility for appointing and removing members of the Committee. Under the (conflicting) Plan Document, the Board was given explicit authority to appoint and remove members of the Committee. Assuming each document is correct (to some extent or another), M&T Bank and the Board therefore had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Committee.

149.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and its participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

150.   To the extent that M&T Bank's or the Board's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

151.   M&T Bank and the Board breached their fiduciary monitoring duties by, among other things:

    a)   Failing to monitor and evaluate the performance of the other Fiduciary Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the other Fiduciary Defendants' imprudent actions and omissions;

    b)   failing to monitor the processes by which Plan investments were evaluated, which would have alerted a prudent fiduciary to the preferential treatment the other Fiduciary Defendants were giving to M&T-affiliated mutual funds in their process of selecting and monitoring the Plan's investments, their failure

67

to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

c) failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

152.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses per year due to excessive fees and investment underperformance.

153.   Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), M&T Bank and the Board are liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from their failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

## COUNT III
### Other Equitable Relief Based on Ill-Gotten Proceeds
### 29 U.S.C. § 1132(a)(3)

154.   Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be held liable under that section regardless of whether it is a fiduciary. A non-fiduciary transferee of ill-gotten proceeds is subject to equitable disgorgement of those assets if the non-fiduciary had actual or constructive knowledge of the circumstances that rendered the transaction or payment a violation of ERISA.

155.    The Employer Defendants profited from the Plan's investments in M&T-affiliated mutual funds.

156.    All payments to the Employer Defendants from or in connection with Plan assets are in current possession of one or more of the Employer Defendants, and are traceable to specific transactions that have taken place on specific dates.

157.    Pursuant to 29 U.S.C. § 1132(a)(3), the Employer Defendants should be required to disgorge all monies they have received during the relevant class period as a result of the Plan's investments in M&T-affiliated mutual funds. The selection and retention of these proprietary mutual funds was imprudent and violated ERISA based on the facts set forth in the First Amended Complaint. Moreover, the Employer Defendants had actual or constructive knowledge of circumstances rendering the selection and retention of these proprietary funds (and the payments that the Employer Defendants received from these proprietary funds) unlawful, by virtue of:

(a)    the Committee members with executive positions at multiple Employer Defendants;

(b)    other dual-hatted employees;

(c)    the Employer Defendants' affiliation with M&T;

(d)    the Employer Defendants' participation in the Plan as employers with employees in the Plan; and

(e)    the Employer Defendants' general operational interconnectedness.

158.    In light of the above facts and other facts likely to be revealed through discovery, the Employer Defendants had actual or constructive knowledge of the process for selecting and monitoring the investments in the Plan, and knew that this process was designed to enrich the Employer Defendants at the expense of Plan participants. The Employer Defendants also knew

that the proprietary investments in the Plan were excessively costly and performed poorly in comparison to other investment alternatives. Given their various roles within Wilmington Funds, the Employer Defendants also had knowledge that none of the proprietary funds held by the Plan were held in any similarly-sized defined contribution plans. Based on these facts and other facts within their knowledge, the Employer Defendants were aware that the Fiduciary Defendants were breaching their fiduciary duties by selecting and retaining proprietary mutual funds in the Plan.

159.    Given their knowledge of these fiduciary breaches, the Employer Defendants had actual or constructive knowledge that the monies they were receiving from or in connection with Plan assets were being received as a result of the Fiduciary Defendants' fiduciary breaches.

160.    Therefore, to the extent any ill-gotten revenues and profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to disgorge these monies from the Employer Defendants under principles of unjust enrichment and equitable restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that the Fiduciary Defendants have breached their fiduciary duties under ERISA;

D.      An order compelling the Fiduciary Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.      An order requiring the Employer Defendants to disgorge all revenues received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

J.      An award of such other and further relief as the Court deems equitable and just.

Dated: August 17, 2016

**NICHOLS KASTER, PLLP**

/s/ *Kai Richter*
Kai Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
Jacob Schutz, MN Bar No. 0395648*
*admitted in W.D.N.Y.
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
cengstrom@nka.com
jschutz@nka.com

ATTORNEYS FOR PLAINTIFFS

71