UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

In re M&T Bank Corporation ERISA Litigation        Case # 16-CV-375 FPG

                                                    DECISION AND ORDER

## INTRODUCTION

This is a putative class action brought under the Employee Retirement Security Act of 1974

("ERISA") by Plaintiffs Sa'ud Habib, Beverly Williams, J. Marlene Smith, Kenneth Sliwinski,

and Russ Dixon, all of whom are current or former employees of M&T Bank and participate in the

bank's 401(k) retirement plan.  Plaintiffs allege that Defendants M&T Bank and its retirement

plan's fiduciaries[1] engaged in self-dealing at the expense of the bank's employees.

On July 20, 2016, Defendants moved to dismiss the Complaint. ECF No. 21.  On August

17, 2016, Plaintiffs amended the Complaint as of right. ECF No. 25.  On July 26, 2017, the Court

consolidated this case with Allen v. M&T Bank Corp. et al., Case # 16-cv-704-FPG. ECF No. 34.

Plaintiffs filed a Consolidated Amended Complaint ("CAC") on August 25, 2017. ECF No. 35.

On October 10, 2017, Defendants moved to dismiss the CAC. ECF No. 41.  For the reasons stated

below, Defendant's Motion to Dismiss is DENIED in part and GRANTED in part.

## BACKGROUND[2]

Defendant is a regional financial services company that provides investment products,

including mutual funds, to investors, and sponsors a 401(k) retirement plan known as the M&T

---

[1] The alleged fiduciaries are M&T Bank, the M&T Bank Employee Benefit Plans Committee ("the Committee"), its members, the members of M&T Bank's Board of Directors since 2010 ("the Board"), Wilmington Funds Management Corporation ("WFMC"), Wilmington Trust Investment Advisors ("WTIA"), and all individuals who have been delegated fiduciary tasks or responsibilities by any of the above-named fiduciaries. ECF No. 35.
[2] The following allegations are taken from Plaintiff's Consolidated Amended Complaint (ECF No. 35) unless otherwise noted.

Bank Corporation Retirement Saving Plan ("the Plan") for its employees. The Plan is administrated by the M&T Bank Employee Benefit Plans Committee, which is the Plan's named fiduciary, and sponsored by M&T Bank. The Plan is a defined contribution plan[3] that offered participants between 23 and 34 investment options throughout the putative class period. Because "all risks related to high fees and poorly-performing investments are borne by" employees participating in defined contribution plans, employers have "no incentive to keep costs low or to closely monitor" defined contribution plans. ECF No. 35 at 3. Financial services companies are especially prone to abusing defined contribution plans because unlike many other employers, who are merely indifferent to keeping costs low, employers such as M&T Bank are in a position to "stuff" their retirement plans with their own costly investment products. *Id.* In other words, financial service companies are uniquely positioned to benefit from high administrative costs, and that benefit comes at the expense of employees' retirement accounts.

Plaintiffs allege that they fell victim to this exact behavior. According to the Complaint, in 2010, eight of the Plan's 23 designated investment alternatives were M&T Bank proprietary mutual funds[4] that cost significantly more than similar funds and performed worse. Rather than remove these overpriced and underperforming funds, Defendants expanded their proprietary funds offerings in 2011, after M&T purchased Wilmington Trust and added six of Wilmington's expensive, poor-performing mutual fund offerings. According to Plaintiffs, had Defendants conducted an impartial review of the Wilmington Funds, they would have discovered that the Wilmington Funds "was consistently one of the worst performing mutual fund families in the

---

[3] "[A] 'defined contribution plan' ... promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 250 n.1 (2008).
[4] "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund.'" *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010).

United States," and that their "expenses were above average compared to many alternatives within the marketplace that had a superior performance history." *Id.* at 25, 44. The failure to remove these proprietary funds from the Plan allegedly "cost Plan participants tens of millions of dollars due to excess fees and underperformance." *Id.* at 42.

In addition to using expensive and poor-performing proprietary funds, the Plan failed to use its bargaining power as a large institutional investor to obtain the lowest-cost class of shares available, and in several instances, failed to prudently monitor the Plan to determine whether it had invested in the cheapest possible share class. Plaintiffs also allege that Defendants were aware of the benefits of alternative investment vehicles such as collective trusts but failed to offer them to Plan participants. Instead, Defendants left Plan participants in costlier mutual funds that "provided identical investment management services." *Id.* at 58. Defendants' passivity in this regard "caused the Plan to pay millions of dollars per year in unnecessary fees." *Id.* at 60.

On May 11, 2016, Plaintiffs filed this case individually and as the representative of a putative class of participants and beneficiaries of the Plan at any time on or after May 11, 2010. The Complaint raises five claims for relief: (1) breach of fiduciary duties of loyalty and prudence under 29 U.S.C. § 1104(a)(1)(A)-(B); (2) failure to adequately monitor fiduciaries under 29 U.S.C. §§ 1109(a) and 1132(a)(2); (3) prohibited transactions with a fiduciary under 29 U.S.C. §§ 11016(b)(1) and (b)(3); (4) prohibited transactions with a party in interest under 29 U.S.C. §§(a)(1)(C), (D); and (5) equitable disgorgement of ill-gotten gains under 29 U.S.C. § 1132(a)(3).

## DISCUSSION

### I. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

In reviewing a motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 572 (2007), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. These factual allegations "must be enough to raise a right to relief above the speculative level," *id.* at 545, and "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Fiduciary Status

### A. M&T and M&T Bank

Unsurprisingly, ERISA breach of fiduciary duty claims apply only to fiduciaries. *See Bell v. Pfizer, Inc.*, 626 F.3d 66, 73 (2d Cir. 2010). In cases "charging breach of ERISA fiduciary duty, then, the threshold question is ... whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000). Defendants argue that M&T Bank and M&T[5] are not fiduciaries to the Plan and therefore are not liable for Plaintiffs' breach of fiduciary duty claim. The Court agrees.

Plaintiffs rely solely[6] on the doctrine of *respondeat superior* to assert that Defendants M&T Bank and M&T are fiduciaries to the Plan's beneficiaries because the companies' "shared Board of Directors appointed or removed members of the Committee." ECF No. 52 at 32. While courts in other circuits do not uniformly reject *respondeat superior* liability under ERISA, courts in the Second Circuit do. *Compare In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 355

---

[5] M&T is a bank holding company and M&T Bank is the main banking subsidiary of M&T. ECF No. 35 at 8.
[6] Plaintiffs' Opposition makes it clear that they rely solely on *respondeat superior* to assert that M&T and M&T Bank were fiduciaries and never directly responds to Defendants' additional arguments about why the two entities were not fiduciaries. The Court agrees with all of these additional arguments as well. *See* ECF No. 42 at 31-32.

(S.D.N.Y. 2009) ("fiduciary responsibility . . . based on *respondeat superior* theory is not established . . ."); *Crowley ex rel. Corning Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222, 228-29 (W.D.N.Y. 2002) (rejecting *respondeat superior* liability under ERISA); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL 1500, 02 Civ. 8853 (SWK), 2005 WL 563166, at *4 n.5 (S.D.N.Y. Mar. 10, 2005) (refusing to find the employer liable under ERISA according to a theory of *respondeat superior*); *with Hamilton v. Carell*, 243 F.3d 992, 1002–03 (6th Cir. 2001) (the doctrine of *respondeat superior* may be a source of liability in ERISA cases where the employee was acting in the course of his employment and breached his duty to a third party); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 145–47 (D. Mass. 2004) (same and collecting cases). Consequently, Plaintiffs' breach of fiduciary duty claim is DISMISSED as to Defendants M&T Bank and M&T.

### B. Wilmington Trust Investment Advisors ("WTIA") and Wilmington Funds Management Corporation ("WFMC")

Defendants argue that WTIA, which provided advisory services for the Wilmington Funds to the Plan, and WFMC, which is the Wilmington Funds' adviser and manager, are not fiduciaries under ERISA. While "Congress intended the term 'fiduciary' to be broadly construed, this broad construction has limits." *Bell v. Pfizer, Inc.*, 626 F.3d 66, 74 (2d Cir. 2010) (internal quotation marks and citations omitted). As discussed above, there is no *respondeat superior* liability under ERISA, but a

> person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation . . . (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 4 (2d Cir. 2017) (summary order) (quoting 29 U.S.C. § 1002(21)(A)(i),(iii)).

To rely on 29 U.S.C. § 1002(21)(A)(ii), which imposes a fiduciary duty on investment advisers, a plaintiff must allege that the adviser "(A) has discretionary authority or control . . . with respect to purchasing or selling securities or other property for the plan" or " (B) renders any advice . . . on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, . . . that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan." 29 C.F.R. § 2510.3-21(c). Plaintiffs have not made any allegations concerning (A) and, as for (B), they raise only the conclusory allegation that "[a]s investment managers, WTIA and WFMC exercised discretionary authority." ECF No. 52 at 33.

Plaintiffs cite cases to support their argument that this conclusory allegation is sufficient to withstand Defendants' Motion to Dismiss, but the Court need not accept these allegations as true when materials attached to the CAC belie them. *See Olin Corp. v. E.I. Dupont de Nemours & Corp.*, No. 05-CV-100S (SC), 2006 WL 839415, at *1 (W.D.N.Y. Mar. 27, 2006) ("If the documents referenced in the complaint contradict the facts alleged by the plaintiff, the documents control and the court need not accept as true the plaintiff's allegations."). The 2016 Restatement of the Plan, which is attached to the CAC, states that the Committee has "all necessary authority and discretion" to select the Plan's investment options, ECF No. 35-1 at 32-33, and the CAC itself states that "[t]he Committee has the power to manage and invest all Plan assets, as well as to appoint any trustee and investment manager and establish investment and funding policies[,] . . . [and] also has the direct responsibility for selecting and removing designated investment

alternatives within the Plan." ECF No. 35 at 13. To the extent that Plaintiffs allege WTIA and WFMC played some role in the Plan's investment decisions, those allegations do not suffice to confer fiduciary status on WTIA or WFMC. *See Hecker*, 556 F.3d at 583-84 ("Merely 'playing a role' or furnishing professional advice is not enough to transform a company into a fiduciary. Many people help develop and manage benefit plans—lawyers and accountants, to name two groups—but despite the influence of these professionals we do not consider them to be Plan fiduciaries."); *Zang v. Paychex, Inc.*, 728 F. Supp. 2d 261, 270 (W.D.N.Y. 2010) (finding *Hecker*'s fiduciary status analysis persuasive and adopting it). Plaintiffs' breach of fiduciary duty claim is therefore DISMISSED as to Defendants WTIA and WFMC.

## III.     Breach of Fiduciary Duties of Loyalty and Prudence

ERISA does not require employers to establish employee benefits plans, but if an employer chooses to do so, the statute "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). ERISA does this by requiring a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

In addition to this duty of loyalty, ERISA imposes on fiduciaries a duty to act with "care, skill, prudence, and diligence." *Id.* at § 1104(a)(1)(B). The duty of loyalty is concerned with "the fiduciary's conduct in arriving at an investment decision, not on its results," and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc. ("PBGC")*, 712 F.3d 705, 716 (2d Cir. 2013) (internal quotation marks and citation omitted). ERISA holds the

fiduciary's conduct to "the objective prudent person standard developed in the common law of trusts." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006). Under trust law, a fiduciary "has a continuing duty to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

Plaintiffs allege that Defendants abandoned these paramount ERISA duties in three[7] ways: (1) by offering seven proprietary Wilmington Trust mutual funds to Plan participants, even though these funds charged excessive fees and performed poorly, for self-interested reasons; (2) by failing to consider collective investment trusts and separate accounts as alternatives to the mutual funds in the Plan and; (3) by failing to negotiate with non-proprietary mutual funds to obtain the least expensive share classes for Plan participants. ECF No. 35 at 31-60.

## A.     Proprietary Funds Allegation

Plaintiffs allege that Defendants selected and retained higher-cost, poor-performing proprietary mutual funds as designed investment alternatives for the Plan to drive revenues and profits to M&T and its affiliates. Defendants concede that this allegation states a claim to relief and thus "do not move to dismiss the proprietary funds count in its entirety. ECF No. 42 at 12 n.8. Instead, they move to dismiss the proprietary funds count under ERISA's three-year statute of limitations "to the extent it is based on alleged conduct that occurred more than three years before the Original Complaint was filed." *Id.*

---

[7] The Court agrees with Defendants' position that Plaintiffs' single count for breaches of fiduciary duties of loyalty and prudence is effectively "three counts in one." *See* ECF No. 42 at 9 n.7. Plaintiffs could have plead three separate counts under 29 U.S.C. § 1104(a), as there are three different sets of facts underpinning each effective count. *See Schwartz v. Eaton*, 264 F.2d 195, 196-97 (2d Cir. 1959) (defining dismissible claim as "a set of facts giving rise to one or more legal rights"). Accordingly, the Court may analyze each of the three effective counts and decide to dismiss or uphold it without regard to the others. *See Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 145 (N.D. Ill. 1997). Consequently, the Court rejects Plaintiffs' position that the Court cannot dismiss part of its first count while upholding the rest.

Where a plaintiff has "actual knowledge" of an ERISA violation, the limitations period is "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113. "Actual knowledge" means "specific knowledge of the actual breach of duty upon which [plaintiffs are suing]." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001). The plaintiff must have "knowledge of all material facts necessary . . ." *Id.*

"Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiff[s] failed to plead timely claims." *Demopoulos v. Anchor Tank Lines, LLC*, 117 F. Supp. 3d 499, 507 (S.D.N.Y. 2015). It therefore must be "clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

Defendants argue that Plaintiffs had actual knowledge of Defendants' violation from documents provided to Plan participants in January 2013 that detailed the proprietary funds' performance history, expense ratios, and relationship with M&T. According to Defendants, because Plaintiffs did not file this suit until May 11, 2016, their breach of fiduciary duty claims are time-barred to the extent that they are based on conduct occurring before May 11, 2013.

Plaintiffs argue that although they gained some knowledge from the January 2013 documents, those documents did not supply Plaintiffs with actual knowledge of the violation. This is because they still lacked knowledge of other material facts such as

> investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts.

ECF No. 52 at 18. According to the CAC, Plaintiffs did not gain knowledge of these facts until "shortly before this suit was filed." ECF No. 35 at 8.

Key to Plaintiffs' proprietary funds theory is the comparison between M&T-affiliated funds and non-proprietary funds that were not available in the Plan. After all, Plaintiffs do not just argue that proprietary funds were expensive and did not perform well—they argue that they were more expensive and performed worse than other alternatives that Defendants could have chosen for the Plan. Therefore, Plaintiffs would have to know "the data for these comparator funds' fees and performance" to possess actual knowledge of Defendants' violation. *Moreno v. Deutsche Bank*, 15 Civ. 9936 (LGS), 2016 WL 5957307, at *4 (S.D.N.Y. Oct. 13, 2016). It is not evident from the face of the CAC or any documents of which the Court may take judicial notice that Plaintiffs had such knowledge. Defendants indicate that Plaintiffs had knowledge of all material facts from various disclosure documents sent to Plan participants in 2012 and 2013, but these documents only share cost and performance data for investment options that were already available in the Plan—not for the various "more reasonably priced and better performing" alternative funds that Plaintiffs argue should have been included in the Plan, but were not.[8] ECF No. 35 at 46. Plaintiffs therefore did not have knowledge of all the material facts underpinning their claim.

In response, Defendants argue that Plaintiffs *should* have had knowledge of all material facts showing that "the M&T and Wilmington Trust funds were imprudent investments" because that information was publicly available. They argue that "[w]here, as here, ERISA plaintiffs allege that problems with an investment option were 'abundantly clear' such that fiduciaries were required to act, this same information starts the clock on their claims." ECF No. 42 at 22. In other words, they believe Plaintiffs are trying to benefit from a double standard that requires fiduciaries

---

[8] Defendants point out that part of Plaintiffs' proprietary funds theory is premised on the fact that the Wilmington Funds Large Cap Growth Institutional Fund lagged behind mutual fund investment options already included in the plan. Accordingly, Defendants argue, disclosure documents from before May of 2013 supplied Plaintiffs with knowledge of all material facts as to this part of the theory. However, the CAC states that the Plan did not report on the performance of this fund until August 2013, which is within the limitations period. Thus, at this point, the Court does not have sufficient information to conclude that this aspect of the claim is time-barred.

to act on widely-available information while allowing Plan participants to claim ignorance for statute of limitations purposes.

Contrary to Defendants' belief, there is no unfair double standard at play here—there are instead two different standards for fiduciaries and participants that appropriately acknowledge the groups' differing roles and responsibilities. The fiduciary duty established under ERISA is "the highest known to the law," *Donovan v. Bierwith*, 680 F.2d 263, 272 n.8 (2d Cir. 1985), and instructs fiduciaries to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). Fiduciaries must "exercise prudence in selecting investments" and continually "monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828. Plan participants, on the other hand, are not held to the same exceedingly high standard.

The law, however, does not presume that plan participants live under a rock. In a case that Defendants repeatedly cite to, *Muehlgay v. Citigroup Inc.*, No. 15-2461-cv, 2016 WL 2956958 (2d Cir. May 23, 2016) (summary order), the Second Circuit affirmed the U.S. District Court for the Southern District of New York's dismissal of former Citigroup employees' claim that managers of the Citigroup retirement plan breached their fiduciary duties by failing to remove Citigroup stock from the plan when it became clear that Citigroup stock would perform poorly in the future.

The district court found that, due to a "flood of public information" about Citigroup's troubles that dominated the "national news," knowledge of the facts underlying the plaintiffs' claim could be attributed to plaintiffs more than three years before they filed their complaint. *In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 606 (S.D.N.Y. 2015). Defendants' argument that information about the Wilmington Funds' comparatively low performance and high cost was as

widely-known as information about Citigroup during the height of the financial crisis stretches credulity. Even the most avid news consumer would be forgiven for not being aware of the information underlying this case. Whereas it was logical for the district court in *Citigroup* to assume that both fiduciaries and non-fiduciary beneficiaries alike were aware of subject matter covered extensively in national news, the same assumption does not apply to this case. Accordingly, at this stage of the litigation, the Court finds that Plaintiffs' proprietary funds count is not barred by ERISA's statute of limitations.

### B. Retail Shares and Mutual Fund Alternatives Allegations

Defendants move to dismiss Plaintiffs' claims that Defendants failed to use their bargaining power to invest in the cheapest share class available and that Defendants failed to consider collective investment trusts and separate accounts as alternatives to the mutual funds in the Plan. Defendants label these two sets of allegations the "retail shares" and "mutual fund alternatives" theories, respectively. ECF No. 42 at 12.

### i. Retail Shares Allegations

The allegations underlying the "retail shares" theory are that throughout the class period, Defendants had the opportunity to switch from more expensive fee share classes (i.e. "retail shares") to lower fee share classes (i.e. "investor shares") for the following Plan investment options: (1) the Harbor International Fund; (2) the PIMCO Total Return Fund; (3) the TIAA-CREF Mid Cap Value Fund; and (4) every T. Rowe Price fund offered in the Plan. For each of these funds, Defendants either waited multiple years before switching to the lower fee share classes or never switched from retail share classes to investor share classes. As a result, Defendants needlessly cost the Plan fees.

Plaintiffs do not have actual knowledge of Defendants' decision-making processes in selecting investment options for the plan, nor need they possess such knowledge. *See PBGC*, 712 F.3d at 718 (stating that because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail [before] discovery commences," they need not "allege facts [that] do not directly address the process by which the Plan was managed."). It is instead sufficient for Plaintiffs to allege "facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id.* at 718.

The CAC here does so by alleging "that a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative." *Id.* According to Plaintiffs, the alternative share classes were not materially different from those that the Plan offered because "the funds hold identical investments and have the same manager." ECF No. 35 at 51. There was "no reason the Plan, with over a billion dollars in assets . . . should not have been in the lowest fee share class of the same non-proprietary funds already offered in the Plan." ECF No. 52 at 5.

Defendants disagree, arguing that there are good reasons, such as "increased liquidity," to use retail shares instead, even if they are more expensive than institutional shares. ECF No. 62 at 4. Therefore, Defendants argue that it was not imprudent for them to choose retail share classes over institutional share classes. However, "the question of whether the defendants did in fact reasonably weigh the benefits and burdens when selecting retail shares over institutional shares is more appropriately taken up at the summary judgment stage." *See Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 686 (D. Conn. 2018); *see also Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1077 (N.D. Cal. 2017) ("Although Defendants may ultimately persuade the Court that they had legitimate reasons to select the [retail] investment options, ... [Plaintiff] has satisfied her burden at

this stage of the litigation by alleging facts from which the Court can reasonably infer that the defendants' decision-making process was flawed."); *Braden v. Wal-Mart Stores, Inc.*, 588 F.2d 585, 596 (8th Cir. 2009) ("Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct."). Discovery may very well indicate that Defendants had prudent reasons for offering the disputed retail shares or that Plaintiffs' claim that they are identical to their institutional counterparts is inaccurate, but the Court cannot reach that conclusion at this stage of the proceedings.

Defendants additionally argue that "Plaintiffs ignore that nearly a majority of the investments offered to Plaintiffs *were* institutional-class shares and that information about the mix of investment options was spelled out in Plan documents" and suggest that the Court consider the disputed retail share investment options within the context of the Plan as a whole. ECF No. 62 at 5. However, a fiduciary "cannot free himself from his duty to act as a prudent man simply by arguing that other funds, which individuals may or may not elect to" invest in "could theoretically, in combination, create a prudent portfolio." *Gedek v. Perez*, 66 F. Supp. 3d 368, 480 (W.D.N.Y. 2014) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)). Instead, "a fiduciary must initially determine, and continue to monitor, the prudence of each investment option available to plan participants." *DiFelice*, 497 F.3d at 423. Furthermore, Plaintiffs' retail shares theory challenges the inclusion of specific investment options in the Plan and not the Plan's mix and range of investment options as a whole.[9] Accordingly, to the "extent [P]laintiffs [allege] that defendants breached their fiduciary duties by selecting specific retail funds over lower-cost, but

---

[9] Defendants cite *PBGC*'s language that "the prudence of each investment is not assessed in isolation but, rather, as the investment relates to the portfolio as a whole" to support their argument that the retail shares theory must be dismissed because Plan participants were offered a diverse mix of shares from which to choose. *See* ECF No. 42 at 18 (quoting *PBGC*, 712 F.3d at 718 (2d Cir. 2013)). But the allegations in *PBGC* were that a retirement plan was not "properly diversifi[ed], achieving a disproportionate exposure to the risk of the mortgage security markets." *Id.* at 711. Plaintiffs here are concerned about the Plan's inclusion of options that needlessly cost beneficiaries money, not with the Plan's diversity or exposure to risk. This language from *PBGC* thus does not neatly apply to this case.

otherwise identical, institutional funds," these allegations are sufficient to survive Defendants' motion to dismiss. *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *8 (S.D.N.Y. Sept. 29, 2017).

Nor is the Court persuaded by Defendants' argument that the challenged retail shares' fees "fall well within the range rejected by other courts as insufficient to plead a fiduciary duty claim." ECF No. 62 at 5. Defendants rely on the Second Circuit's decision in *Young v. Gen. Motors Inv. Mgmt. Corp.*, which dismissed a complaint alleging that investment options in plaintiffs' retirement plan carried excessive fees. 325 F. App'x 31, 32 (2d Cir. 2009). Because the fees in question were similar to those at-issue in this case, Defendants argue that *Young* forecloses Plaintiffs' claims.

This argument misconstrues *Young*'s holding. The *Young* court specifically faulted the plaintiffs for "fail[ing] to allege that the fees were excessive relative to the services rendered," and thus failing to "provide a basis upon which to infer that defendants' offering of the [challenged funds] was a breach of their fiduciary duties." *Id.* Plaintiffs have not so failed.[10] Plaintiffs here argue that the "Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants." ECF No. 35 at 53-54. In other words, unlike the plaintiffs in *Young* and other cases that Defendants cite, including *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009), the Plaintiffs here argue that the fees were excessive relative to the services rendered, given that the institutional shares provided the same services and benefits for a lower cost. *See Kruger v. Novant Health, Inc.*, 131 F. Supp.

---

[10] Other courts have called into question the extent to which the "excessive relative to the services rendered" standard applies to ERISA. As the U.S. District Court for the District of Connecticut mentions, *Young* extrapolated this standard from the Investment Company Act ("ICA") and applied it to ERISA, but never "explicitly adopted it." *Vellali*, 308 F. Supp. 3d at 684 n.2. After *Young*, the Supreme Court confirmed that the ICA's "excessive relative to the services rendered" standard is "tailored to the history, statutory scheme, and purposes of the ICA, which regulates investment advisers" and not ERISA fiduciaries. *Id.* (citing *Jones v. Harris Assocs. L.P.*, 335, 339-41 (2010)).

3d 470, 476 (M.D.N.C. 2015) (upholding claim where plaintiffs alleged fees were "excessive, not by virtue of their percentage as in *Hecker* and its progeny, but because there are different versions of the same investment vehicle available to the Plan that have lesser fees").

### ii. Mutual Fund Alternatives Allegations

The "mutual funds theory" centers around allegations that Defendants breached their fiduciary duties by failing to consider collective investment trusts and separate accounts[11] as alternatives to the mutual funds in the Plan. ECF No. 35. Plaintiffs allege that there were collective trust alternatives for several proprietary funds in the Plan that were "half the cost of the mutual fund versions." ECF No. 57. Instead of offering Plan participants the lower cost collective trust versions, Defendants "opted to offer the higher-cost proprietary mutual funds because of the benefit they return to Defendants and their affiliated companies." *Id.* There were "no material service or other advantage[s]" to Plan participants over the collective trust alternatives. *Id.*

These allegations are inextricably intertwined with the proprietary funds allegations discussed earlier in this opinion and thus clearly concern Defendants' duty of loyalty. *See Laboy v. Bd. Of Trustees of Bldg. Serv. 32 BJ SRSP*, 513 F. App'x 78, 80 (2d Cir. 2013) (summary order) (acknowledging that allegations of self-dealing, and not just poor results, are sufficient to survive a motion to dismiss). These allegations therefore survive Defendants' Motion to Dismiss to the extent that they concern proprietary funds.

Plaintiffs' mutual funds alternatives theory also concerns non-proprietary funds. Specifically, Plaintiffs argue that Defendants failed to adequately investigate[12] the availability of

---

[11] Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. ECF No. 35 at 55. Separate accounts are another type of investment vehicle similar to collective trusts. *Id.* at 56.

[12] As Defendants point out, in June 2016, the "Plan switched all of its T. Rowe Price mutual funds to alternative investment vehicles," after Plaintiffs filed their initial Complaint in this matter. ECF No. 62 at 13. This fact, however, does not defeat Plaintiffs' plausible allegations that Defendants "failed to consider collective investment trusts and

collective trusts and separate account alternatives for several non-proprietary mutual funds in the plan, including T. Rowe Price funds and the Sterling Capital Midvalue Fund. ECF No. 35 at 58-59. Like the institutional share counterparts to the challenged retail shares discussed in the previous subsection, the mutual fund alternatives offered "no material service or other advantage to Plan participants," but cost the Plan millions of dollars per year in unnecessary fees. *Id.* at 58-60.

Defendants argue that ERISA plan fiduciaries "are not required to choose [separate accounts] over mutual funds," ECF No. 62 at 5 (quoting *Spano v. Boeing Co.*, 125 F. Supp. 3d 848, 867 (S.D. Ill. 2014)), and that mutual funds carry additional "reporting, governance, and transparency requirements" that might make them more attractive to Plan beneficiaries than collective trusts and separate accounts. *Id.* at 17. Regardless of their veracity, these arguments do not foreclose Plaintiffs' non-proprietary mutual funds alternatives claim at this point in the proceedings. Like Plaintiffs' retail shares argument, Plaintiffs' alternative investment argument is not a generalized grievance that the Plan lacked collective trusts and separate accounts—it is based on allegations that Defendants breached their fiduciary duties by selecting particular mutual funds over specific lower-cost, but otherwise materially indistinguishable, alternatives. At least one other court in the Second Circuit has recognized the viability of Plaintiffs' mutual funds alternative theory, *see Moreno*, 2016 WL 5957307, at *2, *6, and this Court agrees. The factual disputes regarding this theory are for another day.

---

separate accounts" at an earlier date and thereby cost Plaintiffs unnecessary fees over the course of several years. *See* ECF No. 35 at 55.

## IV.    Prohibited Transactions Causes of Action

### A.    Prohibited Transactions Between Plan and Fiduciary

Plaintiffs assert two causes of action under ERISA's prohibited transactions rules. ECF No. 35 at 64.  The first is based on 29 U.S.C. § 1106(b)(1), which prohibits plan fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account," and § 1106(b)(3), which bars fiduciaries from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Plaintiffs assert this cause of action against the "Company Defendants," a group comprised of M&T, M&T Bank, WTIA, WFMC, and Wilmington Trust.[13]  However, as discussed earlier in this opinion, the Company Defendants are not fiduciaries to the Plan, so this claim is DISMISSED.

### B.    Prohibited Transactions Between Plan and Party in Interest

The second prohibited transaction cause of action is under 29 U.S.C. 1106(a)(1)(C)-(D), which forbids a fiduciary from "causing a plan to engage in a transaction if he knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest," or if he knows that the transaction constitutes a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  Plaintiffs assert this cause of action against all Defendants and allege that as "Plan employers, fiduciaries, and/or service providers, the Company Defendants are parties in interest under 29 U.S.C. § 1002(14). This claim concerns only the proprietary funds offered through the Plan.

In response, Defendants argue that these claims should be dismissed because a regulatory exemption to the prohibited transaction laws applies to their conduct.  Specifically, Prohibited Transaction Exemption 77-3 ("PTE 77-3") exempts "transactions that involve the 'acquisition or

---

[13] As the Court will later discuss, Wilmington Trust Corporation is not a proper party to this suit.

sale of shares of [mutual funds] by an employee benefit plan covering only employees of" the mutual fund or affiliated companies." ECF No. 42 at 24. However, PTE 77-3 only applies if the investment is made on the same terms that apply to the rest of the investment public. *Id.*

Plaintiffs correctly argue this exemption is an affirmative defense on which Defendants bear the burden of proof. *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987); *Moreno*, 2016 WL 5957307, at *6 ("Whether an exemption precludes a plaintiff's prohibited transaction claim is treated as an "affirmative defense[ ] for pleading purposes."). It thus must be "clear from the face of the Complaint or judicially noticed court filings that the Plan's use of proprietary funds falls within an available exemption." *Id.*

The parties disagree considerably about whether the dealings between the proprietary mutual funds and the Plan were made on the same terms that apply to the rest of the investment public. The CAC states that Plan beneficiaries did not enjoy the same terms that the investing public enjoyed because the proprietary Wilmington Funds typically rebated 0.25% of investment management fees to other plans, but it conspicuously failed to do so for the M&T Plan. ECF No. 35 at 42-43 n.11. In response, Defendants state that a plan sponsor can use its discretionary contributions to employees' accounts to offset the lack of revenue sharing paid on proprietary funds held by the Plan. Plaintiffs then question the caselaw Defendants rely on and state that it is against "settled principles of trust law." ECF No. 52 at 24. Defendants respond by dismissing Plaintiffs' allegations as "entirely speculative." ECF No. 62 at 14.

After attempting to follow the volleying between Plaintiffs and Defendants, the Court questions whether the applicability of PTE 77-3 is "clear" from the face of the Complaint, and Plaintiffs' allegations about rebates do not appear, as Defendants suggest, to be "entirely

speculative." Accordingly, at this time, this prohibited transactions claim survives Defendants' Motion to Dismiss.

## V. Duty to Monitor

Plaintiffs argue that M&T Bank and its Board of Directors breached their fiduciary duty to monitor the Committee. While ERISA itself does not explicitly authorize such a claim, other courts have recognized it, *see, e.g.*, *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y 2005) (calling duty to monitor "well-established"), and regulations require fiduciaries to review trustees' performance at "reasonable intervals." 29 C.F.R. § 2509.75-8, at FR-17. As discussed earlier, Plaintiffs have not sufficiently alleged that M&T Bank is a fiduciary, so this claim is DISMISSED as to Defendant M&T Bank.

As Defendants indicate, successful duty to monitor claims require an underlying breach of fiduciary duty. *Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013). Because Defendants believe that Plaintiffs' underlying breach claim fails, they argue that their failure to monitor claim necessarily fails. However, as the Court does not share Defendants' belief in this regard, their argument is unavailing.

Defendants additionally argue that Plaintiffs' failure to monitor claim fails because the CAC baldly asserts the essential elements of a failure to monitor claim but omits sufficient supporting factual allegations. However, "because the appropriate ERISA mandated monitoring procedures vary according to the nature of the plan at issue and other facts and circumstances, an analysis of the precise contours of the defendants' duty to monitor at this stage is premature." *Vellali*, 308 F. Supp. 3d at 692 (quoting *In re Xerox*, 483 F. Supp. 2d 206, 215 (D. Conn. 2007)). At this juncture, Plaintiff has plead "facts," including allegations of excessive fees paid by the Plan, that "indirectly show[] unlawful behavior" and thus give Defendants "fair notice of what the

claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

## VI. Equitable Disgorgement

Defendants also move to dismiss Plaintiffs' equitable disgorgement claim against the Company Defendants. Section 503(a)(3) authorizes suits against non-fiduciaries who knowingly participate in ERISA violations for "appropriate equitable relief" including restitution. 29 U.S.C. § 1132(a)(3); *see also Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 246–47 (2000) (non-fiduciary can be liable for knowing participation of violation of section 406(a)); *Gerosa v. Savasta & Co.*, 329 F.3d 317, 320–21 (2d Cir. 2003) (non-fiduciary can be liable for knowing participation in ERISA violations and restitution available as an equitable remedy).

The elements of a cause of action for participation in a breach of fiduciary duty are "1) breach by a fiduciary of a duty owed to plaintiff, (2) defendant's knowing participation in the breach, and (3) damages." *Upstate N.Y. v. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 131 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 281-82 (2d Cir. 1992)). To allege the second element of "knowing participation," a Plaintiff must allege that the Company Defendants "affirmatively assist[ed], help[ed] conceal," or "fail[ed] to act when required to do so." *Upstate*, 131 F. Supp. 3d at 131.

The CAC does not share facts indicating that the Company Defendants—who, as the Court has determined, are not fiduciaries—knowingly participated in the underlying breach. *See In re Bausch & Lomb Inc. ERISA Litig.*, No. 06-CV-6297, 2008 WL 5234281, at *12 (W.D.N.Y. Dec. 12, 2008) ("[T]he Complaint does not allege how [the company] or anyone working for [the company] other than defendants who are already sued for fiduciary breach, 'knowingly participated' as a non-fiduciary in the alleged fiduciary breaches, as the law requires."). Plaintiff

tries to distinguish *Bausch & Lomb* by arguing that the court there dismissed the "knowing participation" claim simply because there was no underlying fiduciary breach. However, as the court makes clear, its reasoning on "knowing participation" is independent of its underlying fiduciary breach analysis. *See id.* ("*In addition*, the Complaint fails to allege that [the company] knowingly participated in the breaches.") (emphasis added). While the CAC alleges that the Company Defendants "had actual or constructive knowledge that the profits they were receiving from or in connection with Plan assets were being received as a result of Defendants' fiduciary breaches," ECF No. 35 at 68, Plaintiffs cite "no law suggesting that knowledge combined with receipt of advisory fees is sufficient to state a claim for knowing participation in the fiduciary breach of another." *Upstate N.Y.*, 131 F. Supp. 3d at 132. Accordingly, the equitable disgorgement claim against the Company Defendants is DISMISSED.

## VII. Wilmington Trust

The originally separate *Allen* and *Habib* actions both named Wilmington Trust Corporation as a Defendant. In drafting the CAC, Plaintiffs name Wilmington Trust Company instead of Wilmington Trust Corporation as a Defendant. Plaintiffs label this mistake a "scrivener's error" and then state that "[a]t no time ha[ve] Plaintiffs dismissed Wilmington Trust Corporation as a Defendant and they accordingly remain a part of the consolidated action." ECF No. 52 at 34.

The CAC is the operative complaint, however, and not the previous complaints in *Allen* and *Habib*. The CAC's omission of Wilmington Trust Corporation as a Defendant is therefore problematic. *Citizens Ins. Co. of the Midwest ex rel. deWitt v. Stone*, No. 1:16-cv56-MW/GRJ, 2016 WL 9275409, at *2 (N.D. Fla. Nov. 30, 2016) ("It is axiomatic that an action may survive only if the plaintiff named the appropriate defendant in its complaint."); *Hughes v. Auto-Owners Ins. Co.*, No. 4:11-CV-979 CAS., 2011 WL 2601519, at *3 (E.D. Mo. June 30, 2011) ("Where a

complaint names the wrong party as a defendant, it is appropriate for the plaintiff to seek leave to amend her complaint . . . .").  In any event, amendment would be futile since the there are no allegations in the CAC establishing Wilmington Trust Corporation's liability. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  Accordingly, Wilmington Trust Corporation is not a proper party to this suit.

## VIII.  Motion for Leave to File Supplemental Authority

Plaintiffs' Motion for Leave to File Supplemental Authority (ECF No. 63) is DENIED AS MOOT.

## CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss (ECF No. 41) is DENIED in part and GRANTED in part.  As the Company Defendants are not fiduciaries, any breach of fiduciary duty claims against them are DISMISSED.  Additionally, the equitable disgorgement claim against them is DISMISSED.  Finally, Wilmington Trust Corporation is dismissed from this action.  The remainder of Plaintiffs' claims stand.

By separate order, this case will be referred to a United States Magistrate Judge for pretrial proceedings.  Defendants must serve their answer to the CAC by September 25, 2018.

IT IS SO ORDERED.

Dated: September 11, 2018
    Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court