# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF NEW YORK

*In re M&T Bank Corporation ERISA Litigation*

**Civil Action No.: 1:16-cv-375-FPG-JJM**

**Consolidated Action**

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

   I.   THE PLAN AND ITS PARTICIPANTS .....................................................................2

   II.   DEFENDANTS IMPRUDENTLY AND DISLOYALLY MERGED THE PLAN WITH THE

      WILMINGTON TRUST PLAN .............................................................................. 4

   III.   DEFENDANTS CONTINUED TO OPERATE THE PLAN DISLOYALLY AND IMPRUDENTLY

      AFTER THE MERGER ..........................................................................................6

      A. The Committee Hired the Fox to Guard the Henhouse .......................................6

      B. The Defendants Did Nothing to Address the Plan's Excessive Fees...................7

      C. Defendants Failed to Remove Poorly Performing Proprietary Funds ................9

      D. Defendants' Retention of Proprietary Funds Was Inconsistent With the Lack of Faith

      the Market Had in Wilmington Funds ...............................................................13

   IV.   DEFENDANTS FAILED TO CONTROL THE PLAN'S RECORDKEEPING EXPENSES ...................14

   V.   DEFENDANTS BREACHES CAUSED CLASS-WIDE DAMAGES ................................15

   VI.   PROCEDURAL HISTORY ....................................................................................16

   VII.   NATURE OF ACTION AND SCOPE OF THE PROPOSED CLASS.................................16

ARGUMENT .....................................................................................................................17

   I.   STANDARD OF REVIEW .....................................................................................17

   II.   THIS COURT SHOULD CERTIFY THE PROPOSED CLASS........................................17

      A. The Proposed Class Satisfies Rule 23(a) .......................................................17

         1. Numerosity .................................................................................................18

         2. Commonality ...............................................................................................18

3.  Typicality.................................................................................................................21

4.  Adequacy of Representation ...................................................................................21

B.  The Proposed Class Satisfies Rule 23(b)(1) ....................................................................23

1.  Rule 23(b)(1)(A).....................................................................................................24

2.  Rule 23(b)(1)(B).....................................................................................................24

CONCLUSION...........................................................................................................................25

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 409 F. Supp. 2d 136

    (N.D.N.Y. 2005) ...................................................................................................25

*Amchem Prod., Inc. v. Windsor*, 117 S. Ct. 2231 (1997)....................................................18, 23

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184 (2013)...................................17, 18

*Banyai v. Mazur*, 205 F.R.D. 160 (S.D.N.Y. 2002)..................................................................24, 25

*Brotherston v. Putnam Investment, LLC*, 907 F.3d 17 (1st Cir. 2018) ....................................20, 23

*Brotherston v. Putnam Investments, LLC*, No. 1:15-cv-13825, ECF No. 88

    (D. Mass. Dec. 13, 2016) ............................................................................................1, 25

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) .......................................21

*Cassell v. Vanderbilt Univ.*, 2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018)....................1, 23, 25

*Cates v. The Trustees of Columbia University in the City of New York et al*, 1:16-cv-06524,

    ECF No. 210 (S.D.N.Y. Nov. 13, 2018).....................................................................1, 25

*Clark v. Duke Univ.*, 2018 WL 1801946 (M.D.N.C. Apr. 13, 2018) ........................................1, 25

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007).................21

*Cunningham v. Cornell Univ.*, 1:16-cv-6525, ECF No. 219 (S.D.N.Y. Jan. 22, 2019) ............1, 25

*Daugherty v. Univ. of Chicago*, 2018 WL 1805646 (N.D. Ill. Jan. 10, 2018).........................1, 25

*Davis v. Eastman Kodak Co.*, 2010 WL 11558014 (W.D.N.Y. Sep. 3, 2010).............................18

*Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951 (D.C. Cir. 1985)....................................................19

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ..................................................................21

*Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353 (E.D.N.Y.2009) ....................................................17

*Hardgers-Powell v. Angels in Your Home LLC*, 2019 WL 409276, (W.D.N.Y. Feb. 1, 2019) ....17

*Harris v. Koenig*, 271 F.R.D. 383 (D.D.C.2010)..........................................................................25

iv

*Henderson v. Emory Univ.*, 2018 WL 6332343 (N.D. Ga. Sept. 13, 2018) .............................1, 25

*Hicks v. T.L. Cannon Corp.*, 35 F.Supp.3d 329 (W.D.N.Y. 2014)............................................17, 18

*In re AOL Time Warner ERISA Litig.*, 2006 WL 2789862 (S.D.N.Y. Sept. 27, 2006)................23

*In re Beacon Assocs. Litig.*, 282 F.R.D. 315 (S.D.N.Y. 2012) .............................................. *passim*

*In re Chesapeake Energy Corp. 2012 ERISA Class Litig.*, 286 F.R.D. 621 (W.D. Okla. 2012)...22

*In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344 (S.D.N.Y. 2014).......................23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009)..................................21

*In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y.2004) ...............................19

*In re Northrup Grumman Corp. ERISA Litig.*, 2011 WL 3505264

    (C.D. Cal. Mar. 29, 2011) ...................................................................................... *passim*

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009).....................................24

*In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2211664 (S.D.N.Y. Oct. 4, 2004) ...................1, 25

*Kanawi v. Bechtel Corp.*, 254 F.R.D. 102 (N.D. Cal. 2008) ................................................. *passim*

*Koch v. Dwyer*, 2001 WL 289972 (S.D.N.Y. Mar. 23, 2001) ....................................................1, 23

*Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559 (D. Minn. 2014) ...................................... *passim*

*L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*,

    710 F.3d 57 (2d Cir. 2013)..............................................................................................20, 22

*MacPherson v. Firth Rixson Ltd.*, 2012 WL 2522881 (W.D.N.Y. June 28, 2012) ......................17

*Main v. Am. Airlines, Inc.*, No. 16-civ-473 (N.D. Tex. Feb. 21, 2018) .........................................23

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) ....................................................................21

*Moreno v. Deutsche Bank Americas Holding Corp.*, 2017 WL 3868803

    (S.D.N.Y. Sept. 5, 2017) ...................................................................................... *passim*

*Moreno v. Deutsche Bank Americas Holding Corp.*, 2017 WL 6506349

    (2d Cir. Dec. 19, 2017) ................................................................................1

*Moreno v. Deutsche Bank Americas Holding Corp.*, No. 1:15-cv-09936,

    ECF No. 311 (July 3, 2018) ........................................................................15

*Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-cv-9936, ECF NO. 348

    (S.D.N.Y. March 7, 2019)...........................................................................23

*Odom v. Hazen Transp., Inc.*, 275 F.R.D. 400 (W.D.N.Y. 2011) ................................18

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013).......19

*Sacerdote v. New York Univ.*, 2018 WL 840364 (S.D.N.Y. Feb. 13, 2018)............................1, 25

*Shanehchian v. Macy's, Inc.*, 2011 WL 883659 (S.D. Ohio Mar. 10, 2011)................................25

*Short v. Brown Univ.*, 320 F. Supp. 3d 363 (D.R.I. 2018).........................................................1, 25

*Stanford v. Foamex L.P.,* 263 F.R.D. 156 (E.D. Pa. 2009)...........................................................25

*Tracey v. MIT*, 2018 WL 5114167 (D. Mass. Oct. 19, 2018)...................................................1, 25

*Tussey v. ABB, Inc.*, 2007 WL 4289694 (W.D. Mo. Dec. 3, 2007)....................................1, 20, 25

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2017 WL 2655678

    (C.D. Cal. June 15, 2017) .........................................................................1, 25

*Wildman v. Am. Century Servs., LLC*, 2017 WL 6045487 (W.D. Mo. Dec. 6, 2017)..............1, 25

**Rules and Statutes**

29 U.S.C. § 1104...........................................................................................................24

29 U.S.C. §§ 1109(a) ..............................................................................................1, 22

29 U.S.C. §§ 1132(a)(2)..........................................................................................1, 22

29 C.F.R. § 2550.404c-1(d)(2)(iv)................................................................................19

Fed. R. Civ. P. 23(a) ........................................................................................18

Fed. R. Civ. P. 23(a)(1)....................................................................................18

Fed. R. Civ. P. 23(a)(2)....................................................................................18

Fed. R. Civ. P. 23(a)(3)....................................................................................21

Fed. R. Civ. P. 23(a)(4)....................................................................................21

Fed. R. Civ. P. 23(b)(1)....................................................................................23

Fed. R. Civ. P. 23(b)(3)....................................................................................23

**<u>Other Authorities</u>**

Fed. R. Civ. P. 23 advisory committee notes (1966) ...................................25

## INTRODUCTION

This is a class action against the M&T Bank Employee Benefit Plans Committee and other fiduciaries and parties-in-interest of the M&T Bank Corporation Retirement Savings Plan for breaching their fiduciary duties and engaging in prohibited self-dealing in violation of the Employee Retirement Income Security Act ("ERISA"). Plaintiffs bring this motion for class certification to provide participants in the Plan with the same opportunity for class-wide relief that is typically granted to 401(k) plan participants in other cases involving such ERISA claims. ERISA provides plan participants an express statutory right to bring suit in a representative capacity on behalf of a retirement plan. *See* 29 U.S.C. §§ 1109, 1132(a)(2). "[T]he distinctive representative capacity aspect of ERISA participant and beneficiary suits makes litigation of this kind a paradigmatic example of a [Rule 23](b)(1) class." *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 342 (S.D.N.Y. 2012) (internal quotation omitted). As a result, the overwhelming weight of authority supports Plaintiffs' request for class certification.[1]

The court's decision in *Deutsche Bank* is a cogent example. *See Moreno v. Deutsche Bank Americas Holding Corp.*, 2017 WL 3868803 (S.D.N.Y. Sep. 5, 2017), *leave to appeal denied*, 2017 WL 6506349 (2d Cir. Dec. 19, 2017). Similar to the present case, Deutsche Bank's

---

[1] *See Cunningham v. Cornell Univ.*, 1:16-cv-6525, ECF No. 219 (S.D.N.Y. Jan. 22, 2019); *Cates v. The Trustees of Columbia University in the City of New York et al*, 1:16-cv-06524, ECF No. 210 (S.D.N.Y. Nov. 13, 2018); *Cassell v. Vanderbilt Univ.*, 2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018); *Tracey v. MIT*, 2018 WL 5114167 (D. Mass. Oct. 19, 2018); *Henderson v. Emory Univ.*, 2018 WL 6332343 (N.D. Ga. Sept. 13, 2018); *Short v. Brown Univ.*, 320 F. Supp. 3d 363 (D.R.I. 2018); *Clark v. Duke Univ.*, 2018 WL 1801946 (M.D.N.C. Apr. 13, 2018); *Sacerdote v. New York Univ.*, 2018 WL 840364 (S.D.N.Y. Feb. 13, 2018); *Daugherty v. Univ. of Chicago*, 2018 WL 1805646 (N.D. Ill. Jan. 10, 2018); *Wildman v. Am. Century Servs., LLC*, 2017 WL 6045487 (W.D. Mo. Dec. 6, 2017); *Moreno v. Deutsche Bank Americas Holding Corp.*, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ; *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2017 WL 2655678 (C.D. Cal. June 15, 2017); *Brotherston v. Putnam Investments, LLC*, No. 1:15-cv-13825, ECF No. 88 (D. Mass. Dec. 13, 2016) (text order); *Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559 (D. Minn. 2014) ("*Ameriprise*"); *In re Northrup Grumman Corp. ERISA Litig.*, 2011 WL 3505264 (C.D. Cal. Mar. 29, 2011); *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102 (N.D. Cal. 2008); *Tussey v. ABB, Inc.*, 2007 WL 4289694 (W.D. Mo. Dec. 3, 2007); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2211664 (S.D.N.Y. Oct. 4, 2004); *Koch v. Dwyer*, 2001 WL 289972 (S.D.N.Y. Mar. 23, 2001).

401(k) plan included several poorly performing, costly "proprietary" mutual funds affiliated with the bank, along with unaffiliated funds from outside vendors. *Id.* at *2. The court found that "Plaintiffs raise numerous questions that are capable of classwide resolution, such as whether each Defendant was a fiduciary; whether Defendants' process for assembling and monitoring the Plan's menu of investment options, including the proprietary funds, was tainted by a conflict of interest or imprudence and whether Defendants acted imprudently by failing to control recordkeeping expenses." *Id.* at *5.

The same conclusion follows here. As discussed below: (1) there are over 21,000 persons who participated in the Plan during the class period; (2) Plaintiffs are typical of those Plan participants; (3) there are common issues regarding the manner in which Defendants managed the Plan's investment menu and recordkeeping expenses; and, (4) Plaintiffs have retained experienced class counsel and are adequate to represent the interests of the class. Further, certification of this action under Rule 23(b)(1) is necessary to: (A) avoid creating incompatible standards of conduct for Defendants with respect to the management of the Plan; and, (B) protect the interests of absent class members, since adjudication of Plaintiffs' claims on an individual basis would, as a practical matter, be dispositive of the interests of other class members (or, at the very least, substantially impair or impede their ability to bring separate claims). Accordingly, Plaintiffs respectfully request that this Court grant their motion for class certification.

## BACKGROUND

### I.   THE PLAN AND ITS PARTICIPANTS

The M&T Bank Corporation Retirement Savings Plan ("Plan") is a 401(k) plan that covers eligible employees of M&T Bank and its affiliates. The M&T Bank Employee Benefits Plans Committee ("the Committee") has responsibility for the investment decisions and

administration of the Plan. *ECF No. 35-1 §§ 9.1, 9.10.* Per the Plan Document, the Committee selects "the Investment Options among which Participants may direct the investment of their Accounts . . . ." *Id. § 9.10.* As dictated by Plan documents, the Committee consists of high-ranking company officials appointed by the shared Board of Directors of M&T and M&T Bank. *Richter Decl. Ex. 2 at 2-3.*

Over the class period, the Plan held between approximately $1.1 billion and $2.5 billion in total assets. *Richter Decl. Ex. 3 , at 696; Richter Decl. Ex. 4, at 3835.* There are currently over 21,000 participants in the Plan.[2] *Richter Decl. Ex. 5, at 2201.* As of the beginning of the statutory period in 2010, the Plan offered participants 23 designated investment alternatives, 8 of which were mutual funds from M&T Bank's proprietary MTB group of funds. *Richter Decl. Ex. 6.* For over a decade, M&T Bank has established a history of acquiring relatively obscure mutual fund companies, and then promptly adding the newly-acquired mutual funds to the Plan. For example, in 2003 M&T Bank acquired Allied Investment Advisors, Inc. and its line of ARK funds. *Richter Decl. Ex. 7, at 3841.* That year, M&T Bank rebranded the ARK funds as "MTB Funds" and then added at least three such funds to the Plan in 2004. *Compare Richter Decl. Ex. 8, at 474; with Richter Decl. Ex. 9, at 503.* As discussed below, M&T Bank's practice of acquiring mutual fund companies and then forcing its employees into their offerings continued into the statutory period.

At the beginning of the statutory period, more that 30% of the Plan's assets were invested in proprietary MTB funds (excluding M&T Bank stock). *Richter Decl. Ex. 10, at 1961.* These proprietary funds were the exclusive option in many of the most typical categories of investments. *See Richter Decl. Ex. 11,  at 48:7-49:1; Richter Decl. Ex. 12  at HABIB0000699.*

---

[2] The average participant's salary is a modest $51,000. *Richter Decl. Ex. 5, at MTB-ERISA-00002201.*

The Committee's retention of these funds was not based on superior performance, as the proprietary funds were easily the worst performing funds in the line-up throughout the statutory period. *See infra at* 12. For example, Committee minutes from the start of the statutory period starkly note that the worst performing fund over the past quarter was the MTB Large Cap Value Fund due to "Poor security selection," the worst performing fund over the past year was the MTB Prime Money Market Fund, and the "[n]ext bottom performer was MTB International Equity Fund." *Richter Decl. Ex. 13, at 2413.* Instead, the significant favoritism for MTB funds resulted from the fact that the investment advisor that the Committee relied on to design the Plan's investment line-up was none other than M&T Investment Advisors ("MTIA"), the same group that managed the MTB funds. *Richter Decl. Ex. 14* ("The Committee authorized MTIA to complete a review [of the Plan's funds], asking that they work with the Benefits Department to formulate appropriate recommendations."). Indeed, the Chair of the Committee from approximately 2004 until 2015 testified he could "not remember" any reason any of the M&T funds were in the line-up at the start of the statutory period other than the fact that they were proprietary funds.[3] *Richter Decl. Ex. 11, at 68:22-69:2*

## II.   DEFENDANTS IMPRUDENTLY AND DISLOYALLY MERGED THE PLAN WITH THE WILMINGTON TRUST PLAN

In May 2011, M&T Bank finalized its purchase of Wilmington Trust, a failing Delaware bank that had its own family of proprietary mutual funds, the Wilmington Funds. *See ECF No. 71 ¶ 9.* After the acquisition, M&T Investment Advisors was renamed Wilmington Trust Investment Advisors ("WTIA"), and the MTB funds were re-branded as Wilmington Trust ("WT") funds. *Id.* As part of the acquisition, the Wilmington Trust 401(k) plan was merged into

---

[3] It appears that the Committee selected and maintained these proprietary funds in the line-up without even discussing the potential for conflict that could arise by including proprietary funds in the investment line-up.  *Richter Decl. Ex. 11, at 49:5-17; 52:17-53:19.*

the M&T Plan. Before the merger, Wilmington's plan had over $200 million in assets, and consisted of a mixture of proprietary WT funds and non-proprietary mutual funds from leading fund families such as Vanguard, Fidelity, and American Funds. *Richter Decl. Ex. 15, at HABIB0003793*. However, following the merger, only the proprietary funds survived. *Richter Decl. Ex. 18, at 1053-54, 57*.

The records from the merger make clear that the goal in combining the plans was to maximize the level of assets in proprietary funds. The "project team" tasked with identifying which funds to maintain in the merged Plan was far from impartial—it was composed of representatives from MTIA and their soon-to-be colleagues at WTIA, the same entities that managed the proprietary MTB and WT funds. *Richter Decl. Ex. 16, at 117-120*.[4] Documents created by the project team confirm that one of their goals was to "Maintain WT and MTB funds" in the merged plan. *Richter Decl. Ex. 17, at 2627*. Another handwritten note acknowledges their intent to retain proprietary funds first, and then come up with a justification later, stating: "if surv[iving fund] is a prop[rietary] fund that pays higher fees there must be a justification." *Id.* As a result, Defendants discarded every single non-proprietary fund held in the former Wilmington plan and only superficially evaluated the eight proprietary Wilmington funds for potential inclusion in the Plan. *Richter Decl. Ex. 18, at 1053-54, 57*. Through this process, Defendants achieved their goal: the amount of "[p]roprietary offerings" in the M&T Plan—which Defendants were tracking—increased "by number (8 to 14)" and "by assets (31% to 40%)." *Id.* at 55. In dollars, the Plan went from $255 million in proprietary holdings to more than $417 million. *Id.*

---

[4] The only non-MTIA/WTIA members were one HR representative each from M&T and Wilmington, who focused not on the merits of the investments but "communication and logistics" around the merger. *Richter Decl. Ex. 16, at 117-120*.

Defendants took these actions with full knowledge of the high cost and poor performance of the Wilmington funds. For example, the fact sheet for the Wilmington Aggressive Asset Allocation fund provided to the Committee at the meeting it was selected for the Plan reflected that it underperformed both of its benchmarks over the prior 3- and 5-year periods by 1.5% to a staggering 7%. *Richter Decl. Ex. 18 at 1175*. The Wilmington Conservative Asset Allocation fund also underperformed its listed benchmarks in the prior 1-, 3- and 5-year periods. *Id. at 1177*. The Wilmington Multi-Manager Real Asset fund underperformed its listed benchmarks over the prior 3- and 5-year periods, from 0.4% to 2%. *Id. at 1179*. Similarly, the Wilmington Small-Cap Strategy fund underperformed the listed benchmarks over the prior 3- and 5-year periods. *Id. at 1180*. The performance of other Wilmington funds under consideration was similarly poor. The Committee's Chair (Stephen Braunscheidel) acknowledged that he could not remember any reason why the proprietary Wilmington funds were added as part of this integration other than the fact that they were the bank's own proprietary funds. *Richter Decl. Ex. 11, at 98:8-99:17.*

**III.    DEFENDANTS CONTINUED TO OPERATE THE PLAN DISLOYALLY AND IMPRUDENTLY AFTER THE MERGER**

**A.    The Committee Hired the Fox to Guard the Henhouse.**

After the merger with Wilmington, Defendants continued to operate the Plan in a disloyal and imprudent manner. The manager of the Plan's proprietary funds, WTIA, also continued to serve—under a clear conflict—as the Committee's investment advisor. The Committee's Chair (Mr. Braunscheidel), and its secretary (Anne Marie Odrobina),[5] both testified that the Committee "relied" on WTIA for its review of funds in the Plan. *Richter Decl. Ex. 11 at 38:1-20; Richter Decl. Ex. 16, at 57:3-8.* When asked if there was "any independent analysis going on with respect to the funds" or whether the Committee simply counted on WTIA to provide that

---

[5] Ms. Odrobina was M&T's Rule 30(b)(6) designee in this case.

information, Ms. Ordrobina stated, "We counted on the advisors [i.e., WTIA] to give the information." *Richter Decl. Ex. 16, at 57:3-8.*[6] Yet the Committee relied upon WTIA without even discussing WTIA's potential conflict or bias, or discussing the possibility of using independent advisors. *Richter Decl. Ex. 11, at 142:17-143:18.*[7]

**B.      Defendants Did Nothing to Address the Plan's Excessive Fees.**

The Committee was aware that the Plan's proprietary funds charged significantly higher fees than non-proprietary alternatives. At one Committee meeting, held on August 13, 2012, Valerie Gospodarek of WTIA provided a "Fee Analysis of the funds in the Retirement Savings Plan . . . ." *Richter Decl. Ex. 19.* Acknowledging the proprietary funds' disproportionately high fees, the Committee then "requested the WTIA team to further review the expense ratios of the Wilmington Trust funds and determine if a contractual waiver is possible to reduce the fees closer to the Lipper mean." *Id.* At a subsequent meeting on March 11, 2013, Ms. Gospodarek explained that fees for three *non-proprietary* funds could be lowered by moving into cheaper share classes (a change that a prudent fiduciary would have made far earlier), but made no mention of expenses for the Wilmington Trust funds. *Richter Decl. Ex. 20.* Committee minutes from March 2014 again expressly note that the "funds with higher expense ratios are Wilmington Trust funds." *Richter Decl. Ex. 21.* However, WTIA's representative shrugged off the higher fees, and no serious consideration was given to less expensive alternatives. The notes for the very next Committee meeting state that "WTIA finds no need to change the investment option lineup in the short term." *Richter Decl. Ex. 22.* It was not until after this lawsuit was filed that

---

[6] In her errata sheet, Ms. Odrobina attempted to revise her answer to state: "We counted on the advisors to give the data regarding fund performance."

[7] Mr. Braunscheidel repeatedly testified that he did "not remember" discussions and decisions by the Committee, but did confirm that such discussions and decisions would be contained in the minutes if they did occur.  No such discussions are reflected in the minutes produced in discovery.

WTIA advised the Committee that "all Wilmington Trust funds are in the process of reducing their expenses." *Richter Decl. Ex. 23.*

Defendants also failed to timely make changes to the Plan's investment vehicles that would have saved Plan participants millions of dollars in unnecessary fees. For example, the Plan included certain non-proprietary mutual funds managed by T. Rowe Price. The Plan could have paid significantly less fees for the exact same T. Rowe Price investments by using collective investment trust versions of those investments, offered by T. Rowe Price since 2010. *See ECF No. 35 ¶¶ 186-187.*[8] The Committee's materials reflect that no discussion of these less expensive options occurred until T. Rowe Price gave a presentation to the Committee in February 2016, with the Committee voting to convert the mutual funds to collective investment trusts at its next meeting. *Richter Decl. Ex. 24*; *Richter Decl. Ex. 25.*[9] Likewise, the Plan was invested in needlessly expensive share classes of other non-proprietary mutual funds in the Plan. *See ECF No. 35 ¶¶ 162-175.* Again, it appears from the documents produced in discovery that the Committee was unaware of this issue until 2013, when it noticed the proprietary funds in the Plan were the most expensive options, asked WTIA what could be done to lower the fees, and was advised by WTIA (in an act of changing the subject) that the Plan could lower the expenses of *non-proprietary* funds by changing their share class, which the Committee finally voted to do. *Richter Decl. Ex. 20.*[10]

---

[8] Defendants could have obtained similar savings by investing in alternative investment vehicles for other investment options in the Plan. *See ECF No. 35 ¶¶ 176-191.*

[9] The Committee Chair testified he does not recall any such conversations prior to 2013 and confirmed that such discussion would be contained in the minutes if they had occurred. *Richter Decl. Ex. 11 at 139:19-140:14.*

[10] Mr. Braunscheidel was unable to testify how long these cheaper share classes were available but confirmed that he did not recall any discussion regarding the possibility of cheaper share classes until 2013, and if such conversations had taken place, they would have been reflected in the minutes. *Richter Decl. Ex. 11, at 136:11-138:15.*

### C.      Defendants Failed to Remove Poorly Performing Proprietary Funds.

Defendants consistently exhibited a disloyal and imprudent bias in favor of proprietary funds. WTIA and the Committee did not hesitate to remove *non*-proprietary funds when issues were identified with respect to those funds. For example, WTIA recommended the prompt removal of the PIMCO Total Return Bond fund at a November 3, 2014 meeting upon learning of a management change at the fund, and the Committee approved the immediate removal of this fund. *Richter Decl. Ex. 29.* At the time, the PIMCO Total Return Bond fund was exceeding its benchmarks in the trailing 3-, 5-, and 10-year periods, and underperforming in trailing one-year returns by less than 1%. *Richter Decl. Ex. 27, at 988.*

By contrast, Defendants allowed proprietary funds to remain in the Plan despite similar management changes and consistent periods of underperformance. For example, in May 2012, the Committee was provided materials showing that the MTB Large Cap Growth fund had underperformed its benchmark index by an astonishing 10% over the trailing one-year period, (and by 3.3% and 2.7% over the trailing 5- and 10-year periods, respectively). *Richter Decl. Ex. 28, at 1380.* The same materials showed the MTB Large Cap Value fund underperforming its index by 7% over the trailing one-year period (and by 0.5% and 1.7% over the trailing 5- and 10-year periods, respectively). *Id. at 1381.* The same materials showed the non-proprietary Selected American Shares Fund underperforming its index by 6.4% over the trailing one-year period (and by 1.8% over the trailing 5-year period, while <u>over</u>performing its index by 0.7% over the trailing 10-year period). *Id. at 1366.* At this meeting, the Committee voted to remove the Selected American Fund from the Plan due to "[d]iminishing conviction in active managers' ability to generate alpha in large cap core space." *Id. at 1290.* However, the far-worse performing MTB funds were not removed from the Plan and were not even mentioned in the minutes. *Richter Decl. Ex. 29.*

At the next Committee meeting held on August 13, 2012, Mr. Fraundorf of WTIA discussed "management changes to the Wilmington Trust Large Cap and Small Cap Growth Funds." *Richter Decl. Ex. 19*. Both of these funds performed extremely poorly before and after the management changes (as of September 2011 and December 2012, these funds were significantly underperforming their benchmarks in the trailing 1-, 3-, 5-, and 10-year periods). *Richter Decl. Ex. 30, at 506-507; Richter Decl. Ex. 31, at 87-88*. Yet, unlike the PIMCO fund that was promptly removed from the Plan shortly after a manager change, the Committee did not remove these funds from the Plan at that time. *See Richter Decl. Ex. 19*.

Indeed, WTIA sometimes used manager changes to justify *retaining* poorly performing proprietary funds, even though that was cited as a basis for *removing* non-proprietary funds. For example, when the Committee "noted the underperformance of several of the Wilmington Trust funds, particularly the Large Cap Growth fund," WTIA excused this poor performance on the ground that "much of that fund's underperformance over recent time periods is attributable to the time when the prior management team was in place." *Richter Decl. Ex. 32*.[11]

At this same meeting, the Committee "discussed when an underperforming fund should be dropped from the Plan." *Richter Decl. Ex. 32*. During the course of this discussion, WTIA stated that it "first flags a fund when it has underperformed for two years, and calls for a discussion of the fund if it has underperformed for three years." *Id.* Yet, as noted earlier, WTIA and the Committee were willing to act far more quickly when non-proprietary funds were at issue.[12] One Committee member pointed out that, even forgiving shorter term underperformance,

---

[11] The materials for the next Committee meeting show that the fund continued to be the worst performing fund over the trailing one-year period, with half of the underperformance attributable to the new management team. *Richter Decl. Ex. 33, at 753*.

[12] As another example, Ms. Gospodarek "recommended the removal of TIAA CREF Mid Cap Value Fund from the Plan" during the August 12, 2013 Committee meeting, stating that "the performance of the TIAA-CREF Fund has deteriorated rapidly over the last year." *Richter Decl.*

"some Wilmington Trust funds show underperformance over a five year period." *Id.* In response, WTIA proceeded to offer excuses for this long-term underperformance. *Id.*

WTIA eventually formalized criteria for when a fund should be discussed for potential removal, and adopted a "WTIA Watchlist." These criteria were first applied to the Plan's investments at the Committee's November 21, 2013 meeting. *Richter Decl. Ex. 35*. The new methodology flagged seven actively-managed funds as underperforming and needing further review. *Id.* Five of these seven were proprietary funds. *Id.* After modifications to the Watchlist, modified criteria were applied to the Plan's investments in May 2015, and four of the Plan's funds were flagged for review – three of which were proprietary. *Richter Decl. Ex. 36, at 659*. This prompted the Committee to realize that WTIA's Watchlist was not part of the Plan's Investment Policy Statement, which used more lenient criteria under which none of the three proprietary funds were flagged. The Committee then noted "the potential inconsistency of a bank client being told that a fund is on the watch list under the Wilmington Trust criteria, while the same fund is not on the watch list under the Retirement Savings Plan [criteria]." *Id.*

In light of this glaring inconsistency, at the next Committee meeting on August 31, 2015, the Committee voted to incorporate the WTIA Watchlist criteria into its own Investment Policy Statement. *Richter Decl. Ex. 37*. At the same time, although only three months had passed since WTIA first announced the new criteria that flagged three proprietary funds, and even though the criteria called for monitoring flagged funds for 12 months, materials for this meeting reflect that

---

*Ex. 34*. Consistent with this advice, the Committee removed the TIAA-CREF fund based on this one year of poor performance. *Id.*

the three flagged Wilmington funds had been removed from the Watchlist based on their one-year returns. *Richter Decl. Ex. 38, at 1428.*[13]

The underperformance of the proprietary funds was widespread and long enduring. As of December 31, 2012, seven of the twelve proprietary mutual funds in the Plan were underperforming their benchmarks in both trailing 5- **and** 10-year annualized returns (assuming the fund existed long enough to calculate 10-year returns). *Richter Decl. Ex. 31*, at 87-92. Three of the remaining five proprietary funds underperformed their benchmarks in either the 5- **or** 10-year period. *Id.* That is, only two of the proprietary funds in the Plan at year-end 2012 exceeded their benchmark's performance in trailing 5- and 10-year annualized returns. This chronic underperformance – especially compared to the non-proprietary funds in the line-up – was presented to the Committee in vivid color in May 2013:



---

[13] Notably, it does not appear that the Committee voted to remove these funds from the Watchlist. Instead, this appears to have been the result of an off-the-record decision of WTIA or its employees, which would have conflicted with the stated criteria used for the Watchlist.

*Richter Decl. Ex. 39, at 567.* This chart shows that the nine worst funds in the line-up were proprietary funds (designated with a WT), judged over a three-year period by return (a 0% return representing the horitzontal axis) and peer group ranking (the bottom 50% are right of the vertical axis). The chart reflecting five-year performance displayed the same systemic underperformance by the Wilmington funds in the Plan. *Id. at 568.* Similarly, as of December 31, 2013, seven of the 12 proprietary funds in the Plan were underperforming in both the 5- and 10-year periods (again, assuming the fund existed long enough to calculate 10-year returns), and three were trailing in one or the other. *Richter Decl. Ex. 40, at 166-171.* As of December 31, 2014, five of the 10 proprietary funds in the Plan were underperforming in both these 5- and 10-year trailing periods, and another trailed its benchmark's 10-year trailing returns. *Richter Decl. Ex. 41, at 1242-45.*

### D. Defendants' Retention of Proprietary Funds Was Inconsistent With the Lack of Faith the Market Had in Wilmington Funds.

Given WTIA's consistent and longstanding history of underperformance as a fund manager, it is unsurprising that Defendants' proprietary funds have been poorly received in the market. In 2013, the financial newspaper Barron's ranked Wilmington Funds the 52nd-ranked mutual fund company out of 55 over the past five years, and the 33rd ranked fund family out of 48 over the past ten years. *Richter Decl. Ex. 42.* In 2014, Wilmington Funds was the 54th-ranked mutual fund family out of 56 fund families, and ranked 42nd out of 48 fund families over the past ten years *Richter Decl. Ex. 43.* In other years, the Wilmington funds were deemed so far outside the mainstream of fund families that they were not even ranked by Barron's.

As of the end of 2013, among the approximately 1,450 defined-contribution plans with over $500 million in assets (the Plan had approximately $1.9 billion in assets at this time), not a single plan (other than the Plan) included ***any*** of the twelve Wilmington funds held by the Plan.

*Richter Decl. Ex. 44*. Every non-conflicted fiduciary of similarly-sized plans had either removed Wilmington mutual funds from their plan or avoided them altogether. Given the lack of traction of Wilmington funds in the marketplace, the Plan is responsible for a substantial portion of the assets of the proprietary funds. For example, in December 2016, the Plan owned ███████ of the Wilmington Strategic Allocation Conservative Fund, and █████ of the Wilmington Strategic Allocation Aggressive Fund. *Richter Decl. Ex.* 45 at 1857. Similarly, as of September 2018 the Plan owned █████ of the Wilmington Short-Term Bond Fund, and █████ of the Wilmington Intermediate-Term Bond Fund. *Richter Decl. Ex. 46, 2481*.

In other settings, even Defendants appeared to lack faith in their proprietary funds. For example, in August 2012, the Committee removed the Wilmington Mid Cap Growth and Multi-Manager International funds as investment options in M&T Bank's health savings account for employees. *Richter Decl. Ex. 47, at 416*. The latter was replaced by the Harbor International Fund, which the Committee's secretary noted had a "lower expense ratio and improved performance." *Id. at 415*. In contrast, the Committee left the Wilmington Mid Cap Growth Fund in the Plan until it closed in 2015, and the Wilmington Multi-Manager International Fund remains in the Plan. *Richter Decl. Ex. 3*. Both appeared on the Plan's watchlist after they were removed from the HSA menu.

## IV.   DEFENDANTS FAILED TO CONTROL THE PLAN'S RECORDKEEPING EXPENSES

Finally, Defendants failed to prudently monitor and control the fees paid to T. Rowe Price, the Plan's recordkeeper. The Committee's Rule 30(b)(6) designee testified that no requests for proposal for recordkeeping services have been performed since T. Rowe Price was selected as the Plan's recordkeeper in 2004. *Richter Decl. Ex. 16. at 102:8-18*. As a result, the recordkeeping fees paid by the Plan to T. Rowe Price greatly exceeded the reasonable range that

a fiduciary of a similarly sized plan would have paid (which Plaintiffs have pled to be $45 to $50 per participant in 2010 to 2012, and lower thereafter).[14] A presentation given to the Committee in May 2013 (the only time the Committee appears to have examined such fees) shows that in 2010, T. Rowe Price was paid approximately $142.37 per participant for recordkeeping services, or about triple the reasonable rate. *Richter Decl. Ex. 39, at 570* (reflecting total recordkeeping compensation of $2,218,000 in 2010); *see also Richter Decl. Ex. 3, at 653* (reflecting 15,579 participants with account balances at yearend 2010). Had Defendants adhered to their fiduciary duties and obtained a comparable level of recordkeeping services at market rates, Plan participants would have saved over $1 million per year.[15]

## V.   DEFENDANTS BREACHES CAUSED CLASS-WIDE DAMAGES.

Plaintiffs have retained an expert to provide a preliminary damages analysis in connection with their motion for class certification. *See Declaration of Steve Pomerantz, Ph.D., Ex. 1.* In his preliminary report, Dr. Pomerantz opines:

> Any losses suffered by the Plan attributable to the selection and retention of proprietary investments affiliated with M&T Bank can be measured on a class-wide basis by comparing the performance of the Plan's investments during the Putative Class Period to what the performance would have been had the Plan's assets been invested by a prudent fiduciary acting in accordance with its fiduciary duties.

---

[14] This benchmark figure is consistent with the expert report submitted by Martin Schmidt in the Deutsche Bank matter. *See* Trial Declaration of Martin Schmidt, ECF No. 311 at ¶ 122, *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 1:15-cv-09936 (July 3, 2018).

[15] When Defendants belatedly renegotiated their agreement with T. Rowe Price in 2016 (twelve years after the initial contract), T. Rowe Price readily agreed to cap its compensation at $40 per participant, three to four times lower than what the Plan had paid the prior year. *See Proposed First Am. Consolidated Compl.*, ECF No. 85-1 ¶ 220. The Committee's materials during the time the recordkeeping contract was finally renegotiated acknowledge the costs saved by participants: "Savings to participants in form of fee reductions on revenue sharing resulting in increased investment returns." *Richter Decl. Ex. 48, at 2256.* A prudent fiduciary would have realized that excessive fees were being paid to T. Rowe Price and taken corrective action much sooner.

*Id. at ¶ 10.* Dr. Pomerantz preliminarily estimates that this category of damages caused the Plan between $26 and $38 million in damages. *Id.* Dr. Pomerantz also opines that damages can be calculated on a class-wide basis for Defendants' failure to consider the availability of collective investment trusts and separate accounts, failure to prudently manage recordkeeping expenses, and failure to use the lowest cost share class for the investments in the Plan. *Id.*

## VI.   PROCEDURAL HISTORY

This consolidated matter originated as two related actions, the earliest of which was filed on May 11, 2016. The operative Consolidated Complaint was filed on August 25, 2017. *ECF No. 35.* On October 10, 2017, Defendants moved to dismiss certain claims in the Consolidated Complaint. *ECF No. 41.* On September 11, 2018, the Court granted in part and denied in part Defendants' partial motion to dismiss. Plaintiffs' core fiduciary duty and prohibited transactions claim survived the motion to dismiss, but certain corporate defendants (including WTIA) were dismissed from the action, as was Plaintiffs' equitable disgorgement and prohibited transactions with fiduciaries claims. *ECF No. 68.* Plaintiffs have since moved to amend their existing Consolidated Complaint by naming WTIA as a fiduciary and renaming it as a Defendant in this matter, and adding the recordkeeping allegations set forth above. *See ECF No. 83.*

## VII.   NATURE OF ACTION AND SCOPE OF THE PROPOSED CLASS

Plaintiffs bring this action on behalf of Plan pursuant to 29 U.S.C. § 1132(a), to recover losses to the Plan under 29 U.S.C. § 1109(a) and obtain other appropriate relief. *See CC, Dkt. No. 35, ¶ 200.* Following the Court's ruling on Defendants' partial motion to dismiss, Plaintiffs assert operative claims against Defendants for breach of their fiduciary duties of loyalty and prudence (Count One); failure to monitor fiduciaries (Count Two); and, causing the Plan to engage in

prohibited transactions with a party-in-interest (Count Four). Plaintiffs assert these claims on behalf of the following class:

> All persons, except Defendants and their immediate family members, who were participants on or beneficiaries of the Plan, at any time between May 11, 2010 and the present.

*ECF No. 35 ¶ 80.*

## ARGUMENT

### I.     STANDARD OF REVIEW

District courts have "broad discretion" in deciding whether to certify a proposed class, and traditionally take "a liberal rather than a restrictive approach in determining whether" the requirements of Rule 23 are met. *Hicks v. T.L. Cannon Corp.*, 35 F.Supp.3d 329, 350 (W.D.N.Y. 2014) (quotations omitted). In making this determination, the Court must conduct a "rigorous analysis" of the requirements that apply under Rule 23. *Hardgers-Powell v. Angels in Your Home LLC*, --- F.R.D. ----, 2019 WL 409276, *3 (W.D.N.Y. Feb. 1, 2019) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982)). However, "Rule 23 grants no license to engage in free-ranging merits inquiries." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1194–95 (2013). Thus, a motion for class certification "should not . . . become a mini-trial on the merits." *MacPherson v. Firth Rixson Ltd.*, 2012 WL 2522881, *3 (W.D.N.Y. June 28, 2012) (quoting *Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, *2 (S.D.N.Y. Jul. 22, 2010)). Moreover, "it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y.2009) (citation and quotation omitted).

### II.    THIS COURT SHOULD CERTIFY THE PROPOSED CLASS

#### A.     The Proposed Class Satisfies Rule 23(a)

Rule 23(a) sets forth four requirements applicable to all class actions: (1) numerosity; (2)

commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prod., Inc. v. Windsor*, 117 S. Ct. 2231, 2245 (1997); Fed. R. Civ. P. 23(a). Each of these criteria are satisfied here.

### 1. Numerosity

Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The Second Circuit has held that 'numerosity is presumed at a level of 40 members . . . .'" *Hicks*, 35 F.Supp.3d at 351 (quoting *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995)). This threshold is easily met. As noted above, there are more than 21,000 participants in the Plan. *See supra* at 3. Joinder of such a large number of class members "obviously" would be impracticable. *In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 339 (S.D.N.Y. 2012).

### 2. Commonality

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is "generally considered a 'low hurdle' easily surmounted." *Davis v. Eastman Kodak Co.*, 2010 WL 11558014, *9 (W.D.N.Y. Sep. 3, 2010) (*quoting In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y.1995)). Commonality does not mean that all issues must be identical as to each class member, but simply requires that plaintiffs identify some unifying thread among the members' claims that warrants class treatment. *Odom v. Hazen Transp., Inc.*, 275 F.R.D. 400, 407 (W.D.N.Y. 2011). Thus, "[c]ourts have generally construed the commonality requirement liberally and require that only one issue be common to all class members." *Id.*

Questions that can be resolved by reference to an "objective standard" are "common to all members of the class" and satisfy the commonality requirement. *Amgen*, 133 S. Ct. at 1191. The liability of an ERISA fiduciary for breach of duty under section 1104(a) is precisely such a

question. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) ("Under this **objective standard**, whether an ERISA fiduciary's investment decision is improvident depends on what a prudent man in like circumstances would do.") (emphasis added); *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 955 (D.C. Cir. 1985) ("Prudence under ERISA is measured according to the **objective prudent person standard** developed in the common law of trusts.") (emphasis added).[16]

This standard is more than satisfied here. This case involves "numerous questions that are capable of classwide resolution, such as whether each Defendant was a fiduciary; whether Defendants' process for assembling and monitoring the Plan's menu of investment options, including the proprietary funds, was tainted by a conflict of interest or imprudence and whether Defendants acted imprudently by failing to control recordkeeping expenses." *Moreno*, 2017 WL 3868803, at *5. Resolution of these issues "will 'generate common answers apt to drive the resolution' of Defendants' liability." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (U.S. 2011); *see also In re Global Crossing*, 225 F.R.D. 436, 452 (S.D.N.Y.2004) ("In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries."); *Kanawi*, 254 F.R.D. at 109 ("[T]he common focus is on the conduct of Defendants: whether they breached their fiduciary duties to the Plan as a whole by paying excessive fees, [and] whether they made imprudent investment decisions."); *Krueger*, 304 F.R.D. at 572 (whether Defendants breached their fiduciary duties by selecting imprudent investment options and whether plan suffered losses "are common to all Plan participants' claims[.]"); *In re Northrup Grumman Corp.*

---

[16] Defendants cannot evade liability by pointing to participants' individual investment decisions. *See* 29 C.F.R. § 2550.404c-1(d)(2)(iv) (fact that plan participant exercises "independent control" over assets in his or her account "does not serve to relieve a fiduciary from its duty to prudently select and monitor any . . . designated investment alternative offered under the plan.").

*ERISA Litig.*, 2011 WL 3505264, at *8 (noting common questions regarding "whether the Plans' fees and expenses are reasonable; [and] whether the investment options selected by Defendants have been prudent"); *Tussey*, 2007 WL 4289694, at *5   (W.D. Mo. Dec. 3, 2007) (finding commonality satisfied and certifying class based on allegations of excessive recordkeeping expenses paid in part by revenue sharing because "all members of the class are interested in these excess fees being returned to the Plan.").

Similarly, because this matter is brought pursuant to 29 U.S.C. §§ 1109(a) and 1132(a) and in a "representative capacity" on behalf of the Plan, *In re Beacon Assocs. Litig.*, 282 F.R.D. at 342, the issue of damages is also ideally suited for classwide resolution based on common proof.[17] Plaintiffs' damages expert, Dr. Pomerantz, will calculate damages to the Plan by, among other things, comparing the performance of Defendants' proprietary funds to a set of comparable index funds. *See Brotherston v. Putnam Investment, LLC*, 907 F.3d 17, 32 (1st Cir. 2018) (endorsing Dr. Pomerantz's comparative approach for measuring losses to the plan in ERISA cases). Dr. Pomerantz has already performed this analysis, on a preliminary basis, for purposes of class certification, and will be able to analyze a variety of other measures of Plan loss at trial. *Pomerantz Decl Ex. 1.* At that point, "[i]f the Plaintiffs recover any damages on behalf of the Plan, it will be up to the Plan administrator to determine how those damages are to be distributed." *Kanawi*, 254 F.R.D. at 109 (quotation omitted). As a result, common evidence of damages to the Plan will suffice because "Plaintiffs' claims do not focus on injuries caused to each individual account, but rather on how the Defendants' conduct affected the pool of assets that make up the [Plan]." *Id.*

---

[17] *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 710 F.3d 57, 65 (2d Cir. 2013) (lawsuit brought pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) is "derivative" in nature, brought on behalf of Plan itself, even though recovered benefits eventually flow to participants).

### 3.      Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement "tend[s] to merge" with the commonality requirement. *See Gen. Tel. Co.*, 457 U.S. at 157 n.13; *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Typicality does not require a showing that "the factual background of each named plaintiff's claim be identical to that of all class members," *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999), but only that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

As was the case in *Moreno*, here each plaintiff has done "one or more of the following: (1) invested in at least one proprietary mutual fund; (2) participated in the Plan during the time period when the recordkeeping fees were allegedly excessive; and (3) invested in a proprietary or non-proprietary fund for which cheaper alternatives were allegedly available." 2017 WL 3868803, at *7; *see also Plaintiffs' Declarations*. "This is sufficient to show typicality." *Id.*; *see also Ameriprise*, 304 F.R.D. at 573 ("typicality is satisfied" where "Plan participants … are seeking redress of similar grievances under the same legal and remedial theories").

### 4.      Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs.*

*v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). Both prongs of this inquiry demonstrate that the adequacy requirement is satisfied here.

Plaintiffs have stated under oath that they are not aware of any conflicts of interest with other class members, and will represent the interests of the class members as they would their own. *Plaintiffs' Declarations ¶ 7.* Their interest in pursuing a recovery on behalf of the Plan is aligned with the class, and ERISA grants them the express the right to sue on behalf of the Plan. *See* 29 U.S.C. §§ 1109(a), 1132(a); *L.I. Head Start Child Dev. Servs.*, 710 F.3d at 65. Plaintiffs have been actively involved in the case, have produced documents in response to Defendants' discovery requests, and some already have been deposed by Defendants. *Plaintiffs' Declarations ¶ 5.* They are willing to undertake any responsibilities required of them as class representatives, and are prepared to testify at trial if necessary. *Id. ¶ 6.* They will adequately represent the class.[18]

Plaintiffs' counsel are also adequate. The attorneys at Nichols Kaster, PLLP ("Nichols Kaster") "are experienced litigators who serve as class counsel in ERISA actions involving defined-contribution plans." *Moreno*, 2017 WL 3868803, at *11; *see also Richter Decl. ¶¶ 5-7.* Likewise, Kessler Topaz Meltzer & Check, LLP ("KTMC") "is one of the most experienced ERISA litigation firms in the country, with particular expertise in the area of ERISA breach of fiduciary duty class actions." *In re Chesapeake Energy Corp. 2012 ERISA Class Litig.*, 286 F.R.D. 621, 624 (W.D. Okla. 2012); *see also Declaration of Mark Gyandoh Ex. 1.* In many ERISA cases that Nichols Kaster and KTMC have brought, including the present action, the

---

[18] *See Ameriprise*, 304 F.R.D. at 574-75; *In re Northrup Grumman Corp. ERISA Litig.*, 2011 WL 3505264, at *15 ("Here, the class representatives participated actively in discovery, met with counsel, sat for deposition, and reviewed the complaint before it was filed. … [They] testified that they would be willing to travel to Los Angeles to testify at trial if necessary. This kind of participation comports with what courts expect of class representatives.").

firms have achieved favorable rulings, including several orders granting class certification. *See*

*supra* at n.1.[19] Accordingly, Nichols Kaster and KTMC are well-qualified to represent the class.

### B.       The Proposed Class Satisfies Rule 23(b)(1)

In addition to meeting the requirements of Rule 23(a), the proposed class also satisfies

Rule 23(b)(1).[20]  Under Rule 23(b)(1), a class may be certified if prosecution of separate actions

by individual class members would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23(b)(1). Here, the proposed class plainly satisfies this Rule in light of the nature

of the claims alleged, which are brought on behalf of the Plan. *See, e.g., Moreno*, 2017 WL

3868803, at *8 (certifying class under Rule 23(b)(1) where plaintiffs "challenge[d] the

investment lineup that the [p]lan offered to all participants, and the recordkeeping fees imposed

on the [p]lan"). "Indeed, courts have noted that the distinctive 'representative capacity' aspect of

ERISA participant and beneficiary suits makes litigation of this kind 'a paradigmatic example of

---

[19] *See also Brotherston*, 907 F.3d 17 (vacating in substantial part judgment adverse to plan participants and remanding for further proceedings); *Moreno*, No. 15-civ-9936, ECF No. 348 (S.D.N.Y. March 7, 2019) (noting approval of $21.9 million settlement in where Nichols Kaster was class counsel); *Main v. Am. Airlines, Inc.*, No. 16-civ-473 (N.D. Tex. Feb. 21, 2018) (approving $22 million settlement where Nichols Kaster was class counsel); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 347 (S.D.N.Y. 2014) (noting approval of $45.9 million settlement where KTMC was co-lead counsel); *In re AOL Time Warner ERISA Litig.*, No. 02-civ-8853, 2006 WL 2789862, at *1 (S.D.N.Y. Sept. 27, 2006) (granting final approval of $100 million settlement where KTMC served as co-lead counsel).

[20] Plaintiffs only address class certification under Rule 23(b)(1) because it is clear that certification is proper under Rule 23(b)(1), and Rule 23(b)(3) is intended to address "situations in which class action treatment is not as clearly called for as it is in Rule 23(b)(1) …" *Amchem Prods.*, 117 S. Ct. at 2245. However, in the event that further analysis were required, the proposed class also satisfies the requirements of Rule 23(b)(3) because the common questions in this case "predominate" and class treatment is "superior." *See* Fed. R. Civ. P. 23(b)(3).

a [23](b)(1) class.'" *In re Beacon Assocs. Litig.*, 282 F.R.D. at 342 (quoting *Global Crossing*, 225 F.R.D. at 453).[21]

### 1.    Rule 23(b)(1)(A)

ERISA's fiduciary duties apply "with respect to a plan" and protect the "interest of the participants" collectively. *See* 29 U.S.C. § 1104. "Because Defendants' alleged conduct was uniform with respect to each participant, adjudicating Plaintiffs' claims, as a practical matter, would dispose of the interests of the other participants or substantially impair or impede their ability to protect their interests." *Moreno*, 2017 WL 3868803, at *8. Thus, "class certification in this case is properly granted under Rule 23(1)(A)" as "separate lawsuits by various individual Plan participants to vindicate the rights of the Plan could establish incompatible standards to govern Defendants conduct, such as . . . determinations of differing 'prudent alternatives' against which to measure the proprietary investments, or an order that Defendants be removed as fiduciaries." *Ameriprise*, 304 F.R.D. at 577. "In light of this risk, Plaintiffs have successfully satisfied the requirements of Rule 23(b)(1)(A)." *Kanawi*, 254 F.R.D. at 111.

### 2.    Rule 23(b)(1)(B)

For similar reasons, class certification is also appropriate under Rule 23(b)(1)(B). *Banyai v. Mazur*, 205 F.R.D. 160, 165 (S.D.N.Y. 2002) ("Because plaintiffs, as a Fund participant and a Fund beneficiary, seek to remedy an alleged breach of fiduciary duty, and because any recovery here would benefit the Fund as a whole, the Court finds that there is a risk that separate prosecutions by individual Fund participants or beneficiaries would be dispositive of the interests of other members not parties to those prosecutions."). Because the claims in this case are brought

---

[21] *See also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3d Cir. 2009) ("In light of the derivative nature of ERISA § 502(a)(2) claims, breach of fiduciary duty claims brought under § 502(a)(2) are paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class, as numerous courts have held.") (citing cases).

on behalf of the Plan as a whole, a decision in this case could bar subsequent individual actions under the doctrine of *res judicata. See Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 409 F. Supp. 2d 136, 145 (N.D.N.Y. 2005). At the very least, "as a practical matter, the adjudication of one participant's § 1132(a)(2) action will influence a subsequent adjudication of the same claims brought by another participant and . . . could dispose of the other participants' actions on behalf of the Plan." *Ameriprise*, 304 F.R.D. at 577.

The Advisory Committee Notes to Rule 23 expressly recognize that class certification is appropriate under Rule 23(b)(1)(B) in "an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust." Fed. R. Civ. P. 23 advisory committee notes (1966); *see also Banyai*, 205 F.R.D. at 165. "This case falls squarely within the meaning articulated by the Advisory Committee as Plaintiffs allege breaches of fiduciary duties affecting the Plan[] and the thousands of participants in the Plan[]." *Shanehchian v. Macy's, Inc.*, 2011 WL 883659, *10 (S.D. Ohio Mar. 10, 2011). Accordingly, class certification should be granted under Rule 23(b)(1)(B), consistent with the Advisory Committee Note and the overwhelming weight of case law.[22]

## CONCLUSION

For the above reasons, this Court should grant Plaintiffs' Motion for Class Certification.

---

[22] *See supra* at 1 n.1*; see also Ameriprise*, 304 F.R.D. at 577; *Shanehchian*, 2011 WL 883659, at *10; *In re Beacon Associates Litig.*, 282 F.R.D. at 342 ("[A] breach of fiduciary duty claim brought by one member of a retirement plan necessarily affects the rights of the rest of the plan members to assert that claim, as the plan member seeks recovery on behalf of the plan as an entity. Accordingly, by the very nature of the relief sought, the prosecution of separate actions would risk prejudice to putative class members.") (quoting *In re AOL Time Warner ERISA Litig.*, 2006 WL 2789862, at *4 (S.D.N.Y. Sept. 27, 2006)); *Harris v. Koenig*, 271 F.R.D. 383, at 394 (D.D.C.2010), ("Historically, § 502(a)(2) actions brought on behalf of the entire plan have been considered especially appropriate for Rule 23(b)(1)(B) certification."); *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 174 (E.D. Pa. 2009) ("because of the unique and representative nature of an ERISA § 502(a)(2) suit, numerous courts have held class certification proper pursuant to Rule 23(b)(1)(B)").

Dated:  March 25, 2019

Respectfully submitted,

By: s/Kai Richter

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 022084X*
Kai Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
Jacob Schutz, MN Bar No. 0395648*
  *admitted in W.D.N.Y.
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
Email: krichter@nka.com
  cengstrom@nka.com
  jschutz@nka.com

**KESSLER TOPAZ MELTZER**
  **& CHECK, LLP**
Mark K. Gyandoh (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: mgyandoh@ktmc.com

*Interim Co-Lead Counsel*

**TREVETT CRISTO**
Lucinda Lapoff, Esq.
2 State Street, Suite 1000
Rochester, NY 14614
Tel: (585) 454-2181
Fax: (585) 454-4026

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2019, a true and correct redacted copy of Plaintiffs' Memorandum in Support of Their Motion for Class Certification was served by CM/ECF to the parties registered to the Court's CM/ECF system.  An unredacted copy was served on all counsel of record via encrypted email, pending the Court's determination as to whether those exhibits may be filed under seal.

Dated: March 25, 2019                    /s/ Kai Richter
                                         Kai Richter