# **EXHIBIT 11**

In the Matter Of:

*M&T BANK CORPORATION ERISA LITIGATION*

_____

*STEPHEN BRAUNSCHEIDEL*

*March 13, 2019*

_____

epiq
court reporting solutions

STEPHEN BRAUNSCHEIDEL - 03/13/2019

```
 1   UNITED STATES DISTRICT COURT

 2   WESTERN DISTRICT OF NEW YORK

 3   _____

 4           IN RE M&T BANK CORPORATION ERISA LITIGATION

 5
             Civil Action No. 1:16-cv-375-FPG
 6

 7                       Consolidated Action
     _____
 8

 9   Examination Before Trial of STEPHEN BRAUNSCHEIDEL, held

10   pursuant to the Federal Rules of Civil Procedure, in the

11   offices of METSCHL & ASSOCIATES, 295 Main Street, Suite

12   1098, Buffalo, New York, on Wednesday, March 13, 2019 at

13   9:00 a.m. before Molly Fenske, Notary Public.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2
      NICHOLS KASTER
 3    BY:  PAUL J. LUKAS, ESQ.
      4600 IDS Center
 4    80 S. 8th Street
      Minneapolis, Minnesota  55402
 5    lukas@nka.com
      Appearing for the Plaintiffs.
 6

 7    SULLIVAN & CROMWELL, LLP
      BY:  JONATHAN J. OSSIP, ESQ.
 8    and TYLER M. DATO, ESQ.
      125 Broad Street
 9    New York, New York  10004
      ossipj@sullcrom.com
10    datot@sullcrom.com
      Appearing for the Defendants.
11

12    M&T BANK
      BY:  MICHAEL C. DRISCOLL, ESQ.
13    One M&T Plaza, 8th Floor
      Buffalo, New York  14203
14    mdriscoll@mtb.com
      Appearing for M&T Bank.
15

16

17

18

19

20

21

22

23

24

25
```

1   Q.   Was there anyone you relied upon for advice or
2   information with respect to what should actually be in
3   the lineup?
4   A.   Yes.
5   Q.   Who?
6   A.   Individuals that would present the fund to us.
7   Q.   And that was the people that was -- that were
8   part of the investment group at the bank; correct?
9   A.   I don't remember.
10  Q.   I think the initials I got are MTBIA, as in
11  M&T Bank Investment Advisors.  Does that sound right?
12  A.   Yes.
13  Q.   And then after the acquisition of Wilmington
14  Trust it became WTIA, Wilmington Trust Investment
15  Advisors; correct?
16  A.   Yes.
17  Q.   And that's who you relied upon as a member of
18  the committee with respect to the selection of funds?
19          MR. OSSIP:  Objection to form.
20          THE WITNESS:  Yes.
21          MR. LUKAS:  And it was also true that's
22     who you relied upon to monitor the funds that were
23     already in the lineup and decide whether to remove
24     or replace them; correct?
25          MR. OSSIP:  Same objection.

1   BY MR. LUKAS:
2       Q.   An SDBA in the lineup at any time while you
3   were on the Benefits Committee?
4       A.   I do not know.
5       Q.   You do not know or there was not?
6       A.   I don't know.
7       Q.   Do you still have 2010 in front of you?
8       A.   Yes.
9       Q.   So if a participant in the plan for example
10  wanted to invest in a large cap growth fund, their only
11  option in this lineup was to select the MTB Large Cap
12  Growth Fund; correct?
13      A.   Yes.
14      Q.   And that's true with all of these MTB funds,
15  if they -- well, let me do this.  I think there's -- if
16  you look at MTB International Equity, and there's also
17  a Harbor Capital International.  Let's set those two
18  aside, okay?  Let me ask you this.  With respect to all
19  of the other MTB funds, it's true, is it not, that if a
20  participant wanted to select a fund in those specific
21  categories, it had to pick an MTB fund to do so?
22               MR. OSSIP:  Objection to form.
23               THE WITNESS:  This is the roster of
24      what's available?
25               MR. LUKAS:  Correct.

```
 1                    THE WITNESS:  Yes.
 2                    MR. OSSIP:  Objection to form.  Also
 3       mischaracterizes the document.
 4     BY MR. LUKAS:
 5       Q.   While you were on the committee, was there any
 6     discussion about the potential conflict of having
 7     proprietary funds in the 401(k) lineup, proprietary
 8     meaning M&T funds?
 9       A.   I don't remember.
10       Q.   So if there ever was such conversation, you
11     don't recall if it occurred?
12       A.   No, I don't.  I don't recall.
13       Q.   You would expect such a conversation to be
14     captured in the minutes if such a conversation
15     occurred, would you not?
16                    MR. OSSIP:  Objection to form.
17                    THE WITNESS:  Yes.
18     BY MR. LUKAS:
19       Q.   Now looking back at this Exhibit 18 in the
20     2010 lineup, not only does it have the funds that are
21     available, it has the assets that are invested in them,
22     first by number of units or shares and then actual fair
23     value of those investments.  Do you see that?
24       A.   Yes.
25       Q.   So at this point in time in 2010, including
```

1      thinking.
2              MR. LUKAS:  As chair of this committee,
3      it was your expectation that the participants wanted
4      to make money on their 401(k) plan; right?
5              MR. OSSIP:  Objection to form.
6              THE WITNESS:  Yes.
7              MR. LUKAS:  And that would include the
8      stock.  They wanted to make money in stock, that's
9      why they were investing in the stock?
10             MR. OSSIP:  Same objection.
11             MR. LUKAS:  That was your understanding,
12     at least as the chair of the Benefits Committee;
13     correct?
14             MR. OSSIP:  Same objection.
15             THE WITNESS:  Yes.
16  BY MR. LUKAS:
17     Q.  Was there any discussion that you can recall
18  while you were on the committee about the danger of
19  having M&T investment funds in a lineup that is already
20  so heavily invested in common stock in the same
21  company?
22     A.  I don't remember.
23     Q.  If there ever was such a conversation, you
24  don't recall it?
25     A.  I don't recall it, yes.

```
 1      Q.   And you would expect it to be in the minutes
 2   if such a conversation took place amongst the committee
 3   members?
 4              MR. OSSIP:  Objection to form.
 5              THE WITNESS:  Yes.
 6              MR. LUKAS:  Was there any discussion
 7      about the risk of having proprietary funds in the
 8      lineup because it could attract loyal employees to
 9      the fund?  In other words, that they would gravitate
10      to that fund because it had MTB in front of it as
11      opposed to one of the other options in the plan?
12              MR. OSSIP:  Objection to the form of the
13      question.
14              THE WITNESS:  I don't remember.
15              MR. LUKAS:  If such a conversation took
16      place, you would expect to see it in the minutes?
17              THE WITNESS:  Yes.
18              MR. OSSIP:  Same objection.
19              THE WITNESS:  Yes.
20   BY MR. LUKAS:
21      Q.   So part of your day job was HR and benefits;
22   correct?
23      A.   Yes.
24      Q.   And having these funds in this lineup provided
25   the bank with something that a lot of employee, or
```

```
 1      A.   I don't remember, no.
 2      Q.   And as you sit here today, you don't remember
 3   studying it or comparing it and trying to figure out
 4   yourself whether a fund was doing well or not?
 5           MR. OSSIP:  Objection to form.  You can
 6      answer.
 7           THE WITNESS:  I don't remember.
 8           MR. LUKAS:  So you don't know whether or
 9      not you relied on MTBIA and WTIA to let you know or
10      whether you did your own independent review of these
11      performance documents?
12           MR. OSSIP:  Objection to form.  Asked and
13      answered.  You can answer.
14           THE WITNESS:  I don't remember.
15           MR. LUKAS:  And if I picked a few others
16      like the MTB Small Cap Growth or MTB International
17      Equity, it would be the same answers?
18           THE WITNESS:  Yes.
19           MR. OSSIP:  Objection to form.  Give a
20      minute for me to get in.
21           THE WITNESS:  Yes.
22           MR. LUKAS:  As you sit here today, can
23      you think of any reasons why as of 2010 these MTB
24      funds were in this lineup other than the fact that
25      they were proprietary funds?
```

```
 1                MR. OSSIP:  Objection to form.
 2                THE WITNESS:  I don't remember.
 3                MR. LUKAS:  Do you recall the integration
 4      of the WT or Wilmington Trust pension plan into the
 5      M&T pension -- or I'm sorry.  Let me start over.  Do
 6      you recall after the acquisition of Wilmington Trust
 7      the integration of the Wilmington Trust 401(k) plan
 8      into the M&T 401(k) plan?
 9                MR. OSSIP:  Objection to form.
10                THE WITNESS:  Yes.
11   BY MR. LUKAS:
12      Q.   Do you remember a project team being compiled
13   to make recommendations with respect to how that
14   integration should occur?
15      A.   We would have project teams to do that with
16   any acquisition.
17      Q.   Do you remember there -- one being a project
18   team?  Well, let me piggyback on that.  So any time
19   there was a business that was acquired that had a
20   401(k) plan, the committee would put together a project
21   team to discuss the or to map out the integration of
22   that plan?
23                MR. OSSIP:  Objection to form.
24                THE WITNESS:  I don't know that.  I don't
25      know.
```

1   other than Wilmington Trust?
2       A.   I don't remember.
3       Q.   Do you recall him doing a quantitative review?
4   Not -- this says qualitative.  Do you recall him doing
5   a quantitative review of the performance of the
6   specific funds that were being added to the plan?
7       A.   No, I do not.
8       Q.   Can you give any reason why these six funds
9   were being moved into the M&T lineup other than the
10  fact that they were proprietary funds?
11              MR. OSSIP:  Objection to form.
12              THE WITNESS:  I don't remember.  I don't
13       remember the...
14              MR. LUKAS:  So you can't give any reasons
15       other than the fact that they're proprietary as to
16       why they were being added?
17              MR. OSSIP:  Objection to form.  Asked and
18       answered.  You can answer.
19              THE WITNESS:  I don't remember.
20              MR. LUKAS:  Is there anything you could
21       review or look at to help your memory about whether
22       there are any reasons these things were being moved
23       in other than the fact that they were WT funds?
24              MR. OSSIP:  Objection to form.
25              THE WITNESS:  That's such a broad

1     question.  I don't know how to answer that when you
2     say any.
3              MR. LUKAS:  Well, what would you look at?
4     Is there something as you're sitting there, is there
5     something you're dying to look at so you can try to
6     come up with reasons why they were added other than
7     the fact that they were WT funds?
8              MR. OSSIP:  Objection to form.
9              THE WITNESS:  No.  Today?  No, no,
10    there's -- not for today.  Then I would, perhaps
11    would have seen something at the time, but I just
12    don't -- I don't remember this.
13             MR. LUKAS:  If you had seen it, it would
14    be in the materials or it would be in the minutes;
15    correct?
16             MR. OSSIP:  Objection to form.
17             THE WITNESS:  Yes.
18             MR. LUKAS:  Okay.  Now would be a good
19    time to break.
20             THE WITNESS:  Okay.
21             (A recess was taken.)
22    BY MR. LUKAS:
23       Q.  We're back on the record, back from lunch.  I
24    wanted to show you Exhibit 3, which is the IPS or
25    investment policy statement.  If you could go to tab

```
 1      A.   I don't really.  I don't.  I don't know.
 2      Q.   Do you recall there being any discussion about
 3   the or use of the term revenue sharing in connection
 4   with recordkeepers or recordkeeper payment?
 5              MR. OSSIP:  Objection to form.
 6              THE WITNESS:  I do not remember.
 7   BY MR. LUKAS:
 8      Q.   What is your understanding of what a share
 9   class is, if you have one?
10      A.   I don't have an understanding.
11      Q.   Let's go to the document I marked by mistake,
12   Exhibit 23.  Maybe I did mark this.  I'm not going to
13   save myself if that doesn't help.  I want to go to the
14   minutes again, which was Exhibit 20.  I want to go to
15   March 11, 2013.  I'm -- if you -- I'm most interested
16   in the last -- the second to last paragraph, but if you
17   want to read for context, you could read --
18      A.   Right through proposal?
19      Q.   Yeah.
20              MR. OSSIP:  If you want to read the whole
21      thing for context, that might be helpful.
22   BY MR. LUKAS:
23      Q.   Yeah, you can read the whole thing if you
24   want.  You've read it?
25      A.   Yes.
```

```
 1      Q.   So does that refresh your recollection of what
 2   is being referred to at least in this context as a
 3   share class?
 4      A.   Yes.
 5      Q.   And what we have here is the committee is
 6   agreeing to the -- WTIA's proposal to change the share
 7   class of three of the non-proprietary funds; correct?
 8      A.   Yes.
 9      Q.   Is it your understanding because they are
10   cheaper, less expensive?
11              MR. OSSIP:  Objection to form.  You can
12       answer.
13              THE WITNESS:  I don't know that.  I don't
14       know.
15              MR. LUKAS:  Do you know how long these
16       share classes have been available to the plan prior
17       to this discussion reflected in the March 11, 2013
18       minutes?
19              MR. OSSIP:  Objection to form.
20              THE WITNESS:  I do not.  I do not
21       remember.
22              MR. LUKAS:  Do you recall any
23       conversation about share class prior to March 11,
24       2013?
25              MR. OSSIP:  Objection to the form.
```

```
 1                THE WITNESS:  I do not.
 2                MR. LUKAS:  You would however as we see
 3   them here, if such a conversation took place, you
 4   would expect to see them in the minutes or in the
 5   materials; correct?
 6                MR. OSSIP:  Objection to the form of the
 7   question.
 8                THE WITNESS:  Do you mind restating that?
 9                MR. LUKAS:  Sure.  Like we see them here,
10   if there was an earlier conversation about share
11   class, you would expect to see them in the minutes
12   or the materials?
13                MR. OSSIP:  Same objection.
14                THE WITNESS:  Yes.
15                MR. LUKAS:  Thank you.  Do you recall any
16   conversation from the committee or in the committee
17   about reasons why the plan should hold onto more
18   expensive share classes and not get the cheaper
19   share classes?
20                MR. OSSIP:  Objection to the form of the
21   question.
22                THE WITNESS:  I don't remember.
23                MR. LUKAS:  And again, you would expect
24   to see those such conversations reflected in the
25   minutes if they took place; correct?
```

```
 1                MR. OSSIP:  Objection to form.
 2                THE WITNESS:  Yes.
 3   BY MR. LUKAS:
 4      Q.   What is your understanding, if any, of what is
 5   a separate account?
 6      A.   I don't have -- I don't know.
 7      Q.   So fair to ask you if there are any
 8   discussions that you can remember concerning looking at
 9   an investment vehicle called a separate account, you
10   wouldn't recall that?
11      A.   I do not.
12      Q.   And if such a conversation took place with
13   respect to changing investment vehicles, that would be
14   something you would expect to see in the minutes or the
15   materials; correct?
16                MR. OSSIP:  Objection to the form of the
17      question.
18                THE WITNESS:  Yes.
19                MR. LUKAS:  My next questions are going
20      to be about CITs, but I think earlier we discussed
21      today you don't know what a CIT is; correct?
22                MR. OSSIP:  And Counsel, those are
23      collective trusts is what you're talking about;
24      right?
25   BY MR. LUKAS:
```

 1     Q.   Yeah, collective investment trusts, CITs?
 2     A.   Was that a question?
 3     Q.   Yeah.
 4     A.   I'm sorry.
 5     Q.   I think this morning you said that you didn't
 6   know what those were?
 7     A.   That's correct.
 8     Q.   So if I were to ask you questions about
 9   whether they were discussed, you would say you don't
10   know?
11     A.   Yes.
12     Q.   And if they were discussed, you would expect
13   to find those in the minutes?
14     A.   Yes.
15          MR. OSSIP:  Objection to the form of the
16     question.
17          MR. LUKAS:  Now, do you know -- I'm
18     shifting gears here to talk about WTIA.  As I
19     understand it, when Wilmington Trust was acquired,
20     MTBIA and WTIA merged and became WTIA; correct?
21          MR. OSSIP:  Objection to form.
22          THE WITNESS:  Yes.  Yes.
23          MR. LUKAS:  So prior to the acquisition,
24     the plan's advisors were WTWB?
25          MR. OSSIP:  Want to try that again?

```
 1                MR. OSSIP:  Objection to the form.
 2                THE WITNESS:  I do not know.
 3   BY MR. LUKAS:
 4       Q.   Do you know whether or not they were paid?
 5       A.   Again, I don't understand the question.  Were
 6   the employees paid?
 7       Q.   Were the WTIA personnel paid for advising the
 8   plan?
 9                MR. OSSIP:  Objection to the form.
10                THE WITNESS:  I don't know.
11   BY MR. LUKAS:
12       Q.   Was WTIA as an organization paid by the plan
13   to advise for them?
14       A.   I don't know.
15       Q.   Who would know?
16       A.   I don't know.
17       Q.   Did WTIA -- let me strike that.  Was there
18   ever any discussion about terminating WTIA?
19                MR. OSSIP:  Objection to form.
20                THE WITNESS:  I don't know.
21                MR. LUKAS:  Was there any discussion
22       about replacing them with independent advisors or
23       advisors that weren't in-house?
24                MR. OSSIP:  Objection to form.
25                THE WITNESS:  I don't know.
```

```
 1                MR. LUKAS:  If those conversations did
 2      take place, you would expect to see those reflected
 3      in the minutes; correct?
 4                MR. OSSIP:  Same objection.
 5                THE WITNESS:  Yes.
 6                MR. LUKAS:  Did the committee ever
 7      discuss the dangers of conflict of interest by
 8      having the asset managers of the same funds and the
 9      plan advising the committee on the investment
10      lineup?
11                MR. OSSIP:  Objection to form.
12                THE WITNESS:  I don't remember.
13                MR. LUKAS:  Again, if they had those
14      discussions, you would expect to see them in the
15      minutes?
16                MR. OSSIP:  Same objection.
17                THE WITNESS:  Yes.
18                MR. LUKAS:  Who were the M&T lawyers that
19      you dealt with in connection with the plan, do you
20      remember their names?
21                MR. OSSIP:  Objection to form.  Assumes
22      facts not in evidence.
23                THE WITNESS:  I don't -- I don't know.
24      I'd be guessing.
25                MR. LUKAS:  It's a good point.  It's like
```