**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re M&T Bank Corporation ERISA Litigation* | **Civil Action No.: 1:16-cv-375-FPG**<br>**Consolidated Action** |

## FIRST AMENDED CONSOLIDATED COMPLAINT

Plaintiffs Jacqueline Allen, Russ Dixon, Sa'ud Habib, Kenneth Sliwinski, J. Marlene Smith, and Beverly Williams ("Plaintiffs"), by and through their attorneys, on behalf of the M&T Bank Corporation Retirement Savings Plan[1] (the "Plan" or "M&T Plan"), themselves, and all others similarly situated, state and allege as follows:

### NATURE OF THE ACTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1009 and 1132, against M&T Bank Corporation ("M&T"), Manufacturers and Traders Trust Company ("M&T Bank"), Wilmington Trust Investment Advisors ("WTIA"), Wilmington Funds Management Corporation ("WFMC"), M&T Bank Employee Benefit Plans Committee (the "Committee"), Edward Amoroso, Brent O. Baird, C. Angela Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Gary N. Geisel, John D. Hawke, Jr., Newton P.S. Merrill, Melinda R. Rich, Robert E. Sadler, Jr., Denis J. Salamone, Herbert L. Washington, Robert J. Bennett, Michael D. Buckley, Colin E. Doherty, Jorge Pereira, Janet Coletti, Brian E. Hickey, Darren J. King, Kevin J. Pearson, Michael

---

[1] The Plan includes retirement plans that were previously separate prior to the purchase of Wilmington Trust Bank.

R. Spychala, Michele D. Trolli, and Stephen J. Braunscheidel. [2]

2.      Plaintiffs allege that Defendants have breached their fiduciary duties to the Plan
and its participants in regards to the selection and monitoring of the Plan's investments, and
engaged in prohibited transactions and other improper conduct with respect to the Plan in
violation of ERISA.

3.      As participants in the Plan during the relevant statutory period, Plaintiffs bring
this action on behalf of the Plan and their fellow participants and beneficiaries to remedy
Defendants' unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable
and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

4.      As of the end of 2015, Americans had approximately $6.7 trillion in assets
invested in defined contribution plans such as the Plan.  *See* INVESTMENT COMPANY INSTITUTE,
*Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at
https://www.ici.org/research/stats/retirement/ret_15_q4;  PLAN SPONSOR, *2015 Recordkeeping
Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

5.      Many of these plans have very significant amounts of assets.  The M&T Plan, for
example, has over $1 billion dollars in assets that are entrusted to the care of the Plan's
fiduciaries.

6.      The potential for fiduciary disloyalty and imprudence is much greater in defined
contribution plans than in traditional defined benefit plans (*i.e.*, pension plans).  In a defined

---

[2] Plaintiffs have amended their allegations throughout this First Amended Consolidated
Complaint to track the rulings in the Court's Decision and Order on Defendants' Partial Motion
to Dismiss (*ECF No. 68*).  By doing so, Plaintiffs do not waive their right to appeal the Court's
ruling or to seek to reinstate any dismissed parties or claims.

benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *David v. Alphin*, 2008 WL 5244504, at *2 (W.D.N.C. Dec. 15, 2008) (citing *Hughes Aircraft Co. v. Jacobson*, 525, U.S. 432, 439 (1999)). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.  But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

7.     For financial services companies, the potential for imprudent and disloyal conduct is even greater, because the Plan's fiduciaries are in a position to benefit the company through the Plan's investment decisions by, for example, stuffing the plan with expensive proprietary investment products that a disinterested fiduciary would not choose.

8.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

9.      Defendants breached these duties in multiple respects, particularly with regard to the Plan's selection and retention of M&T mutual funds (and later Wilmington Trust mutual funds) as investment options.[3]   Among other things, Defendants (1) failed to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, both in terms of cost and performance;  (2) gave an improper preference to proprietary funds, and maintained such funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) continued to offer proprietary funds as investment options when it was imprudent to do so due to their high cost and underperformance compared to benchmarks.

10.     A prudent and loyal fiduciary would not have offered these proprietary funds in the Plan.  Notably, as of the end of 2013 (the middle of the Class Period),[4] among the approximately 1,450 defined contribution plans with over $500 million in assets, not a single plan (other than the Plan) held **_any_** of the Wilmington mutual funds included in the Plan as designated investment alternatives.  Defendants maintained these proprietary funds in the Plan to further their own self-interest, not because they were in the best interest of Plan participants.

11.     To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective trusts, commingled accounts, or separate accounts as alternatives to the mutual funds in the Plan, despite their lower fees.

---

[3] In 2012, after purchasing Wilmington Trust, M&T combined the M&T Bank family of mutual funds and the Wilmington family of funds and rebranded them all as the "Wilmington Funds". Therefore, all references to "Wilmington" mutual funds are meant to include both the funds that were originally associated with Wilmington Trust as well as the funds formerly known as M&T Bank Funds, unless otherwise indicated.

[4] "Class Period" refers to the period from May 11, 2010 to the present.

12.     Defendants also failed to monitor the Plan's recordkeeping fees.  A fiduciary has a duty to ensure participants are not paying excessive fees by both comparing the fees to market rates and conducting a request for proposal every three to five years, to determine if another recordkeeper could provide comparable services for lower costs.  This monitoring is particularly important for retirement plans such as the Plan that pay most of their recordkeeping fees through revenue sharing, i.e. as a percentage of assets in the Plan's investment options, because the plan's recordkeeping fees automatically rise as the Plan grows.  Yet Defendants took none of these actions, sitting idle for twelve years between 2004 and 2016 while the Plan nearly tripled in size and marketplace recordkeeping rates shrank.  Defendants' failure to ensure the Plan's recordkeeping costs were reasonable have cost participants over $1 million per year in excess fees between 2010 and 2016.

13.     Defendants' mismanagement of the Plan, and prioritization of M&T's profits over the interests of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

14.     Further, Defendants violated ERISA's prohibited transaction rules, which bar transactions between the Plan and its fiduciaries and other parties-in-interest.

15.     Defendants' unlawful and inequitable conduct has resulted in millions of dollars in losses to the Plan and lost retirement income for Plan participants, while generating substantial profits for M&T and its affiliates.

16.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), failure to monitor fiduciaries (Count Two), and prohibited transactions with a party-in-interest (Count Three).

**JURISDICTION AND VENUE**

5

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

18.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.   Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiffs

20.     Plaintiff Jacqueline Allen ("Allen") is a citizen and resident of Wilmington, Delaware.   During her employment, Plaintiff Allen participated in the Plan, and invested in the Wilmington Broad Market Bond Fund, the Wilmington Strategic Allocation Conservative Fund, and the T. Rowe Price Balanced Fund.   Her account balance was withdrawn from the Plan in 2014.

21.      Plaintiff Russ Dixon ("Dixon") resides in Cheektowaga, New York.   During his employment, Plaintiff Dixon participated in the Plan and invested in seven of the Plan's designated investment alternatives between April 2010 and December 2010, including four

proprietary M&T mutual funds (M&T Prime Money Market Fund, M&T US Government Bond Fund, Wilmington Large Cap Value, and Wilmington Mid Cap Growth), and Investor shares of the Harbor International Fund.  His account balance was withdrawn from the Plan in December 2010.

22.     Plaintiff Sa'ud Habib ("Habib") resides in Alexandria, Virginia.  During his employment, Plaintiff Habib participated in the Plan and was invested in the T. Rowe Price Balanced Fund, the Fidelity Stable Value Fund, and M&T Bank stock offered within the Plan. His account balance was distributed from the Plan in 2011.

23.     Plaintiff Kenneth Sliwinski ("Sliwinski") resides in North Tonawanda, New York.  During his employment, Plaintiff Sliwinski participated in the Plan and was invested in the T. Rowe Price Balanced Fund, the T. Rowe Price Equity Income Fund, the T. Rowe Price Growth Stock Fund, the T. Rowe Price Small Cap Value Fund, and M&T Bank stock within the Plan.  His account balance was distributed from the Plan in September 2012.

24.     Plaintiff J. Marlene Smith ("Smith") resides in Harrisburg, Pennsylvania.  During her employment, Plaintiff Smith participated in the Plan and was invested in eight of the Plan's designated investment alternatives between April 2010 and March 2012, including one that was managed by M&T Bank (the Wilmington Mid Cap Growth Fund).  Her account balance was distributed from the Plan in October 2013.

25.     Plaintiff Beverly Williams ("Williams") resides in Clarence, New York, and is a current participant in the Plan.  Plaintiff Williams is or has invested in ten of the Plan's designated investment alternatives between April 2010 and the present, including five that are or were managed by M&T Bank (Wilmington Stable Value Fund, Wilmington Large Cap Value Fund, Wilmington Mid Cap Value Fund, Wilmington Broad Market Bond Fund, and

Wilmington Intermediate Term Bond Fund).   Plaintiff Williams also was invested in Administrative shares of the PIMCO Total Return Fund before the Plan switched to Institutional shares of the fund in June 2013.

26.    Each of the Plaintiffs has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

27.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.   Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. Having never managed a jumbo 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.   Plaintiffs did not and could not review the Employee Benefit Plans Committee (also referred to herein as

"Committee") meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof.  For purposes of this First Amended Consolidated Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Company Defendants**

28.     Defendant M&T is a bank holding company incorporated under the laws of New York in 1969.  Headquartered in Buffalo, New York, Defendant M&T has two principal banking subsidiaries, M&T Bank and Wilmington Trust, National Association.

29.     Defendant M&T Bank is the Plan Sponsor and was originally founded as "Manufacturers and Traders Trust Company" in 1856.  Defendant M&T Bank is headquartered in Buffalo, New York, sharing an address with its corporate parent, M&T.  Defendant M&T Bank is the main banking subsidiary of M&T, and as such, is a banking corporation incorporated under the laws of New York.

30.     Defendant WTIA provides advisory services for the Wilmington Funds to the Plan. WTIA also consults with the Committee regarding the Plan's investment options, and provides the Committee with information and recommendations related to the investment options within the Plan.  Defendant WTIA is a wholly owned subsidiary of M&T Bank, and is compensated from the fees assessed to the holdings of Plan participants in its mutual funds. Defendant WTIA is a Maryland corporation headquartered in Baltimore, Maryland. WTIA was previously named MTB Investment Advisors, Inc.

31.     Defendant WFMC is the Wilmington Funds adviser and manager.  Defendant WFMC is a wholly owned subsidiary of Wilmington Trust Corporation.  Defendant WFMC

received a portion of the fees assessed to the holdings of Plan participants in its mutual funds. Defendant WFMC is a Delaware corporation headquartered in Wilmington, Delaware.

32.    Defendants M&T, M&T Bank, WTIA, and WFMC are collectively referred to herein as the "Company Defendants" and are considered "parties in interest" under ERISA. 29 U.S.C. § 1002(14).

33.    WTIA is also a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it renders investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of the Plan, and/or because it exercised discretionary authority and control over Plan management and/or had authority or control over management or disposition of Plan assets.

**Board Defendants**

34.    Defendants M&T and M&T Bank share a board of directors. The Board of Directors appoints the members of the Employee Benefit Plans Committee which is the named Plan Administrator "within the meaning of ERISA Section 3(38)" and whose members "are fiduciaries of the Plan within the meaning of ERISA Section 3(21)."  *See* M&T Bank Corporation Retirement Savings Plan, January 1, 2016 Restatement (hereafter, "Plan Document") (attached hereto as Exhibit 1), § 9.1.  Accordingly, each of the Director Defendants identified below is/was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), and had a duty to supervise and monitor the Committee and its members, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

35.    Defendant Edward Amoroso ("Amoroso") is a director on the M&T Bank Board, a position held during the Class Period.

36.    Defendant Brent O. Baird ("Baird") is a director on the M&T Bank Board, a position held during the Class Period.

37.    Defendant C. Angela Bontempo ("Bontempo") is a director on the M&T Bank Board, a position held during the Class Period.

38.    Defendant Robert T. Brady ("Brady") is a director on the M&T Bank Board, a position held during the Class Period, and also serves as the Vice Chairman.

39.    Defendant T. Jefferson Cunningham III ("Cunningham") is a director on the M&T Bank Board, a position held during the Class Period.

40.    Defendant Gary N. Geisel ("Geisel") is a director on the M&T Bank Board, a position held during the Class Period.

41.    Defendant Richard A. Grossi ("Grossi") is a director on the M&T Bank Board, a position held during the Class Period.

42.    Defendant John D. Hawke, Jr. ("Hawke") is a director on the M&T Bank Board, a position held during the Class Period.

43.    Defendant Newtown P.S. Merrill ("Merrill") is a director on the M&T Bank Board, a position held during the Class Period.

44.    Defendant Melinda R. Rich ("Rich") is a director on the M&T Bank Board, a position held during the Class Period.

45.    Defendant Robert E. Sadler, Jr. ("Sadler") is a director on the M&T Bank Board, a position held during the Class Period.

46.     Defendant Denis J. Salamone ("Salamone") is a director on the M&T Bank Board, a position held since 2015.

47.     Defendant Herbert L. Washington ("Washington") is a director on the M&T Bank Board, a position held during the Class Period.

48.     Defendant Robert J. Bennett ("Bennett") was a director on the M&T Bank Board during the Class Period, ending in 2012.

49.     Defendant Michael D. Buckley ("Buckley") was a director on the M&T Bank Board during the Class Period.

50.     Defendant Colin E. Doherty ("Doherty") was a director on the M&T Bank Board during the Class Period.

51.     Defendant Jorge Pereira ("Pereira") was a director on the M&T Bank Board during the Class Period, ending in 2015.

52.     Defendants Amoroso, Baird, Bontempo, Brady, Cunningham, Geisel, Grossi, Hawke, Merrill, Rich, Sadler, Salamone, Washington, Bennett, Buckley, Doherty, and Pereir are collectively referred to herein as the "Board Defendants."

**<u>Committee Defendants</u>**

53.     As noted above, Defendant M&T Bank Employee Benefit Plans Committee is the named Plan Administrator and its members are appointed by the Board of Directors of M&T Bank.  The Committee has the power to manage and invest all Plan assets, as well as to appoint any trustee and investment manager and establish investment and funding policies.  *See* Plan Document, § 9.1(a).  The Committee also has the direct responsibility for selecting and removing designated investment alternatives within the Plan.  *Id.* at § 9.10.

54.     Each of the Committee Defendants identified below was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) as acknowledged in the Plan Document, because each exercised discretionary authority to appoint and monitor Plan fiduciaries (*i.e.*, trustees, investment consultants, and investment managers) and had control over Plan management and/or authority or control over management or disposition of Plan assets.  *Id.* at § 9.1(b).

55.     Defendant Janet M. Coletti ("Coletti") is an Executive Vice President for M&T as well as M&T Bank, and is the head of the Human Resources Division.  Defendant Coletti also serves as a member of the Committee.

56.     Defendant Brian E. Hickey ("Hickey") is an Executive Vice President at both M&T and its subsidiary, M&T Bank.  Defendant Hickey also serves as member of the Committee.

57.     Defendant Darren J. King ("Darren King") is an Executive Vice President at M&T and M&T Bank, and Chief Financial Officer at M&T Bank.  Defendant Darren King also serves as member of the Committee.

58.     Defendant Kevin J. Pearson ("Pearson") is an Executive Vice President of M&T and Vice Chairman of M&T Bank.  Defendant Pearson also serves as member of the Committee.

59.     Defendant Michael R. Spychala ("Spychala") is a Senior Vice President and Controller for M&T and M&T Bank.  Defendant Spychala also serves as member of the Committee.

60.     Defendant Michele D. Trolli ("Trolli") is an Executive Vice President and Chief Information Officer of M&T and M&T Bank.  Defendant Trolli also serves as a member of the Committee.

61.     Defendant Stephen J. Braunscheidel ("Braunscheidel") is a former Executive Vice President and head of Human Resources at M&T and M&T Bank.  Prior to 2015, Defendant Braunscheidel served as a member of the Committee.

62.      Defendants Coletti, Hickey, Darren King, Pearson, Spychala, Trolli, and Braunscheidel, together with the Committee itself, are collectively referred to herein as the "Committee Defendants."

### THE PLAN

63.     The Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A), and it is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, the Plan is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

64.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

65.     The Plan's original effective date was April 1, 1986.  It has been restated several times, most recently as of January 1, 2016.  *See* Plan Document, at 1.

66.     An employee becomes an eligible participant as of the first day of the first payroll period following completion of a year of continuous service and attainment of age 21.  *Id.*, at 10.

67.     Eligible participants "may make Employee Pretax Contributions by entering into a salary reduction agreement by which his [or her] Employer reduces the Employee's Benefit Compensation by a designated whole percentage (not exceeding 50%), and contributes that amount to the Plan on his [or her] behalf."  *Id.* at 12.   Employee contributions are fully vested at all times.  *See* Prospectus and Summary Plan Description Dated January 1, 2016 for the M&T Bank Retirement Savings Plan, at 9 (attached as Exhibit 2).

68.     M&T Bank is the Plan Sponsor and its designee, the Committee, is the named Plan Administrator.  The members of the Committee are appointed by the Board of Directors for M&T Bank.

69.     The Committee has all necessary authority and discretion to "appoint 'investment managers' within the meaning of ERISA Section 3(38), and select, monitor and replace investment options in accordance with Section 9.10."  *Id.* at 32.

70.     "Members of the Committee are fiduciaries of the Plan within the meaning of ERISA Section 3(21) when the Committee exercises its authority and discretion under" Section 9.1.  *Id.*

## CLASS ACTION ALLEGATIONS

71.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

any time between May 11, 2010 and the present (the "Class Period").

72.     The members of the Class are so numerous that joinder of all members is impractical.  The Class includes thousands of persons.

73.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

74.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    A.     Whether WTIA, the Board Defendants, and the Committee Defendants are fiduciaries of the Plan;

    B.     Whether these Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

    C.     Whether the Board Defendants had a duty to monitor the Committee Defendants under ERISA, and whether they breached that duty;

    D.     Whether the Committee Defendants had a duty to monitor WTIA, and whether they breached that duty;

16

E.    Whether Defendants engaged in prohibited transactions or caused the Plan to engage in prohibited transactions with parties-in-interest in violation of 29 U.S.C. § 1106;

F.    The proper form of equitable and injunctive relief; and

G.    The proper measure of monetary relief.

75.    Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

76.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

77.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

78.     Class certification is also alternatively appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this First Amended Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## DEFENDANTS' FIDUCIARY STATUS

79.     During the Class Period, WTIA, the Committee Defendants, and the Board Defendants were fiduciaries of the Plan, either as a named fiduciary or as a *de facto* fiduciary that provided investment advice for an indirect or direct fee, and/or acted with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

80.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

81.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

82.     At all times relevant to this First Amended Consolidated Complaint, WTIA, the Committee Defendants, and the Board Defendants were fiduciaries of the Plan because:

  (a)     they were so named; and/or

  (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

  (c)     they rendered investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the Plan, or had any authority or responsibility to do so; and/or

  (d)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

  (e)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

83.     Instead of delegating fiduciary responsibility for the Plan to external service providers, Defendant M&T Bank chose to internalize certain vital aspects of this function to the

Committee.  As noted above, Defendant M&T Bank acted through the Committee, which it named as Plan Administrator, as well as the Committee members who were officers and employees of M&T Bank.  Defendant M&T Bank had, at all times, effective control over the activities of its officers and employees, appointed by itself to perform Plan-related fiduciary functions in the course and scope of their employment, including over their Plan-related activities.

## FIDUCIARY DUTIES

84.     ERISA imposes strict fiduciary duties of loyalty and prudence upon plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest known to the law."  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

85.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *accord Dezelan v. Voya Ret. Ins. & Annuity Co.*, No. 16-cv-1251, 2017 WL 2909714, at *10 (D. Conn. July 6, 2017) ("This statutory duty of loyalty has been described by this Court as requiring that a fiduciary act, in Judge Friendly's felicitous phrase, with an 'eye single to the interests of the participants and beneficiaries.'") (quoting *Donovan*, 680 F.2d at 271).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative

investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added); *accord Taylor v. United Techs. Corp.*, No. 06-cv-1494, 2009 WL 535779, at *8 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009) ("In making investment decisions, plan trustees must conduct a careful and impartial investigation with 'an eye to the interests of the participants and beneficiaries.'") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

86.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

87.     The foregoing duties entail, among other things:

> (a)     The duty to conduct an independent and thorough investigation into, and continually to monitor the merits of, all of the investments in a plan;
>
> (b)     A duty to avoid conflicts of interest and to resolve them promptly when they occur; and

21

(c)   A duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

88.   In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

89.   As discussed below, WTIA, the Board Defendants, and the Committee Defendants  breached their fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

90.   In addition, the Company Defendants engaged in prohibited transactions or caused the Plan to engage in prohibited transactions with parties-in-interest in violation of 29 U.S.C. § 1106.

## SPECIFIC ALLEGATIONS

## A.    <u>Investment Options Available to Plan Participants</u>

91.     M&T Bank was originally founded in 1856, under the name Manufacturers and Traders Bank.  Today M&T Bank operates as the main subsidiary of M&T, comprising "over 99% of the consolidated assets of the Company."  *See* M&T Bank Corporation 2015 Form 10-K at 4.

92.     M&T Bank established and maintained the Plan for the benefit of the employees of M&T and all its subsidiaries.  The Plan included a number of investment options, as well as access to a self-directed brokerage account ("SDBA") which would allow Plan participants to invest in thousands of options, including stocks and mutual funds.

93.     The investment options offered within the Plan were mostly pooled investment products known as mutual funds.  Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds.

94.     Each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management.  For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index.  Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

95.     By contrast, actively managed funds, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of the investment managers of such funds and their associates.  However, long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014."  *See Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html.

96.     An SDBA offers access to many different types of investments (both passively-managed investments and actively-managed investments), but is typically subject to account fees and trading fees.  Further, those who invest in mutual funds through an SDBA face higher investment management fees because they only have access to retail shares, rather than institutional shares with lower fees that can be made available through the Plan's core investment lineup.  Under 29 U.S.C. § 2550.404c-1(d)(1)(iv), the availability a SDBA does not ameliorate the duty of a plan fiduciary to engage in a prudent and loyal process for selecting and monitoring the investments in a defined contribution plan.

**B.      Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings**

97.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

98.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/ebsa/publications/401k_employee.html (last visited August 18, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because

24

"[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1190 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

99.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. *See* Brandon, Emily, "The Top 10 Sources of Retirement Income," available at http://money.usnews.com/money/blogs/planning-to-retire/2014/05/13/the-top-10-sources-of-retirement-income ("The 401(k) is the major source people think they are going to rely on."). Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

100.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A Look at 401(k) Plan Fees,*" *supra*.

101.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4. "Any costs not paid by the employer, which may include

administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

102.    The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, who sorts mutual funds of all kinds into categories "based on the underlying securities in each portfolio…We place funds in a given category based on their portfolio statistics and compositions over the past three years." *See* http://www.morningstar.com/InvGlossary/morningstar_category.aspx.[6]

103.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11.   ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

104.    This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000.  In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

---

[6] As described by Morningstar, these categories "were introduced in 1996 to help investors make meaningful comparisons between mutual funds.  Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested…[we] solved this problem by breaking portfolios into peer groups based on their holdings.  The categories help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios." *See The Morningstar Category Classifications* (June 30, 2016), at 7.  These categories are assigned to mutual funds, variable annuities, and separate accounts. *Id.*

105.    The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[7]

FIGURE 7

**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

|  | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
|  | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id.* at 12.

106.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

---

[7] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management.  Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

107.    This is especially critical because while higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year). Conversely, mutual funds with the worst performance tend to continue to perform poorly in the future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of the Worst Performing Mutual Funds*,            at            6,            (2004)            available            at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf (attributing continuing poor mutual fund performance to less responsive investors who do not pull their capital from the funds, causing the fund manager to change strategies).

108.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

109.    "[T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-

28

one, which would imply that low-quality funds charge higher fees.  Price and quality thus seem to be inversely related in the market for actively managed funds. Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

110.    Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among available investments. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Contribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001). Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

111.    As a result, plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective

trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

112.    Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select proprietary funds as investment options for the plans they administer.  The inherent conflict of interest in such situations can cause proprietary funds to be selected when they are not the most prudent investment option and can cause those same funds to remain as an investment option despite poor performance.

113.    In fact, one recent Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans" especially for the worst performing funds.  *See* Pool, Veronika, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund investment Options in 401(k) Plans*, at 2 (May 2015), available at https://www.federalreserve.gov/econresdata/feds/2014/files/201496pap.pdf.

114.    The fact that fiduciaries may have "superior information about their own proprietary funds" does not correlate to improved performance. *Id* at 3. "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year" and thus "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds."  *Id*. at 3, 26.

115.    Given the vulnerability of plan participants, who are presented a menu of very limited choices but who are dependent on the retirement income earned by those choices, plan fiduciaries must be particularly vigilant about the selection and maintenance of affiliated, proprietary funds in their 401(k) plans.

**C.**    **Defendants' Breaches of Fiduciary Duty**

30

**(1)   WTIA Failed to Provide Prudent Investment Consulting Services Solely in the Interest of the Plan.**

116.   Since at least 2006, WTIA has served as a fiduciary investment advisor for the Plan. In that capacity, WTIA plays a significant role in managing the Plan's investment lineup, and makes investment recommendations to the Committee and other Plan fiduciaries. For example, minutes for the Committee dated March 9, 2006 note, "Ken Thompson and Tom Pierce of M&T Investment Advisors [as WTIA was previously named] advised the Committee of their capabilities to perform a review of the plan's funds. The Committee authorized MTIA to complete a review, asking that they work with the Benefits Department to formulate appropriate recommendations." HABIB0002779.

117.   WTIA has not employed a prudent or impartial process for reviewing the Plan's investments and advising other Plan fiduciaries with respect to selection, monitoring, and removal of Plan investments. WTIA has prioritized the inclusion and retention of proprietary funds in the Plan in order to promote its own business interests and those of its parents and affiliates, in breach of its duty of undivided loyalty to the Plan.  Defendants' failures described throughout this First Amended Consolidated Complaint, as such failures pertain to WTIA, were the product of WTIA's desire to promote the use of its own mutual funds despite their poor performance and excessive fees.

118.   Minutes of the Committee during the statutory period reflect that employees of WTIA regularly attended Committee meetings and offered opinions and recommendations regarding the Plan's investments. One of the regular WTIA employees to attend the Committee meetings was Valerie Gospodarek. Ms. Gospodarek's LinkedIn profile notes that she "[c]onsulted on M&T Bank 401K (assets of approximately $1.8 billion), providing money

manager oversight and recommendations for investment menu options to the bank's senior management."

119.    Ann Marie Odrobina, as the Committee's Rule 30(b)(6) designee, further testified that WTIA prepared Committee materials, including fact sheets and performance information. In addition, Ms. Odrorbina stated that the Committee "relied" on WTIA for its review of funds in the Plan. When asked if there was "any independent analysis going on with respect to the funds" or whether the Committee simply counted on WTIA to provide that information, Ms. Odrobina stated, "We counted on the advisors [i.e., WTIA] to give the information."

120.    The Committee has entered into a "401(k) Plan Advisory Services Agreement" with WTIA acknowledging that the Committee previously "retained [WTIA] to provide certain investment advisory services to the Committee to assist it in performing its fiduciary duties under the Plan," stating that WTIA "is willing to continue to provide such services" on a going forward basis, and confirming that in this role WTIA "is a 'fiduciary' as that term is defined in §(3)(21)(A)(ii) and 29 CFR §2510.3-21 under ERISA."

### (a)    WTIA Provided Imprudent and Disloyal Advice Regarding the Plan's Expenses and What Funds to Offer.

121.    At one Committee meeting, held on August 13, 2012, Ms. Gospodarek provided a "Fee Analysis of the funds in the Retirement Savings Plan . . . ." MTB-ERISA-00000122. The Committee then "requested the WTIA team to further review the expense ratios of the Wilmington Trust funds and determine if a contractual waiver is possible to reduce the fees closer to the Lipper mean." *Id.* In essence, the Committee asked the fox if it could do a better job guarding the hen house.

32

122.    At a subsequent meeting on March 11, 2013, Ms. Gospodarek explained that fees for three *non-proprietary* funds could be lowered by moving into cheaper share classes (a change that a prudent fiduciary would have made far earlier), but made no mention of expenses for the Wilmington Trust funds. MTB-ERISA-00000695. A prudent and loyal fiduciary would have recommended that the Committee consider less expensive alternatives to the proprietary options in the Plan as well. However, WTIA failed to do so because of its interest in having the Plan continue to offer proprietary investments.

123.    The Committee minutes for the March 10, 2014 Committee meeting expressly note that the "funds with higher expense ratios are Wilmington Trust funds." MTB-ERISA-00000250. However, WTIA's representative shrugged off the higher fees, and no serious consideration was given to less expensive alternatives.

124.    In spite of the high fees of the Wilmington funds, the notes for the very next Committee meeting (held on May 12, 2014) state that "WTIA finds no need to change the investment option lineup in the short term." MTB-ERISA-00000253.

125.    It appears that WTIA may have even caused fund changes to the Plan without a Committee vote. Materials prepared for the August 31, 2015 meeting note that effective August 4, 2015, two proprietary funds had closed (the Wilmington Mid-Cap Growth and Small-Cap Strategy funds) and been replaced with two new funds. The Committee minutes do not reflect a vote on this change, instead stating, "They [i.e., the Committee] noted the removal of two Wilmington Trust equity mutual funds that had ceased operations and their replacement" by new investments. MTB-ERISA-00001409.

       **(b)**      **WTIA Provided Imprudent and Disloyal Advice Regarding the Plan's Removal and Replacement of Funds.**

126.   WTIA also played a critical role in monitoring the performance of Plan's funds. However, WTIA employed very different levels of scrutiny depending on whether funds were proprietary or non-proprietary.

127.   WTIA and the Committee did not hesitate to remove non-proprietary funds where issues were identified with respect to those funds.  For example, WTIA recommended the prompt removal of the PIMCO Total Return Bond fund at a November 3, 2014 meeting upon learning of a management change at the fund, and the Committee approved the removal of this fund. MTB-ERISA-00000558. At the time, the PIMCO Total Return Bond fund was exceeding its benchmarks in the trailing 3-, 5-, and 10-year periods, and underperforming in trailing one-year returns by less than 1%. MTB-ERISA-00000951, at 988.

128.   In contrast, WTIA and the Committee allowed proprietary funds to remain in the Plan despite management changes and consistent periods of underperformance.  For example, at a Committee meeting held August 13, 2012, Mr. Fraundorf of WTIA discussed "management changes to the Wilmington Trust Large Cap and Small Cap Growth Funds."  MTB-ERISA-00000122.  Both of these funds performed extremely poorly before and after the management changes (as of September 2011 and December 2012, these funds were significantly underperforming their benchmarks in the trailing 1-, 3-, 5-, and 10-year periods).  Yet, these funds were not removed from the Plan at that time.

129.   Indeed, WTIA sometimes used manager changes to justify *retaining* poorly performing proprietary funds, even though that was cited as a basis for *removing* the PIMCO Total Return Bond fund.  For example, at a May 5, 2013 Committee meeting, the Committee "noted the underperformance of several of the Wilmington Trust funds, particularly the Large Cap Growth fund."  MTB-ERISA-00000496. However, Ms. Gospodarek attempted to excuse

this poor performance on the grounds that "much of that fund's underperformance over recent time periods is attributable to the time when the prior management team was in place."[8]

130.    The Committee then "discussed when an underperforming fund should be dropped from the Plan". During the course of this discussion, Ms. Gospodarek "stated that WTIA first flags a fund when it has underperformed for two years, and calls for a discussion of the fund if it has underperformed for three years." Yet, as noted earlier, WTIA and the Committee were willing to act far more quickly when non-proprietary funds (such as the PIMCO Total Return Bond fund) were at issue.[9]

131.    At the same May 2013 meeting, the Committee pointed out that, even forgiving shorter term underperformance, "some Wilmington Trust funds show underperformance over a five year period." However, WTIA proceeded to offer excuses for this long-term underperformance as well.

132.    WTIA also played a crucial role in developing a "watchlist" for the funds in the Plan, ostensibly to flag underperforming funds for potential removal. Indeed, the Committee's materials refer to a "WTIA Watch List." It appears that funds were only removed from the Plan if they closed or if WTIA recommended their removal.

133.    WTIA's first watchlist criteria appear to have been those discussed at the May 5, 2013 meeting described above, whereby "WTIA first flags a fund when it has underperformed for two years, and calls for a discussion of the fund if it has underperformed for three years." As

---

[8] The materials for the next Committee meeting show that the fund continued to be the worst performing fund over the trailing one-year period, with half of the underperformance attributable to the new management team. MTB-ERISA-00000749, at 753.

[9] As another example, Ms. Gospodarek "recommended the removal of TIAA CREF Mid Cap Value Fund from the Plan" during the August 12, 2013 Committee meeting, stating that "the performance of the TIAA-CREF Fund has deteriorated rapidly over the last year." Consistent with this advice, the Committee removed the TIAA-CREF fund.

noted, this lengthy period of review was not afforded to non-proprietary funds such as the TIAA-CREF and PIMCO funds discussed above, which were removed for short-term underperformance.

134.    WTIA adopted modifications to its watchlist criteria that it first applied to the Plan's investments at the Committee's November 21, 2013 meeting. The new methodology flagged seven actively-managed funds as underperforming and needing further review. Five of these seven were proprietary funds.

135.    WTIA again modified its watchlist criteria on May 11, 2015. This time four of the Plan's funds were flagged for review, three of which were proprietary. This prompted the Committee to realize that WTIA's watchlist was not part of the Plan's Investment Policy Statement, which used different criteria under which none of the three proprietary funds were flagged.  The Committee's minutes for this meeting state:

> [N]one of the three funds are in watch status according to the Retirement Savings Plan Investment Policy Statement which has different watch list criteria. The Committee noted the potential inconsistency of a bank client being told that a fund is on the watch list under the Wilmington Trust criteria, while the same fund is not on the watch list under the Retirement Savings Plan.

136.    At the next Committee meeting on August 31, 2015, the Committee voted to incorporate the WTIA Watchlist criteria into its own Investment Policy Statement. MTB-ERISA-00000844. However, it does not appear that the Plan's Investment Policy Statement was actually amended to reflect this change.

137.    Although only three months had passed since WTIA first announced the new criteria that flagged three proprietary funds, and even though the criteria called for monitoring flagged funds for 12 months, materials for this August 31, 2015 meeting reflect that the three flagged Wilmington funds had been removed from the watchlist based on their one-year returns.

MTB-ERISA-00001409, 1428. It does not appear that the Committee voted to remove these funds from the watchlist. Instead, it appears to have been the result of a decision of WTIA or its employees, even though this conflicted with the stated criteria used for the watchlist.

138.    These were not isolated occurrences. WTIA provided investment advice on a regular basis to the Committee pursuant to an agreement or understanding with the Committee, and this advice was a primary basis for investment decisions respecting Plan assets, and the advice was individualized to the Plan. WTIA received a fee indirectly for this service through the investment management fees paid on the Plan's proprietary investments. Because this advice was tainted with disloyalty and imprudence, WTIA breached the fiduciary duties it owed to the Plan.

**(2)    Defendants Added Seven Proprietary Investments to the Plan in the Second Half of 2011 for Self-Interested Reasons**

139.    In 2010, the Plan had approximately $1.1 billion in assets, and offered participants twenty-three designated investment alternatives, eight of which were mutual funds form M&T Bank's proprietary MTB Group of Funds.

140.    In May 2011, M&T Bank finalized its purchase of Wilmington Trust, a Delaware bank that had its own family of mutual funds, the Wilmington Funds.  Four months later, the Wilmington Trust defined-contribution plan was merged into the Plan.

141.    Before the merger, Wilmington's plan had over $200 million in assets, and consisted of 24 designated investment alternatives that included Wilmington stock, the Wilmington Stable Value Fund, a non-proprietary stable value fund, six Wilmington mutual funds, three non-proprietary separate accounts, and twelve non-proprietary mutual funds from fund families such as Vanguard, Fidelity, and American Funds.

142.    When one defined-contribution plan is merged into a larger plan, standard practice is to "map" the investments from the old plan into the closest analogue within the new

37

plan. Jeanne Sahadi, *Mind Your 401(k) in M&A*, CNN MONEY (Oct. 26, 2000), available at http://money.cnn.com/2000/10/26/strategies/q_retire_401kmerger/. For example, a participant invested in a large-company growth mutual fund in the old plan will have that money transferred into a large company growth fund within the new plan, or the closest thing to it. It is quite rare for the investments within a plan being merged to simply transfer over to the new plan.

143. Defendants did not follow standard practice when mapping the Wilmington Trust plan into the Plan. Instead, they designed the merger to maximize the financial benefit received by M&T. Defendants got rid of all non-proprietary investment options that had been held by the Wilmington plan, yet added the Wilmington Stable Value Fund and the six Wilmington mutual funds to the Plan (and all of the assets held by those funds), to maximize the amount of Plan assets held within proprietary M&T investments. The Committee and WTIA had substantial conflicts of interest that loomed large over the Plan merger process, as the Committee members were M&T Bank officers and M&T shareholders with financial incentives to retain assets in M&T's newly-acquired funds, and WTIA was presented with additional fee generating opportunities through its new advisor relationship with the newly-acquired funds.

144. Before adding the seven proprietary Wilmington investments to the Plan in 2011, Defendants were obligated to conduct a thorough investigation of each fund, and only add it to the Plan if the addition of each fund was prudent and in the best interest of the Plan's participants. According to the Plan's Investment Policy Statement, the funds should not have been added unless their "[f]ees [we]re competitive compared to similar investments." Investment Policy Statement ("IPS") § VI.5. (attached as Exhibit 3) Furthermore, Defendants should have reviewed each fund's one-, three-, five-, and ten-year average rates of return, *see* IPS § VI.1-2, to ensure that the costs imposed by each of these actively-managed mutual funds

could be "justified by realistically evaluated return expectations."  Restatement (Third) of Trusts § 90 cmt. h(2).

145.    Defendants' investigation gave preferential treatment to the Wilmington mutual funds with the goal of furthering the financial interests of M&T, and a prudent and impartial investigation of all proprietary Wilmington investments would have revealed that their expenses were above average compared to many alternatives within the marketplace that had a superior performance history.  A reasonable fiduciary would have conducted such an investigation as part of the Plan merger process, which would have led to the exclusion of Wilmington's mutual funds from the merged Plan. Instead, Defendants selectively retained the Wilmington investments without conducting a prudent investigation of unaffiliated investment options based on their own self-interest, without any consideration of the best interests of Plan participants.

146.    An employee of WTIA led the team tasked with making recommendations for the lineup of the Plan following the acquisition of Wilmington, and several other WTIA employees served as members. A memorandum reviewing Wilmington funds to be added to the Plan was written by a Kenneth Thompson of WTIA, and does not compare the funds to non-proprietary alternatives. Fact sheets about the Wilmington funds provided to the Committee also failed to compare them to non-proprietary alternatives, and reflect abysmal performance by most of the proprietary Wilmington funds. For example, the fact sheet for the Wilmington Aggressive Asset Allocation fund provided to the Committee at the meeting it was selected for the Plan reflected that it underperformed both of its benchmarks over the prior 3- and 5-year periods, by 1.5% to 7%.  MTB-ERISA-00001045 at 1175. The Wilmington Conservative Asset Allocation fund also underperformed its listed benchmarks in the prior 1-, 3- and 5-year periods. *Id.* at 1177. The Wilmington Multi-Manager Real Asset fund underperformed its listed benchmarks over the 3-

and 5-year periods, from 0.4% to 2%. *Id.* at 1179. Similarly, the Wilmington Small-Cap Strategy fund underperformed the listed benchmarks over the prior 3- and 5-year periods. *Id.* at 1180. The performance of other Wilmington funds under consideration was similarly poor.  Nonetheless, the team lead by WTIA employees still recommended the inclusion of these Wilmington funds in the Plan.

**(3)     Defendants Retained Excessively Costly Proprietary Investment Options**

147.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

148.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)).  The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id*. § 2 comment.

149.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these

duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

150.    As the amount of assets under management approaches and exceeds $1 billion, economies of scale dictate that very low cost investment options will be available to such plans. When large plans, particularly those with over $1 billion in assets, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

151.    The Plan has retained several actively-managed proprietary funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent and were likely to perform poorly in the future.

152.    For example, as of the end of 2014, all but one of the twelve Wilmington mutual funds in the Plan were much more expensive than the average comparable fund found in a similarly-sized plan.  The Wilmington Mid Cap Growth Fund had an expense ratio of 1.08%, more than double the category average of 0.48% as reported by the Investment Company Institute ("ICI").  *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 45 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf. (hereafter, "ICI Study").  The Wilmington Multi-Manager International fund had a 1.21% expense ratio, nearly double the 0.64% average for international equity funds.  The Wilmington Broad Market Bond,

Wilmington Intermediate-Term Bond, Wilmington Short Duration Government Bond, and Wilmington Short-Term Corporate Bond funds had expense ratios of 0.55%, 0.53%, 0.64%, and 0.48%, respectively, all significantly higher than the 0.35% category average for domestic bond funds. The Wilmington Strategic Allocation Aggressive and the Wilmington Strategic Allocation Conservative funds had expense ratios of 1.45% and 1.21% respectively, ***three to four times higher*** than the 0.35% average for balanced funds in similarly-sized plans.[10]

153. These comparisons actually understate the excessiveness of fees within the Wilmington Funds in the Plan in 2014, because the most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601 (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

154. Further, average-based comparisons also understate the excessiveness of the investment management fees of the Wilmington Funds because many prudent alternative funds were available that offered lower expenses than the average. The chart below compares proprietary funds in the Plan to a comparable passively-managed and actively-managed alternative in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives, as each alternative fund is more widely-used by plans similar in size to the Plan than the Wilmington fund held by the Plan.

---

[10] The Wilmington Small-Cap Strategy Fund uses a modified indexing approach, whereby the fund tracks a custom index weighted to favor either growth or value stocks. Because there is no stock selection and associated research costs, the fund's costs are limited. In 2012, the fund's net expense ratio was 0.31%.

| Fund in Plan | 2014 Exp. Ratio | Passive/Active Lower Cost Alternative[11] | 2014 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Mid Cap Growth (ARMEX) | 108 bps | Vanguard Mid-Cap Growth Index Adm (VMGMX)<br><br>T. Rowe Price Institutional Mid-Cap Growth (PMEGX) | 9 bps<br><br><br>61 bps | Mid Cap Growth | 1100%<br><br><br>77% |
| Wilmington Short-Term Corporate Bond (MVSTX) | 61 bps | Vanguard Short-Term Bond Index Instl (VBITX)<br><br>Vanguard Short-Term Investment Grade I (VFSIX) | 7 bps<br><br><br>7 bps | Short-Term Bond | 771%<br><br><br>771% |
| Wilmington Strategic Allocation Conservative (WCAIX) | 121 bps | Vanguard LifeStrategy Conservative Growth Fund (VSCGX)<br><br>Vanguard Wellesley Income Adm (VWIAX) | 15 bps<br><br><br><br>18 bps | Conservative Allocation | 806%<br><br><br><br>672% |
| Wilmington Strategic Allocation Aggressive (WAAIX) | 145 bps | Vanguard LifeStrategy Growth (VASGX)<br><br>American Funds Capital Income Builder R6 (RIRGX) | 17 bps<br><br><br>30 bps | Aggressive Allocation | 753%<br><br><br>383% |

---

[11] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). The listed expense figures are taken from the most recent summary prospectus as of January 2015.

| Fund in Plan | 2014 Exp. Ratio | Passive/Active Lower Cost Alternative[11] | 2014 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Wilmington Intermediate-Term Bond (ARIFX) | 60 bps | Vanguard Intermediate-Term Bond Index I (VBIMX)<br><br>Metropolitan West Total Return Bond (MWTSX) | 7 bps<br><br>39 bps | Intermediate-Term Bond | 757%<br><br>54% |
| Wilmington Broad Market Bond (ARKIX) | 65 bps | Vanguard Intermediate-Term Bond Index I (VBIMX)<br><br>Metropolitan West Total Return Bond (MWTSX) | 7 bps<br><br>39 bps | Intermediate-Term Bond | 829%<br><br>67% |
| Wilmington Multi-Manager International (MVIEX) | 136 bps | Vanguard Developed Markets Index Instl (VTMNX)<br><br>Dodge & Cox International Stock (DODFX) | 7 bps<br><br>64 bps | Foreign Large Blend | 1843%<br><br>89% |
| Wilmington Multi-Manager Real Asset (WMRIX) | 103 bps | Vanguard REIT Index Adm (VGSLX)<br><br>Vanguard Inflation-Protected Securities I (VIPIX) | 10 bps<br><br>7 bps | Real Estate / Inflation-Protected Bond | 930%<br><br>1371% |

155.    The data for 2014 is not anomalous.  The chart below compares the fees of the proprietary funds in the Plan to the fees of comparable passively-managed alternatives in the

same investment style for all years the proprietary funds were in the Plan during the Class Period.[12]

156.

| Plan Fund/Comparator Fund | Category | Yearly Class Period Fees | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| Wilmington Large Cap Growth Fund (MLGIX) | Large Cap Growth | 104 bps | 104 bps | 104 bps | 104 bps | | | |
| TIAA-CREF Large-Cap Growth Index (TILIX) | | 9 bps | 8 bps | 7 bps | 7 bps | | | |
| | | | | | | | | |
| Wilmington Large Cap Value Fund (MLCVX) | Large Cap Value | 104 bps | 104 bps | 104 bps | 104 bps | | | |
| TIAA-CREF Large-Cap Value Index (TILVX) | | 9 bps | 8 bps | 8 bps | 7 bps | | | |
| | | | | | | | | |
| Plan Fund/Comparator Fund | Category | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| Wilmington Small Cap Growth Fund (ARPEX) | Small Cap Growth | 125 bps | 125 bps | 125 bps | 125 bps | | | |
| Vanguard Small Cap Growth Index (VSGIX) | | 8 bps | 8 bps | 8 bps | 8 bps | | | |
| | | | | | | | | |
| Wilmington Short Duration Government Bond Fund (GDVLX) | Short Term Government | 74 bps | 74 bps | 64 bps | 64 bps | | | |
| Vanguard Short-Term Government Bond Index Fund (VSBOX) | | 9 bps | 9 bps | 9 bps | 9 bps | | | |
| | | | | | | | | |
| Wilmington Mid Cap Growth Fund (ARMEX) | Mid Cap Growth | 108 bps | 108 bps | 108 bps | 108 bps | 108 bps | | |
| Vanguard Mid-Cap Growth Index (VMGMX) | | 10 bps | 10 bps | 10 bps | 9 bps | 9 bps | | |
| | | | | | | | | |

---

[12] The fee data is taken from each of the funds' prospectuses for the years 2010 through 2016.

| Plan Fund/Comparator Fund | Category | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| Wilmington Intermediate-Term Bond Fund (ARIFX) | Intermediate-Term Bond | 63 bps | 66 bps | 64 bps | 60 bps | 60 bps | 57 bps | 53 bps |
| Vanguard Intermediate-Term Bond Index (VBIMX) | | 7 bps | 7 bps | 7 bps | 7 bps | 7 bps | 6 bps | 6 bps |
| Wilmington Multi-Manager International (MVIEX) | Foreign Large Blend | 137 bps | 141 bps | 138 bps | 135 bps | 136 bps | 129 bps | 118 bps |
| Vanguard Developed Markets Index (VTMNX) | | 8 bps | 8 bps | 7 bps | 7 bps | 7 bps | 7 bps | 6 bps |
| Wilmington Broad Market Bond Fund (ARKIX) | Intermediate-Term Bond | | 66 bps | 66 bps | 64 bps | 65 bps | 60 bps | 55 bps |
| Vanguard Intermediate-Term Bond Index (VBIMX) | | | 7 bps | 7 bps | 7 bps | 7 bps | 6 bps | 5 bps |
| Wilmington Multi-Manager Real Asset Fund (WMRIX) | Real Estate/Inflation-Protected Bond | | 100 bpa | 102 bps | 102 bps | 103 bps | 98 bps | 98 bps |
| Vanguard REIT Index (VGSLX) | | | 12 bps | 10 bps | 10 bps | 10 bps | 12 bps | 12 bps |
| **Plan Fund/Comparator Fund** | **Category** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| Wilmington Strategic Allocation Conservative Fund (WCAIX) | Conservative Allocation | | 95 bps | 124 bps | 128 bps | 121 bps | 133 bps | 127 bps |
| Vanguard LifeStrategy Conservative Growth Fund (VSCGX) | | | 24 bps | 15 bps | 15 bps | 15 bps | 15 bps | 13 bps |
| Wilmington Strategic Allocation Aggressive Fund (WAAIX) | Aggressive Allocation | | 108 bps | 141 bps | 144 bps | 145 bps | 161 bps | 169 bps |
| Vanguard LifeStrategy Growth (VASGX) | | | 23 bps | 17 bps | 17 bps | 17 bps | 17 bps | 15 bps |
| Wilmington Short-Term Corporate Bond Fund (MVSTX) | Short-Term Bond | | | | 61 bps | 61 bps | 56 bps | 48 bps |

| Vanguard Short-Term Bond Index Fund (VSBSX) | | | | | 12 bps | 7 bps | 10 bps | 7 bps |
|---|---|---|---|---|---|---|---|---|

157.    The below chart compares the fees of the proprietary funds in the Plan to the fees of comparable actively-managed alternatives in the same investment style for all years the proprietary funds were in the Plan during the Class Period.[13]

158.

| Plan Fund/Comparator Fund | Category | Yearly Class Period Fees | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| Wilmington Large Cap Growth Fund (MLGIX) | Large Cap Growth | 104 bps | 104 bps | 104 bps | 104 bps | | | |
| American Funds Growth Fund of America (RGAGX) |  | 34 bps | 33 bps | 34 bps | 34 bps | | | |
| | | | | | | | | |
| Plan Fund/Comparator Fund | Category | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| Wilmington Large Cap Value Fund (MLCVX) | Large Cap Value | 104 bps | 104 bps | 104 bps | 104 bps | | | |
| American Funds American Mutual Fund (RMFGX) |  | 33 bps | 32 bps | 32 bps | 31 bps | | | |
| | | | | | | | | |
| Wilmington Small Cap Growth Fund (ARPEX) | Small Cap Growth | 125 bps | 125 bps | 125 bps | 125 bps | | | |
| Vanguard Explorer Fund Admiral Shares (VEXRX) |  | 32 bps | 34 bps | 32 bps | 34 bps | | | |
| | | | | | | | | |
| Wilmington Short Duration Government Bond Fund (GDVLX) | Short Term Government | 74 bps | 74 bps | 64 bps | 64 bps | | | |

[13] The fee data is taken from each of the funds' prospectuses for the years 2010 through 2016.

| Plan Fund/Comparator Fund | Category | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| DFA Short-Term Government I (DFFGX) | | 23 bps | 21 bps | 20 bps | 19 bps | (red) | (red) | (red) |
| Wilmington Mid Cap Growth Fund (ARMEX) | Mid Cap Growth | 108 bps | 108 bps | 108 bps | 108 bps | 108 bps | (red) | (red) |
| T. Rowe Price Insitutional Mid-Cap Growth (PMEGX) | | 65 bps | 63 bps | 62 bps | 61 bps | 61 bps | (red) | (red) |
| Wilmington Intermediate-Term Bond Fund (ARIFX) | Intermediate-Term Bond | 63 bps | 66 bps | 64 bps | 60 bps | 60 bps | 57 bps | 53 bps |
| Metropolitan West Total Return Bond (MWTSX) | | 40 bps | 40 bps | 40 bps | 39 bps | 39 bps | 39 bps | 38 bps |
| Wilmington Multi-Manager International (MVIEX) | Foreign Large Blend | 137 bps | 141 bps | 138 bps | 135 bps | 136 bps | 129 bps | 118 bps |
| Dodge & Cox International Stock (DODFX) | | 65 bps | 64 bps | 64 bps | 64 bps | 64 bps | 64 bps | 64 bps |
| **Plan Fund/Comparator Fund** | **Category** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| Wilmington Broad Market Bond Fund (ARKIX) | Intermediate-Term Bond | (red) | 66 bps | 66 bps | 64 bps | 65 bps | 60 bps | 55 bps |
| Metropolitan West Total Return Bond (MWTSX) | | (red) | 40 bps | 40 bps | 39 bps | 39 bps | 39 bps | 38 bps |
| Wilmington Multi-Manager Real Asset Fund (WMRIX) | Real Estate/Inflation-Protected Bond | (red) | 100 bpa | 102 bps | 102 bps | 103 bps | 98 bps | 98 bps |
| Vanguard Inflation-Protected Securities (VIPIX) | | (red) | 7 bps | 7 bps | 7 bps | 7 bps | 7 bps | 7 bps |
| Wilmington Strategic Allocation Conservative Fund (WCAIX) | Conservative Allocation | (red) | 95 bps | 124 bps | 128 bps | 121 bps | 133 bps | 127 bps |

| Fund | Category | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vanguard Wellesley Income Adm (VWIAX) | | | 18 bps | 18 bps | 18 bps | 18 bps | 16 bps | 15 bps |
| Wilmington Strategic Allocation Aggressive Fund (WAAIX) | Aggressive Allocation | | 108 bps | 141 bps | 144 bps | 144 bps | 161 bps | 169 bps |
| American Funds Capital Income Builder (RIRGX) | | | 32 bps | 32 bps | 30 bps | 30 bps | 30 bps | 30 bps |
| Wilmington Short-Term Corporate Bond Fund (MVSTX) | Short-Term Bond | | | | 61 bps | 61 bps | 56 bps | 48 bps |
| Vanguard Short-Term Investment Grade I (VFSIX) | | | | | 7 bps | 7 bps | 7 bps | 7 bps |

159. As reflected above, the Company Defendants received unreasonably high compensation for investment management services provided to the Plan and its participants.[14]

160. Despite the high cost of the proprietary investments within the Plan, and despite the massive discrepancy between the proprietary funds in the Plan and non-proprietary alternatives adopted by other plans, Defendants failed to remove the high-cost proprietary mutual

---

[14] The unreasonableness of the fees was exacerbated by Defendants' failure to consider alternative investment vehicles, as discussed below. Moreover, for Wilmington Funds held by other plans, Wilmington Funds rebated a portion of its investment management fees—typically 0.25% for institutional shares (the share class used by the Plan)—to the plan. Although these payments are nominally made to recordkeepers, acting as financial intermediaries, the plans themselves have discretion as to how they are used, and thus the revenue sharing rebates can be used to reduce administrative expenses or can be rebated to participants. However, Defendants did not seek revenue sharing rebates from Wilmington Funds in connection with the Plan's investments in those funds, opting instead to pay a per-participant fee to the Plan's recordkeeper for each participant that held a Wilmington mutual fund. These fees were significantly less than the revenue sharing payments that the Plan would have received had it been treated like other plans that held Wilmington Funds. As a result, Wilmington (and ultimately M&T) retained money that otherwise would have flowed to the Plan and ultimately its participants, again resulting in unreasonable compensation for the Company Defendants' investment management services.

funds from the Plan in favor of lower-cost non-proprietary investments because M&T and its affiliates would have lost the profits they were earning from the inclusion of Wilmington mutual funds in the Plan.  As a result, the Plan's investment lineup remained excessively costly. This constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA, and cost Plan participants millions of dollars in excess fees.

161.    The fact that the funds in the Plan lineup were imprudent investment options is not merely evident with the benefit of hindsight.  Rather, it should have been evident from the information available to Defendants as fiduciaries and investment professionals that these funds were imprudent and inappropriate for a large institutional investor like the Plan, given readily apparent alternatives.

   **(4)    The Proprietary Investment Options in the Plan Performed Poorly and Were Not Used by Other Fiduciaries.**

162.    Defendants also failed to conduct an impartial review of the performance of each of the proprietary mutual funds, and of the Wilmington funds as a whole, to determine whether it remained prudent for the Plan to retain these proprietary funds.

163.    The performance of the proprietary mutual funds in the Plan failed to justify their excessive fees. Had Defendants conducted an impartial review of the performance of the proprietary mutual funds in the Plan, it would have revealed that Wilmington Funds was consistently one of the worst performing mutual fund families in the United States.  In 2013, Wilmington Funds was the 52nd-ranked mutual fund company out of 55 over the past five years, and the 33rd ranked fund family out of 48 over the past ten years.  In 2014, Wilmington Funds was the 54th-ranked mutual fund family out of 56 fund families, and ranked 42nd out of 48 fund families over the past ten years.  Thus, the high fees charged to the Plan for the Wilmington

Funds were not justified by superior investment performance or any reasonable expectation of superior investment performance.

164.   In spite of these low institutional rankings, a high percentage of Wilmington's mutual funds were held by the Plan.  In 2012, Wilmington offered 21 mutual funds to the public, more than half of which (12) were held by the Plan.  By the end of 2014, only eighteen Wilmington funds were being offered to the public, more than half of which (10) were held within the Plan.  Thus, not only was Wilmington Funds as a whole performing poorly between 2008 and 2014 (given Wilmington's five-year trailing performance rankings in 2013 and 2014), but the majority of the mutual funds contributing to that poor performance were held by the Plan.

165.   Throughout the statutory period, only one proprietary mutual fund was removed from the Plan due to its poor performance.  Every other removal of a Wilmington mutual fund occurred because the fund merged with another proprietary fund, or because the fund ceased its operations altogether.

166.   The disloyal and imprudent nature of the Defendants' conduct is further demonstrated by the conduct of non-conflicted fiduciaries.  As of the end of 2013, among the approximately 1,450 defined-contribution plans with over $500 million in assets (the Plan had approximately $1.9 billion in assets at this time), not a single plan (other than the Plan) included ___*any*___ of the twelve Wilmington funds held by the Plan as a designated investment alternative. Every non-conflicted fiduciary of similarly-sized plans had either removed Wilmington mutual funds from their plan or avoided them altogether.[15]

---

[15] Because the Wilmington mutual funds in the Plan have remained unattractive to similarly-sized defined contribution plans, the total number of Wilmington funds in the Plan has decreased based on fund closures.  Following recommendations from WFMC and WTIA, Wilmington Trust liquidated its Large Cap Growth and Large Cap Value funds in 2014 and its Mid Cap

167.    Particularly egregious examples of the excess expenses and underperformance of funds in the Plan as of 2013 are set forth below for illustrative purposes.  These examples are representative of the fees and performance suffered by participants throughout the class period.

**(5)    Illustrative Examples**

**(a)    The Wilmington Funds Large Cap Growth Institutional Fund**

168.    In August 2013, the Plan reported on the performance of the Wilmington Funds Large Cap Growth Institutional Fund.  As illustrated in the following chart, the Fund not only lagged its benchmark (the Russell 1000 Growth Index), it also lagged another Large Cap Growth mutual fund investment option ***already included in the Plan,***[16] the T. Rowe Price Growth Stock Fund, in one-year, five-year and ten-year increments.  The Defendants had already selected a better performing option in this investment strategy segment, yet continued to include the poorly performing Wilmington Funds Large Cap Growth Institutional Fund.  Even if Defendants wanted to give the Plan participants more options for this kind of investment, it would have been far more reasonable to include the TIAA-CREF Large-Cap Growth Institutional Fund,[17] a more reasonably priced and better performing alternative to the proprietary Wilmington Fund.

---

Growth, Small Cap Strategy, and Small Cap Growth funds in 2015.  With the exception of Small Cap Growth, the Plan offered these proprietary funds up until the time of liquidation.

[16] Prudent management of a plan's investments require removal of unnecessary or duplicative funds, especially where one of the funds has significantly higher costs than the other because investors are likely to falsely "diversity" by splitting an investment between multiple investments in the same asset class.  Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes? An Experiment on Mutual Fund Choice*, 162 U. PA. L. REV. 605, 623, 636-38 (2014).  *See also* James J. Choi, *et al.*, *Why Does the Law of One Price Fail? An Experiment on Index Mutual Funds*, 23 Rev. Fin. Stud. 1405 (2010).

[17] All comparator funds cited are in the same Morningstar category as the proprietary fund.



169.    For this historically poor performance, the Fund charged an expense ratio of 1.41,

significantly higher than the average of 0.56 for a similar mutual fund, the 0.70 ratio of the T.

Rowe Price option, and the 0.47 ratio of a more reasonable outside alternative, the TIAA-CREF

Large-Cap Growth Institutional Fund.



**(b)    The Wilmington Funds Small Cap Growth Institutional Fund**

170.    In August 2013, the Plan also reported on the performance of the Wilmington

Funds Small Cap Growth Institutional Fund.  As illustrated in the following chart, this Fund

53

significantly lagged its benchmark (the Russell 2000 Growth Index) in one-year, five-year and ten-year increments.   The Fund's performance also failed to compare to a more reasonably priced alternative, the T. Rowe Price New Horizons Fund.



171.   For this incredibly poor performance, including a 5 year loss of -0.45%, the Fund charged an expense ratio of 1.39, compared to the average Small Cap Growth fee of 0.56 and the fee charged by the T. Rowe Price alternative of 0.8.



**(c)     The   Wilmington   Funds   Strategic   Allocation   Conservative Institutional Fund**

172.    In August 2013, the Plan reported on the performance of the Wilmington Funds Strategic Allocation Conservative Institutional Fund.  As illustrated in the following chart, this Fund consistently performed conversely to its chosen benchmark, the Barclays U.S. Aggregate Bond Index.  In contrast, the Vanguard Wellesley Income Fund, another Conservative Allocation mutual fund posted better, less volatile performance.



173.    For this erratic and sub-par performance, the Fund charged an expense ratio of 1.7, over four times higher than the category average for almost ten times higher than the suggested Vanguard alternative's charge of 0.18.



174.    Moreover, for some investment strategies, such as the Large Cap Growth strategy, the Plan included both a propriety and non-propriety alternative.  *See supra*.  **The propriety funds all performed significantly worse while charging higher fees than the non-propriety alternative.**  The continued inclusion of these poorly performing proprietary funds when more reasonably-priced and better-performing funds had already been approved for inclusion in the Plan was done solely to benefit the Defendants at the expense of the Plan participants.

175.    Based on the above facts, one can reasonably infer that the Defendants' process for reviewing and monitoring Plan investments was deeply flawed. Defendants failed to evaluate (or, at the very least, failed to impartially evaluate) the track record, cost, and performance of each investment within the Plan as compared to other alternatives.  Even as between investment options within the Plan, Defendants failed to compare the cost and performance of funds in the same investment style, and allowed proprietary funds to remain in the Plan that were inferior to other existing options and resulted in needless duplication with no redeeming benefit.[18]

---

[18] For example, while the Plan maintained the Wilmington Funds Multi-Manager International Institutional Fund as an investment option, it also offered the Harbor International Institutional

Defendants consistently showed favoritism towards Wilmington mutual funds, avoiding removal of Wilmington funds wherever possible.[19] And the Defendants failed to periodically re-assess the long-term performance record of Wilmington Funds as a whole, which would have called into question whether the Wilmington Funds as a mutual fund family were appropriate for the Plan. Accordingly, it can be reasonably inferred that the process by which the Plan was managed was flawed. *See Pension Benefit Guar. Corp. ex. rel. St. Vincent Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718 (2d Cir. 2013) ("*PBGC*") (holding that a claim for a breach of the duty of prudence is rendered plausible where the circumstantial facts reveal that the plan's investment management process was flawed); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) (plausible factual allegations of flawed investment decisions by fiduciaries give rise to an inference that "the process by which [defendants] selected and managed the funds in the Plan [was] tainted by failure of effort, competence, or loyalty").

176.    Given Wilmington mutual funds' consistently high fees and poor performance, an impartial review of Wilmington Funds' institutional performance and an adequate investigation of available alternatives would have led a prudent fiduciary to remove the Wilmington mutual funds from the Plan.  The failure to monitor the proprietary funds in the Plan in an impartial and prudent fashion has cost Plan participants tens of millions of dollars due to excess fees and underperformance by the Wilmington Funds.

**(6)    Defendants Failed to Use the Lowest Cost Share Class of Several Mutual Funds in the Plan.**

---

Fund, a mutual fund with a similar investment strategy that cost less than half of the proprietary option.

[19] Even in the one instance when the Defendants did remove a proprietary fund from the Plan, the action was taken years after a prudent and impartial fiduciary would have taken the same action.

177.    In addition to imprudently selecting and retaining proprietary funds for self-interested reasons, Defendants failed to obtain the least expensive share class of many funds in the Plan.

178.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.   Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

179.    Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.   Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.   Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.   For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

180.    This claim is not about the use of "retail mutual funds" versus the use of "institutional mutual funds".   Retail mutual funds are perfectly acceptable and prudent choices under certain circumstances.   In some instances, a mutual fund company may only offer retail mutual funds.   For example, Dodge & Cox—who ranks sixth in defined contribution assets under management among mutual fund companies—only offers retail shares of its mutual funds.   Yet a large number of prudent fiduciaries have selected and retained Dodge & Cox funds within their

plans.  Or, in other instances, the mutual fund company might restrict institutional share classes in such a manner that would make it impossible to utilize the mutual funds.  For example, Fidelity offers lower-cost K-share mutual funds, but the prospectus of each fund makes clear that K shares are only available to plans that use Fidelity as a recordkeeper.  This claim is instead about utilizing the lowest-cost class of shares that is available to the Plan.

181.    In several instances, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available.

182.    For example, until 2012, the Plan offered participants the Investor share class of the Harbor International Fund, needlessly costing investors 37 extra basis points annually compared to the lower cost Institutional shares for which the Plan was eligible.

183.    As a second example, the Plan used Admin shares of the PIMCO Total Return Fund until 2013, even though Institutional shares of the exact same Fund were available throughout the statutory period.  By failing to prudently investigate the availability and advisability of switching to the lower-cost share class, Defendants needlessly cost Plan participants an extra 25 basis points annually.

184.    As a third example, the Plan offered Retirement shares of the TIAA-CREF Mid Cap Value Fund for the entire time the fund was in the Plan.  Had Defendants prudently investigated the availability and advisability of lower-cost shares, they would have discovered that the Plan qualified for Institutional shares, which would have cost Plan participants 25 basis points less per year.

185.    Finally, in the fall of 2015, T. Rowe Price began offering Institutional shares for every T. Rowe Price mutual fund in the Plan.  These funds would have saved Plan participants between 13 and 25 basis points annually.  Had Defendants conducted a prudent review of the

expenses of the Plan's investments, and the availability of lower-cost share classes, they would have discovered the availability of Institutional shares of these T. Rowe Price funds.

186.    Defendants knew or should have known of the existence of these cheaper share classes and also should have immediately identified the prudence of transferring the Plan into the lower-cost shares.  Ann Marie Odrobina, as the Committee's Rule 30(b)(6) designee, testified that the Committee relied on WTIA for information with respect to share class.

187.    A prudent fiduciary conducting an impartial review of the Plan's investments would have conducted such a review of the Plan's investments on at least a quarterly basis, and would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity.  Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from retail shares into institutional shares, in breach of their fiduciary duties.

188.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

189.    One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Jan. 21, 2016), available at http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-surge-ups-the-ante-for-401-k-advice.  Indeed, recently a court observed that "[b]ecause the

institutional share classes are otherwise *identical* to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

190.    Such failures are inexcusable given the substantial bargaining power of billion dollar plans like the Plan here. As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances.  In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process.  The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, Plan Sponsor (Jan. 2011), available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

**(7)    Defendants Breached their Fiduciary Duty by Failing to Use All the Tools Available to Reduce Fees While Providing the Same Investments**

191.    Defendants also breached their fiduciary duties by failing to consider collective investment trusts and separate accounts as alternatives to the mutual funds in the Plan.

192.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their

costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

193. Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[20] Indeed, as of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

194. Thus, a prudent fiduciary managing a plan with over $1 billion in assets will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

[20] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts is identical to those held by the mutual fund. Use of CITs in DC Plans Booming; CITs Gaining Ground. And because collective trusts contract directly with the Plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/Tools/Function/Trust/Documents/ABA%20Primer%20on%20Bank%20Collective%20Investment%20Funds.pdf.

195.    Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

196.    Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees.  Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund.   By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds."  U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").

197.    Defendants were at all times during the Class Period aware of the benefits of these alternative investment vehicles.  Defendant M&T is the ultimate parent of Wilmington Trust Fiduciary Services Company, which serves as the trustee and investment adviser of a series of collective trusts known as the Wilmington Trust Funds.  These proprietary collective trusts are designed exclusively for employer-sponsored retirement plans.  Defendant M&T is also the ultimate parent of additional Wilmington subsidiaries that provide trustee and investment advisory services for collective trust portfolios associated with other money management firms. An example is the Diamond Hill Large Cap Portfolio, part of the Wilmington Trust Collective Investment Trust, serviced by Wilmington Trust, N.A.

198.    Many investment strategies utilized in mutual funds in the Plan were also utilized in M&T's affiliated collective trusts—at lower costs to investors.  The Diamond Hill Large Cap

Value Fund, Wilmington Multi-Manager Real Asset Fund, Wilmington Multi-Manager International Fund, Wilmington Short-Term Bond Fund, Wilmington Mid Cap Growth Fund, Wilmington Broad Market Bond Fund, and Wilmington Small-Cap Strategy Fund each utilized a strategy available to the Plan during the Class Period at lower cost through a collective trust serviced by the Company Defendants. The collective trust versions were generally about half the cost of the mutual fund versions. Yet, instead of offering Plan participants the lower cost collective trust versions, Defendants retained the higher cost mutual funds as the exclusive way for participants to access these investment strategies.

199.   Defendants opted to offer the higher-cost proprietary mutual funds because of the benefit they return to Defendants and their affiliated companies. The mutual fund versions of Plan investments offered no material service or other advantage to Plan participants over the collective trust versions. The Plan was obligated to provide the same fee, performance, and account information to participants for collective trusts as mutual funds. The only material difference was fees.

200.   Defendants' failure to replace the proprietary mutual funds in the Plan with collective trusts, where such collective trusts were made available by M&T and its affiliates to other investors, has resulted in significant losses to the Plan (in the form of excess fees) over the course of the Class Period.

201.   Defendants also failed to adequately investigate the availability of CITs for non-proprietary mutual funds in the plan. Defendants' failure to investigate the use of collective trusts has been particularly harmful in the context of the T. Rowe Price mutual funds held within the Plan. Since 2010, the Plan has held between $400 and $700 million in nine different T. Rowe Price mutual funds. T. Rowe Price offers all but one of these funds as a collective trust

vehicle. The fees within the collective trust investments would have provided significant cost savings to Plan participants. For example, the Plan has at all times had hundreds of millions of dollars invested in five of T. Rowe Price's target-date funds.  The Plan paid between 56 to 75 bps within these target-date funds. T. Rowe Price advertises the exact same investments in collective-trust form for between 43 and 47 bps. Switching to collective trust target-date investments therefore would have saved Plan participants millions of dollars in investment management fees, yet participants were left in more costly mutual funds that provided identical investment management services.

202.    Numerous companies with defined contributions plans with over $1 billion in assets (like the Plan) and who use T. Rowe Price as a recordkeeper (like the Plan)—including JetBlue, Rite Aid, Costco, Thermo Fisher Scientific, Entergy, Eastman Kodak, Sanofi-Aventis, Sempra Energy, Hyatt Corporation, CACI International, and Syngenta Corporation—have all switched from using T. Rowe Price mutual funds to using collective trusts for their target-date investments, no doubt because of the massive cost savings for participants realized by this switch.  The actions of the fiduciaries of these other, similarly situated plans demonstrate that "a prudent fiduciary in like circumstances would have acted differently" than Defendants.  *PBGC*, 712 F.3d at 720.

203.    The Plan also incurred excess fees due to Defendants' failure to adequately investigate the availability of separate accounts in the same investment style of non-proprietary mutual funds in the Plan.  For example, the Plan offers the Sterling Capital Midvalue Fund as a designated investment alternative at a cost of 93 bps.  But Sterling Capital would have offered the same investment as a separate account for approximately 70 bps, based on 2014 year-end values.  *See* Sterling Capital Form ADV, Part II, at 11 (Jan. 12, 2016), available at

http://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRS N_ID=350970.  Because of the Plan's size, it could have reaped considerable cost savings by using a separate account, but Defendants again failed to investigate this option.

204.    As another example, the Plan offers a variety of T. Rowe Price funds, including the Equity Income Fund at 66 bps, the Growth Fund at 68 bps, and the Small Cap Value Fund at 96 bps.  But T. Rowe Price offers the exact same investment vehicles as separate accounts for much less: approximately 49 bps for the Equity Income Fund, approximately  47 bps for the Growth Fund, and for approximately 63 bps for the Small Cap Value Fund, all based on 2014 year-end values.  *See* T. Rowe Price Associates, Inc. Form ADV, Part II at 7, 8 (Mar. 30, 2016), *available  at*  http://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx? BRCHR_VRSN_ID=349646.  Because of the Plan's size, it could have reaped considerable cost savings by using a separate account format for the Plan assets invested in T. Rowe Price mutual funds, but Defendants (once again) failed to investigate this option.

205.    Moreover, unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation.  Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here. Accordingly, the fee savings that Defendants could have obtained for the Plan were even greater than the amounts reflected in the investment managers' advertised fee schedules.

206.    In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of separate account and collective trust alternatives

to the mutual funds held by the Plan, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

**(8)      Defendants Breached their Fiduciary Duty to Avoid Conflicts of Interest**

207.     Defendants have a conflict of interest that prevented them from carrying out their fiduciary duties in a manner consistent with ERISA.

208.     Despite this conflict of interest, Defendants have failed to appoint independent fiduciaries who could carry out their duties to protect the Plan's participants in a manner consistent with ERISA or to take other appropriate steps to address the conflict.

209.     At all times, Defendants have acted in the interest of M&T and its affiliates, and have not acted solely in the interests of the Plan participants as is required of fiduciaries under ERISA.

**(9)      Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses.**

210.     Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

211.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

212.     Recordkeeping expenses can be paid in three ways: the costs can be paid by the plan sponsor; they can be charged directly to participants in the form of a quarterly or annual fee;

or they can be paid indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both).   Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, as a percentage of the Plan's assets in each fund.  Because these revenue sharing payments come out of the investment management fees participants are paying within each Plan investment, participants bear the financial burden of revenue sharing payments.

213.    In their 2004 recordkeeping contract with T. Rowe Price, Defendants agreed to use a combination of two of these methods to pay recordkeeping expenses.  The employer agreed to pay a flat fee of $25 per year, and participants paid the remaining costs through revenue sharing, with Defendants agreeing to allow T. Rowe Price to retain all revenue sharing payments as compensation without any cap on the amount of that compensation.  At the time of that agreement, the Plan had less than $800 million in assets, less than $500 million of which made revenue sharing payments.

214.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

215.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-

based revenue sharing to the recordkeeper, prudent fiduciaries demand that all revenue sharing payments be paid into a revenue sharing account, with an agreement that the revenue sharing payments to the recordkeeper do not exceed an agreed-upon level, with all revenue sharing payments exceeding that level refunded to participants. By 2010, among plans the size of the Plan by participants and assets, the prudent and widespread practice for fiduciaries of plans employing a revenue sharing model was to use a revenue sharing account in the manner described above.  By 2010, T. Rowe Price had set up such an account for many of its other customers, and had the ability to refund excess revenue sharing payments directly to participants.

216.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a benchmark analysis on a regular basis, typically annually, and a Request for Proposal ("RFP") process at reasonable intervals, typically every three to five years, but, as common sense would dictate, if the benchmarking analysis reveals that the Plan's recordkeeping costs are not in line with prevailing market rates for similarly-sized plans, a prudent fiduciary will initiate an RFP process immediately.

217.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs.  Ann Marie Odrobina, as the Committee's Rule 30(b)(6) designee, testified that no requests for proposal for recordkeeping services have been performed since T. Rowe Price was selected as the Plan's recordkeeper in 2004. During that time the Plan's size has approximately tripled, and excluding company stock, has approximately quintupled.

218.    Given the economies of scale in play at recordkeeping, the Plan's growth would have alerted a prudent fiduciary to two potential issues: one, that any per-participant fee negotiated when the Plan was significantly smaller likely no longer represented the best deal the

Plan could obtain, considering its increased bargaining power; and, two, that asset-based fees (that is, revenue sharing) were likely increasing given the increasing size of the asset base. By the end of 2010, nearly $800 million of the Plan's assets were making revenue sharing payments, a 60% increase since the recordkeeping agreement was negotiated six years earlier.  Given the Plan's steady growth, and the general reduction in recordkeeping expenses across the marketplace, a prudent fiduciary would have conducted a request for proposal to ensure that the price charged for recordkeeping remained competitive, would have monitored asset-based fees along with direct compensation, and would have insisted on a rebate to the Plan for any asset-based fees that exceeded the negotiated recordkeeping fee.

219.    Based on Plaintiffs' investigation and analysis, a normal range of recordkeeping fees for a plan the same size as the Plan (approximately 15,000 to 21,000 participants with account balances throughout the putative class period) would have been between $45 and $50 per participant from 2010 to 2012, and lower in ensuing years.

220.    The recordkeeping fees paid by the Plan to T. Rowe Price greatly exceeded this reasonable range. A presentation given to the Committee in May 2013 (the only time the Committee appears to have examined such fees) shows that in 2010, while the Plan sponsor paid $416,000 in direct payments to T. Rowe Price, participants paid over four times as much, with T. Rowe Price receiving $1,802,000 in revenue sharing payments that year. For the 16,240 participants in the Plan that year, this amounted to $25 per participant paid by the plan sponsor M&T Bank, and an average of $116.57 paid per participant. Had Defendants adhered to their fiduciary duties and obtained a comparable level of recordkeeping services but at market rates, approximately $1.4 million of those revenue sharing payments, approximately $90 per participant, would have been refunded to participants' accounts.  Similar revenue sharing rebates

would have been procured in 2011 and 2012 had Defendants prudently managed recordkeeping expenses, after which the losses only grew for another four years until Defendants renegotiated their agreement with T. Rowe Price to cap T. Rowe Price's compensation at $40 per participant, three to four times lower than what the Plan had paid the prior year.

221.    A prudent fiduciary would have observed the excessive fees being paid to T. Rowe Price and taken corrective action. However, the Committee's minutes reflect no such corrective action, or even a discussion about how to manage the Plan's recordkeeping expenses, until at least 2016. Instead, the gross overpayments continued, and appear to have been retained by T. Rowe Price, rather than being returned to Plan participants.[21]

222.    Defendants' failures to monitor and control T. Rowe Price's recordkeeping compensation cost the Plan over $1 million per year and constituted separate and independent breaches of the duties of loyalty and prudence.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted WTIA, the Board Defendants, and the Committee Defendants)

223.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this First Amended Consolidated Complaint as if fully set forth herein.

---

[21] Ann Marie Odrobina, as the Committee's 30(b)(6) designee, testified that she believes all revenue sharing paid from the Plan's investments from 2004 to 2016 has been "[s]itting in a holding account at T. Rowe Price." Yet it appears that Ms. Obrodina misunderstood the Plan's recordkeeping agreement, because while the Plan's recordkeeping agreement was amended in 2011 to create a revenue sharing account, referred to in the contract as an "Administrative Account", under the terms of that amendment, only one of the Plan's investments—the Wilmington Stable Value Fund—was to deposit its revenue sharing payments into the Administrative Account. It was not until October 1, 2016 that the recordkeeping contract was amended again to require that revenue sharing payments made by the Plan's other thirty investments be paid into the Administrative Account. But even if revenue sharing was not paid to T. Rowe Price, allowing such revenue sharing payments to sit in a holding account for over a decade, rather than being paid back to participants, would also constitute a breach of fiduciary duty.

224.    At all relevant times, WTIA and the Board and Committee Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets, or they rendered investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the Plan.

225.    As fiduciaries of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

226.    WTIA, the Board Defendants, and the Committee Defendants breached these fiduciary duties in multiple respects as discussed throughout this First Amended Consolidated Complaint.  WTIA, the Board Defendants, and the Committee Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants.  Instead, WTIA, the Board Defendants, and the Committee Defendants selected and retained M&T-affiliated mutual funds as designated investment alternatives for the Plan to drive revenues and profits to M&T and its affiliates. WTIA, the Board Defendants, and the Committee Defendants failed to consider prudent alternatives to those proprietary funds, failed to adequately monitor those proprietary funds, and retained them as investment options in the Plan despite the high cost and poor performance history of those proprietary funds in relation to other comparable investments, and despite the fact that M&T-affiliated funds are not generally utilized by other plans.  WTIA, the Board

Defendants, and the Committee Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, WTIA, the Board Defendants, and the Committee Defendants failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  WTIA, the Board Defendants, and the Committee Defendants likewise failed to monitor or control the grossly-excessive compensation being paid by participants for recordkeeping services.

227.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had WTIA, the Board Defendants, and the Committee Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

228.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), WTIA, the Board Defendants, and the Committee Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for WTIA, the Board Defendants, and the Committee Defendants' breaches as set forth in their Prayer for Relief.

229.    WTIA and each of the Board and Committee Defendants knowingly participated in each other's breaches, knowing that such acts were a breach, enabled such other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Board Defendants and the Committee Defendants)**

230.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this First Amended Consolidated Complaint as if fully set forth herein.

231.    The Board Defendants had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.  In light of this authority, the Board Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations consistent with ERISA, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not meeting their fiduciary obligations.

232.    The Committee Defendants had authority to appoint investment advisors on behalf of the Plan, and retained WTIA as the Plan's investment advisor pursuant to that authority. In light of that authority, the Committee Defendants had a duty to monitor any WTIA to ensure that WTIA was adequately performing its fiduciary obligations consistent with ERISA, and to take prompt and effective action to protect the Plan in the event that the WTIA was not meeting its fiduciary obligations.

233.    The Board Defendants and Committee Defendants breached their fiduciary monitoring duties by, among other things:

        (a)    Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of their appointees' imprudent actions and omissions;

(b)      failing to monitor their appointees' fiduciary processes and the process by which Plan investments were evaluated, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein in violation of ERISA; and

(c)      failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

234.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Board Defendants and the Committee Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

235.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Board Defendants and Committee Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor their appointees.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**THIRD CLAIM FOR RELIEF**
**(Prohibited Transactions with a Party in Interest**
**(Asserted against All Defendants)**

263.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this First Amended Consolidated Complaint as if fully set forth herein.

264.    As Plan employers, fiduciaries, and/or service providers, the Company Defendants are parties in interest under 29 U.S.C. §§ 1002(14).

265.    As described throughout the First Amended Consolidated Complaint, Defendants caused the Plan to utilize high-cost investments managed and otherwise serviced by Company Defendants that generated revenue for the Company Defendants. On a periodic basis throughout the statutory period, the Company Defendants performed various services for the Plan and were paid fees and expenses on a periodic basis from the assets being held for the Plan.  Accordingly, these transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest, and a direct or indirect transfer of assets of the Plan to a party in interest, in violation of 29 U.S.C. §§ 1106(a)(1)(C), (D).

266.    Based on the foregoing facts and the other facts set forth in this First Amended Consolidated Complaint, Defendants knowingly caused the Plan to engage in prohibited transactions for the benefit of the Company Defendants, who are all parties in interest, in violation of 29 U.S.C. § 1106(a)(1).

267.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars in investment management fees and other expenses in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

268.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all profits received and/or earned by the Company Defendants in connection with the prohibited transactions.

## JURY DEMAND

269.     Plaintiffs demand a jury.

## PRAYER FOR RELIEF

280.     WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rules 23(b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the

Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

  F.  Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

  G.  An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

  H.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

  I.  An award of pre-judgment interest;

  J.  An award of costs pursuant to 29 U.S.C. § 1132(g);

  K.  An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

  L.  Such other and further relief as the Court deems equitable and just.

Dated: August 15, 2019

        Respectfully submitted,

        By: s/Kai Richter
         Kai Richter, MN Bar No. 0296545*

        **NICHOLS KASTER, PLLP**
        Paul J. Lukas, MN Bar No. 022084X*
        Carl F. Engstrom, MN Bar No. 0396298*
        Brock J. Specht, MN Bar No. 0388343*
        Jacob Schutz, MN Bar No. 0395648*
        Chloe A. O'Neill, MN Bar No. 0398257*
         *admitted in W.D.N.Y.
        4600 IDS Center
        80 S 8th Street
        Minneapolis, MN 55402

Telephone: 612-256-3200
Facsimile: 612-338-4878
Email: krichter@nka.com
    lukas@nka.com
    cengstrom@nka.com
    bspecht@nka.com
    jschutz@nka.com
    coneill@nka.com

*Interim Co-Lead Counsel*

**KESSLER TOPAZ MELTZER
    & CHECK, LLP**
Mark K. Gyandoh (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email:  eciolko@ktmc.com
Email:  mgyandoh@ktmc.com
Email:  jsjohnson@ktmc.com

*Interim Co-Lead Counsel*

**TREVETT CRISTO**
Lucinda Lapoff, Esq.
2 State Street, Suite 1000
Rochester, NY 14614
Tel:  (585) 454-2181
Fax:  (585) 454-4026
Email:  clapoff@trevettcristo.com

*Interim Local Counsel*